**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

_____

| | | |
|---|---|---|
| **GREG ALLEN, *et al.*,** | ) | **Civil Action No.** |
| | ) | **IP02-C-0902-Y/K** |
| **Plaintiffs,** | ) | |
| | ) | **The Honorable** |
| **v.** | ) | **Richard L. Young** |
| | ) | |
| **INTERNATIONAL TRUCK AND ENGINE** | ) | **Magistrate Judge** |
| **CORPORATION, f/k/a NAVISTAR INTERNATIONAL** | ) | **Tim A. Baker** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR SUPPLEMENTAL MOTION FOR SANCTIONS**

## I.   INTRODUCTION

Plaintiffs' March 10, 2006, "Motion for Sanctions Based on Statements Made at February 1, 2006, Hearing Before Magistrate Judge Baker" suggested that International's counsel made untrue statements to the Court regarding their role in an undercover investigation at the Indianapolis Engine Plant.  On April 19, 2006, the Court allowed discovery regarding their involvement. Discovery has confirmed three categories of wrongful activity by International and its counsel:  (1) unethical contact with Named Plaintiffs and Absent Class Members ("Class Members") during the investigation (Indiana Rules of Professional Conduct ("RPC") 4.2, 4.3, 5.3, 8.4); (2) untrue statements made to the Court relating to the investigation (RPC 3.3, 4.1); and (3) discovery violations relating to the investigation (Fed. R. Civ. P. 37(c)).

Documents produced by International on September 30, 2005, revealed that it placed two undercover investigators at the Engine Plant, and that they spoke with Named Plaintiffs about the lawsuit generally ("So, how is the lawsuit coming along?"), and about the specific subject matter of the lawsuit (*i.e.*, racial incidents including graffiti, slurs, and nooses).[1]  Those documents also revealed that the investigators failed to advise the Named Plaintiffs and Class Members that they were agents of International's lawyers, and that they lied to them about the purpose of their conversations.[2]  (*See* CM/ECF Docket 150, Exhibit A to Plaintiffs' Reply in Support of Motion for Sanctions; *see also* CM/ECF Docket 153.)  International's General Counsel, Robert Boardman, admitted directing the undercover investigation.  (CM/ECF Docket 103 at Ex. 1, ¶ 2.)  It also became clear that International's outside counsel, Littler Mendelson ("Littler")  partners David Parsons, Shanthi Gaur, and Garrison Phillips were involved in reviewing the investigators' reports,

---

[1]  Rule 4.2 bars attorneys and their agents from communicating on the subject of the lawsuit with a party who is represented by another lawyer without that lawyer's consent.

[2]  Rule 4.3 requires lawyers (and their agents) who are dealing with an unrepresented person to make clear who they are and what their true interests are.  (Before certification, the prospective Class Members are considered "unrepresented.")  Rule 8.4 bars lawyers and their agents from using dishonesty, fraud, deceit, or misrepresentation in representing clients.

discussing strategy, and interviewing the investigators.[3]  (Ex. 10.)  Recent discovery has uncovered details of these attorneys' involvement and the fact that in-house counsel Gary Savine was also actively involved.  All of these attorneys are experienced practitioners who have no excuse for failing to honor their ethical obligations.

As noted in Plaintiffs' earlier briefs, and as discussed in more detail below, the Rules of Professional Conduct impose higher duties on attorneys – and their agents – than on non-lawyers acting independently.  For example, if a non-lawyer uses deceit in making a non-consensual tape-recording (in a state that does not criminalize such conduct), or contacts represented parties to discuss a lawsuit outside their counsel's presence, this may not be unlawful.  The same acts by an attorney or the attorney's agent are forbidden.  Further, attorneys who learn that an agent has used deceit or has engaged in other acts that attorneys may not do but fail to take steps to prevent it are responsible for the agent's misconduct, as discussed below.

## II.   FACTUAL BACKGROUND OF THE UNDERCOVER INVESTIGATION AND CONCEALMENT OF EVIDENCE FROM PLAINTIFFS AND THE COURT

### A.   Engagement of the Undercover Investigators by Boardman, Parsons, and Their Agents

In the Fall of 2002, Boardman decided to conduct an undercover investigation relating to International's exposure to liabilities from this lawsuit.  (Exs. 101, Boardman Dep. at 38; 55.)  He discussed this undertaking with Littler attorney Parsons, who was involved from the outset.  (Ex. 102, Parsons Dep. at 5-6.)  On November 13, 2002, six weeks before the investigation began, Parsons wrote a 15-page memorandum to Boardman, titled "Undercover Investigation Guidelines."[4]

---

[3]  Rule 5.3 obligates lawyers to take affirmative steps to instruct their assistants, including investigators, to refrain from doing what the lawyers themselves can not ethically do.

[4]  International initially withheld this document and did not even reveal its existence until May 15, 2006, when it served a privilege log.  (Ex. 103.)  On May 17, 2006, Plaintiffs orally moved to compel its production, and the Court ordered that certain pages be produced in redacted form.  The date of the document was redacted when it was produced, but the privilege log states that it was dated November 13, 2002.  (*Id.*)

(Ex. 82.)  Parsons' memorandum urged that the investigators "should be hired by either International's in-house counsel or by Littler," and that they "work under the direct supervision and direction of counsel."  (*Id*. at 2.)  Parsons also directed *how* the investigators should conduct the investigation, instructing that they use "passive" methods.  (*Id*.)  Parsons insisted that International not "identify the plaintiff-employees in the current lawsuit and [should] give minimal practical direction to the investigators."  (*Id*. at 15.)  The portions of the memorandum produced by International give no indication that Parsons advised Boardman that in an attorney-directed investigation (like this one), applicable ethics rules require that the investigators affirmatively be instructed *not* to make false representations to Named Plaintiffs or Class Members.

On November 14, 2002, Parsons wrote another memorandum to Boardman, titled "Proposed authorization language for retaining investigators," for International's Board of Directors to use in authorizing the investigation.  Parsons' proposed language stated that an investigation should be launched due in part to concerns regarding potential "exposure" from "the recent class action lawsuit in federal court."  (Ex. 54.)  The Board approved the investigation.  (Ex. 55.)

Boardman then met with Ralph Fussner, the "number two guy at NASS," and instructed how the investigation should proceed.  (Ex. 101 at 90-91.)  Boardman told Fussner to try to learn the identity of the "graffiti artists," and to report on the racial environment at the plant.  (*Id*. at 91.)  He told Fussner about the *Allen* lawsuit, but he did not tell him that the investigators should avoid speaking with the Named Plaintiffs, or that they must avoid giving false information since they were agents of International's counsel.  (*Id*. at 92-94, 122-25.)  Boardman thus followed Parsons' advice to "give minimal practical direction to the investigators."  (Ex. 82.)

Boardman passed "operational control" of the investigation to John Martinicky, International's Director of Corporate Security, whom Boardman authorized to give subsequent directions to the investigators within his original guidelines.  (Ex. 101 at 123-24.)  Boardman and Savine typically issued follow-up directions to the investigators through Martinicky, who relayed

them to NASS employee Wayne Carver, who then passed them on to investigators Dante Clay and Daniel Mace.  (Exs. 41; 42; 57; 101 at 139-40.)

**B.      Oversight of the Undercover Investigation by In-House Counsel, Littler Mendelson, and Their Agents**

The investigation began in January 2003, and continued through May 2004.  Each investigator created daily reports documenting in detail the events of the day, such as conversations with Named Plaintiffs and Class Members on subjects such as racial graffiti, racial slurs, nooses, and other racial incidents.  (*See* CM/ ECF Docket 153.)  During the 17-month investigation, Parsons reviewed the daily reports at least twenty-two times, on 2/28/03, 3/5/03 (Ex. 47); 5/8/03, 5/27/03, 6/17/03, 6/23/03 (Ex. 48); 7/29/03, 8/8/03, 8/22/03, 9/1/03, 9/18/03 (Ex. 10); 10/8/03, 12/7/03 (Ex. 49); 1/5/04, 1/16/04, 1/23/04, 2/18/04 (Ex. 50); 3/2/04, 3/22/04 (Ex. 51); 4/16/04 (Ex. 52); and 5/5/04, 5/18/04 (Ex. 53).  (Ex. 102 at 20-21, 28-29, 36-37, 66.)  Boardman also reviewed the daily reports regularly, and gave copies to Savine.  (Ex. 101 at 94-95.)

Savine created written summaries of the daily reports.  (Ex. 104, Gaur Dep. at 6-7; Exs. 40; 58; 59.)  In the Summer of 2003, Littler partner Gaur reviewed the daily reports and helped Savine prepare summaries.  (Ex. 104 at 6-7, 13-14.)  Gaur admitted that the reports she reviewed showed that an investigator had spoken to Named Plaintiffs Gwen Moore and JoAnn Norris on the subject of the lawsuit.  (Ex. 104 at 7-8.)  Savine's and Gaur's summaries expressly noted conversations with Named Plaintiffs.  (Exs. 40; 104 at 13-14.)  Although the investigators' daily reports referred to Moore and Norris as "Gwen LNU" and "JoAnn LNU," Savine and Gaur added their last names, Norris and Moore, to the summaries.  (Ex. 40.)  Gaur admitted she knew they were Named Plaintiffs.  (Ex. 104 at 14-15.)

When Gaur learned that the investigators had spoken to Named Plaintiffs, she asked a Littler associate, Marni Helfand, to research the issue.  (Ex. 104 at 7-8.)  Helfand did so with assistance from Littler partner Phillips, (Exs. 104 at 8-10; 105, Phillips Dep. at 8-11), and that research was

reviewed by Parsons and sent to Savine.  (Exs. 10, entries for 7/11/03, 7/14/03; 104 at 8-12.)[5]  Gaur did not recall ever urging anyone to tell the investigators not to speak with Named Plaintiffs about the lawsuit.  (Ex. 104 at 9, 12.)

Boardman admitted he learned that an investigator had spoken to Named Plaintiffs about the lawsuit when he read the daily reports, and that he took no steps to ensure that the contacts cease.  (Ex. 101 at 94-96, 102-06.)  All he did was to "take a mental note" of the situation.  (*Id*. at 105.)  He never gave instructions that the investigators refrain from making false statements to Named Plaintiffs and Class Members, even though he knew it was their plan to do so.  (*Id*. at 103-05, 122-23.)

As for Parsons, although he would not admit knowing about the contacts with Named Plaintiffs, the recently-produced documents prove he knew.  First, Parsons read the daily reports throughout the investigation.  (*See* p. 4 above.)  Second, Parsons read Savine's and Gaur's summaries describing these contacts.  (Exs. 102 at 71-76; 10, entries for 07/10/03, 08/08/03; 40; 59.)  Third, on July 14, 2003, Parsons read and edited Helfand's and Phillips' research memorandum that, among other things, "addressed the issue of the contact with the Named Plaintiffs."  (Exs. 10; 104 at 11.)  Fourth, Parsons met with Boardman, Savine, and others on July 14, 2003.  (Ex. 10.)  Savine's agenda for the meeting, titled, "Talking Points for 7/14 Meeting with SBB, DP, RAB, PJT re NASS Investigation," (Exs. 38; 102 at 83), listed "DC's [investigator Dante Clay] conversations with Gwen Moore and JoAnn Norris."  (Ex. 38.)  Parsons reviewed those "talking points" before the July 14 meeting.  (Ex. 10, entry for 7/10/03.)  Fifth, Parsons reviewed and edited the September 2, 2003, memorandum from Phillips to Savine that discussed the

---

[5]  Plaintiffs have never seen this memorandum; it was withheld on the ground of privilege.  (Ex. 103, privilege log entry Bates-numbered IT-INVEST/0080-0086.)

investigator's "conversation with any Plaintiff."  (Exs. 81 at IT-INVEST/0684-85; 105 at 12-15.)[6]

Finally, Phillips admitted that before he interviewed the investigators, he probably spoke with

Parsons about the investigators' contacts with the Named Plaintiffs on the subject of the lawsuit.

(Ex. 105 at 67-68.)  Even though it is clear that Parsons knew about these improper contacts,

Parsons did nothing to make them stop.  (Ex. 102 at 13, 91, 76-77, 88.)  Nor did he ever advise

Boardman that his agents could not use falsehoods and deception to induce Named Plaintiffs and

Class Members to talk.  (Exs. 101 at 123; 104 at 11-12, 46-47.)

### C.    Interview of and Further Directions to the Undercover Investigators by Counsel

On July 15, Parsons met with Phillips about Phillips' plans to interview the investigators.

(Ex. 10, entries for 7/15/03.)  Over the next few weeks, Phillips prepared outlines for the interviews,

and on August 12, 2003, Phillips met with Parsons to discuss the upcoming interviews.  (Ex. 10,

entries for 7/21/03, 7/23/03, 8/5/03, 8/6/03, 8/8/03, 8/12/03.)  On August 13, 2003, Phillips and

Savine interviewed the investigators for the entire day.  (Exs. 10; 105 at 6-7.)

Phillips and Savine each made notes of the interviews, (Exs. 39; 61; 83; 84; 85), which

prove both attorneys knew the investigators had been instructed "to get as much information out of

[the Named Plaintiffs] as possible about their basis for the lawsuit."  (Exs. 39 at IT-INVEST/0054;

61 at LM0020; 105 at 51-52.)  They knew that NASS supervisor, Wayne Carver, had told the

investigators "to specifically address the lawsuit with the Plaintiffs" (Exs. 61 at LM0020; 105 at 51-

52), and not merely to discuss "race relations and [the] history of [the] plant generally."  (Ex. 39 at

 IT-INVEST/0054.)  Phillips' notes record that Clay had spoken to Named Plaintiffs JoAnn Norris

and Gwen Moore, and that Clay "[t]ried to get specific information from both of them. . . ."  (Exs.

61 at LM0029; 105 at 61.)  Both attorneys also noted that Carver had directed Mace to "get in close

---

[6]  This document was a subject of the oral motion to compel certain documents withheld
by International.  The Court ordered that certain pages of the document be produced in redacted
form.  The date and title of the document were redacted when it was produced, but the date and
title are listed on the privilege log.  (Ex. 103.)

with" Named Plaintiff Robert Coleman. (Exs. 39 at IT-INVEST/0048; 61 at LM0005; 105 at 31-33.) Savine's e-mail to the Littler attorneys states, "its [sic] possible that Carver's instruction to contact Coleman came from someone either in Security or Law at International." (Ex. 57.)

None of International's attorneys made any efforts to stop the improper contacts by the investigators, who were unquestionably their agents; in fact, they ratified and endorsed them. For example, on August 13, Savine and Phillips gave the investigators explicit directions to follow up on information they had learned. (*See* Ex. 39, directions given by Savine and Phillips, *e.g.*, IT-INVEST/0050: "Gary/Garrison - Instructed DM [Daniel Mace] to follow up on lead," instructing Mace to "try to get [Class Member Milburn Chandler] to cite examples of racist conduct," IT-INVEST/0052; *see also* Exs. 61 at LM0012; 105 at 40-45.) Class Member Twala Smith had told Clay that certain Named Plaintiffs may have "credibility" problems, and Savine and Phillips instructed Clay to "Follow-up with Twala who she thinks have credibility problems and the source of the problems." (Exs. 61 at LM0024; 39 at IT-INVEST/0057; 105 at 56-59.)[7] When Class Member Emmanuel Griffin told Clay that he had been spat on and call "nigger," Savine and Phillips instructed Clay to "follow up on who spat and used N-word." (Exs. 39 at IT-INVEST/0057; 61 LM0024-25.) Savine and Phillips also instructed Clay to follow up with Class Member John Wade about certain racial incidents. (Ex. 84 at 10.)

The investigators used "digital recorders" to record conversations with International employees. (Exs. 83 at 13; 101 at 132-33; 105 at 92-94; 60 at 3.) Savine and Phillips discussed the recordings with the investigators in August 2003. (Ex. 83 at 13.) By that time, International knew that investigator Mace had recorded a May 2003 conversation with white employee Scott Butterfield, where Butterfield mentioned "a nigger problem and they will never go away." (Ex. 60.)

---

[7] This direction is among many instructions documented in Savine's summaries. (Ex. 78 at IT-INVEST/0718.) In a December 2, 2004, e-mail to Gaur, Savine explained that the notations "GNS/GLP instructed . . ." represent "follow up instructions that Garrison and I issued to the undercover investigators during our August 03 interviews." (Ex. 78.)

Mace also recorded Butterfield stating, "black people were created because of homosexual acts between men, since the sex took place in the ass and shit is black, God created black people and damned them forever." (*Id.*) An Incident Report, noting that the conversation was recorded, was faxed by NASS to International in May 2003. (*Id.*) At his deposition, Boardman said that he "didn't have any problem" with the investigators secretly recording conversations with International employees. (Ex. 101 at 133.) Savine and Phillips apparently never told the investigators to stop secretly recording conversations either. (Ex. 105 at 92-94.)

> **D.** **The End of the Undercover Investigation**

On September 2, 2003, Phillips wrote a memorandum about the investigator interviews advising International to "be certain to allow sufficient time for investigators Mace and Clay to gather as much of the follow-up information developed during our interviews. . . . [w]e should continue to work through the normal chain of command to ensure that both Mr. Mace and Mr. Clay are progressing towards those identified follow-up issues and that they have sufficient time to gather that information." (Ex. 81 at IT-INVEST/0684.) The investigation lasted eight more months, through May 2004. Plaintiffs did not learn it had happened until June 2004. For that 17-month period, International continued to conceal all documents relating to the investigation, which deprived Plaintiffs of any ability to follow up on leads while the evidence was fresh. When Plaintiffs insisted on production of investigation-related documents, International refused. After Plaintiffs' February 2005 motion to compel, the Court on May 9, 2005, ordered International to produce the NASS reports, which International finally did in September 2005. Further documents were not provided to Plaintiffs until May 2006, and no privilege log was ever produced by International until May 15, 2006.

## III. INTERNATIONAL'S ATTORNEYS VIOLATED THE RULES OF PROFESSIONAL CONDUCT

Discovery shows that the NASS investigation was directed and ratified by at least five attorneys: Boardman, Savine, Parsons, Gaur, and Phillips. These attorneys violated Indiana Rules

of Professional Conduct 4.2, 4.3, 5.3, and 8.4, and/or their Illinois counterparts.  (Boardman and

Savine, licensed in Illinois, were not admitted to this Court; the Littler attorneys were.)

A.     **The Attorneys Directed and Ratified the Investigators' Contacts with the Named Plaintiffs**

1.     **The Contacts With Named Plaintiffs Violated Rule 4.2.**

Under Rule 4.2, "a lawyer shall not communicate about the subject of the representation

with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer

has the consent of the other lawyer or is authorized by law or a court order."  The purpose of Rule

4.2 is to preserve the "integrity of the lawyer-client relationship by prohibiting contact, absent

consent or legal authorization, with the represented party."  *In re Air Crash Disaster Near*

*Roselawn*, 909 F. Supp. 1116, 1121 (N.D. Ill. 1995) (counsel sanctioned for sending questionnaire

to defendant's employees).  Rule 4.2 is "designed to prevent counsel from overreaching and

exploiting uncounseled employees into making ill-considered statements or admissions."  *Id.*

(citation omitted).  Put more simply, "[l]awyers (and investigators) cannot trick protected

employees into doing things or saying things they otherwise would not do or say."  *Hill v. Shell Oil*,

209 F. Supp. 2d 876, 880 (N.D. Ill. 2002).  Further, "they cannot normally interview protected

employees" about facts related to the lawsuit.  *Id.*

There is no doubt that Rule 4.2 was violated here.  On at least six occasions the

investigators spoke with Named Plaintiffs on the subjects of this lawsuit.[8]  On two of those

occasions, the investigator specifically asked about the lawsuit ("So how is the lawsuit coming

---

[8]  *See* contacts with Moore on 2/18/03 (lawsuit mentioned), 4/29/03 (lawsuit mentioned), and 12/3/03; and Norris on 1/14/03, 3/13/03, 9/25/03, and 12/3/03.  (CM/ECF Docket 150, Ex. A.)  International has argued that the 12/3/03 conversations with Moore and Norris were not on the subject of the lawsuit, but it is clear from the investigator's notes that he was attempting to bait them into talking about the lawsuit:  "I brought up the story of the black guy who was killed in Cincinnati by the police to see where it could take me."  (*Id.*)

along?")  (*See* fn. 8 above.)  Defendant admits that these conversations touched on subjects underlying this litigation.  (Ex. 106.)[9]

### 2. The Attorneys Failed to Instruct their Investigators Not to Contact Named Plaintiffs, in Violation of Rule 5.3.

Despite these blatantly improper contacts, International's attorneys say they did not violate Rule 4.2 because they did not affirmatively "direct" the undercover investigators to seek out the Named Plaintiffs.  Even if this were true,[10] their argument would fail because in a lawyer-led investigation like this, attorneys have an affirmative obligation to give their non-lawyer assistants[11] "appropriate instruction and supervision concerning the ethical aspects of their employment."  Rule 5.3, Comment 1.  "[L]awyers are obligated to take affirmative steps to instruct and supervise their investigators or other assistants to ensure that they are aware of, and ultimately comply with, the lawyer's ethical obligations; in other words, it is incumbent upon an attorney to take all reasonable steps necessary to avoid inadvertent deception or unethical conduct carried out by his assistants or investigators."  *United States v. Smallwood*, 365 F. Supp. 2d 689, 699 (E.D. Va. 2005).  If there were no such affirmative obligation, a lawyer could avoid the ethics rules by having assistants carry out proscribed conduct:

> Were this not so, a lawyer might easily circumvent many ethical obligations through the use of an assistant or investigator who, given only a hint, cunningly perceives that his employer's cause can be aided by engaging in conduct that might be ethically forbidden to the lawyer.  Further, *it would give unscrupulous lawyers an incentive to provide those in charge with only limited ethical direction.*[12]

---

[9]  Investigator Dante Clay also spoke with Named Plaintiff Greg Allen, but not on issues related to the litigation.  (Ex. 120.)

[10]  It is not true; *see* Plaintiffs' Exhibits 39, 57 and 61.

[11]  Rule 5.3 defines non-lawyer assistants as those "employed or retained by or *associated with*" a lawyer.  (Emphasis added.)  Thus, the Littler attorneys cannot evade their ethical responsibilities by arguing that they did not technically employ or retain the investigators.

[12]  Unless otherwise indicated, emphasis in quoted material has been supplied.

*Smallwood*, 365 F. Supp. 2d at 696-97.  For these reasons, *Smallwood* explains, lawyers have "*an affirmative duty*" to make reasonable efforts to ensure that their investigators' conduct is compatible with the lawyers' own obligations.  *Id.* at 697. Under Rule 5.3, lawyers are responsible for their assistants' conduct "if the lawyer orders, *ratifies, or knows of* the conduct at a time when the consequences could be 'avoided or mitigated but fails to take remedial action.'"  *Upjohn Co. v. Aetna Cas. & Sur. Co*, 768 F. Supp. 1186, 1213 (W.D. Mich. 1991).  *See also* Rule 8.4 ("It is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.")

An illustrative case is *In re PMD Enterprises Inc.*, 215 F. Supp. 2d 519 (D. N.J. 2002). There, the plaintiff's attorney hired an investigator to obtain information about the defendant.  The investigator spoke with "a member of [the defendant's] litigation control group and a key fact witness."  *Id.* at 522.  Although the attorney argued that he did not "direct" the investigator to contact this person, the court held that the attorney violated Rules 4.2 and 5.3 because he sent the investigator "out to investigate without informing him that he could not contact members of [the defendant's] litigation control group or informing him who those members were" and because he "failed to properly oversee [the investigator's] investigation or take any measures to ensure that [the investigator] would not run afoul of the Rules of Professional Conduct."  *Id.* at 529.  The court sanctioned the attorney by revoking his *pro hac vice* admission to the court.  *Id.* at 532.

The attorneys here similarly failed to instruct the undercover investigators not to speak with the Named Plaintiffs.  (Exs. 101 at 94-96, 102-06; 102 at 13, 76-77, 88, 91; 104 at 9, 12; 105 at 33-35, 51-52, 68.)  Indeed, before the investigation began, Parsons specifically told International "*not* to identify the plaintiff-employees in the current lawsuit and to give minimal practical direction to the investigators." (Ex. 82.)  While the investigation was in progress, Phillips advised International, "It is beneficial to the credibility of the investigation (and any ethical issues) that neither investigator knew who any of the Plaintiffs were. . . ." (Ex. 81.)  Parsons reviewed and

edited this memorandum.  (*Id.*, last page; Ex. 105 at 14-15.)  Thus, instead of complying with Rule 5.3 by instructing the investigators to adhere to Rule 4.2 by avoiding contact with the Named Plaintiffs, International's attorneys intentionally gave the investigators as little information as possible, knowing that there was a high probability that they would speak with Named Plaintiffs.  It makes sense that the investigators would gravitate toward those who brought the lawsuit, as they did, for these individuals were likely to have the most information about the racial issues at the Engine Plant, which the investigators were sent to investigate.[13]

Although Phillips and Savine knew that the investigators had been instructed to target the Named Plaintiffs on the subject of the lawsuit, (Ex. 39 at IT-INVEST/0054) – an outright violation of Rules 4.2 and 5.3 – they endorsed, ratified and compounded the violation by directing them to get *more* information.  (Exs. 39; 61; 105 at 33-35.)  No attorneys took any action to prevent the investigators' improper contacts with Named Plaintiffs from reoccurring.  Worse, they undertook to steps to cover up the misconduct and to use the wrongfully obtained materials in their defense of this lawsuit.  (*See* above pages 2 fn.4; 6 fn. 6; 6-9; and below pages 15-16, 18-29.)

By failing to instruct the investigators, even after learning about the Rule 4.2 contacts, all five attorneys ratified those contacts.  *See* Rule 5.3(c) ("a lawyer shall be responsible for conduct of [non-lawyers employed or retained by or associated with a lawyer] that would be a violation of the Rules of Professional Conduct if engaged by in by a lawyer if . . . the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved."); *see also Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 698 (8th Cir. 2003) (sanctioning attorneys for Rule 4.2 violation and citing Rule 5.3 in refusing to allow attorneys to shield themselves from responsibility

---

[13]     Although *Smallwood* predicted that attorneys might try an end-run on Rule 4.2 by giving their investigators little or no direction, as International's counsel did here, the *Smallwood* court did not impose sanctions for the violation.  The reasons were: 1) the *Smallwood* investigator's improper contact with a represented party was not "reasonably foreseeable"; and 2) once the *Smallwood* attorneys learned of the improper contact, they instructed the investigator to have no such further contact.  365 F. Supp. at 693, 696-97, 699.

by "passing the buck" to the investigator).  If the attorneys rather than the investigators had

contacted the Named Plaintiffs, they would have violated Rule 4.2.  They cannot avoid

responsibility for the investigators' conduct for they ratified the improper contacts.[14]

### 3.    The Littler Attorneys Were Actively Involved in the Investigation.

There is no dispute here that the investigation was run by attorneys, not non-lawyers acting

on their own.  It is also clear that International sought direction from the Littler attorneys from the

outset of the investigation.  The Littler attorneys provided that advice and were actively involved in

the investigation, even giving follow-up instructions to the investigators.

Although Phillips denies ever instructing the investigators to follow up on leads, the

documents prove otherwise.  (Ex. 105 at 73.)  His own notes of the interviews prove that he and

Savine jointly instructed the investigators to do so.  (Ex. 61 (*e.g.*, LM0024).)  Phillips' September

2, 2003, memorandum to Savine confirms that he gave follow-up instructions to the investigators:

---

[14]    International has relied on *Jones v. Scientific Colors, Inc.*, 201 F. Supp. 2d 820
(N.D. Ill. 2001), to suggest that their investigators' repeated contacts with Named Plaintiffs did
not violate Rule 4.2.  In addition to the fact that *Jones* is short on analysis, in *Jones*, no attorney
admitted "causing" the investigation, as Boardman has here.  In *Jones* the defendant's non-
lawyer president hired the investigators.  *Id.* at 825-26.  *Jones* relied on the principle that a non-
attorney who acts *without the assistance or direction of a lawyer* may contact a party.

> [W]hile neither a lawyer nor a lawyer's investigator or other agent . . . may contact
> a represented non-client, the same bar does not extend to the client of a lawyer or
> the client's investigator or other agent.

*Jones* at 829 (citing Section 99 of the Restatement (Third) of Law Governing Lawyers.)

Even International's own research concluded that, under *Jones*, "counsel may not contact,
*or encourage undercover investigators to contact* opposing parties in a lawsuit."  (Ex. 82 at 15.)
Yet, that is just what International's lawyers did here.  Also of significance, unlike *Jones*, when
International's attorneys learned about the improper contacts, they took steps to use the
information for their advantage in the lawsuit and, contrary to their own conclusion contained in
Exhibit 82 at 15, directed that the investigators go back and obtain even more information.  Also,
unlike *Jones*, where the attorney notified opposing counsel of the investigation *while the
investigation was in progress*, *id.* at 826-28, International did not tell Plaintiffs about the
undercover investigation until it was over, and even then took steps to conceal both the evidence
it had yielded and the involvement of its counsel for more than another year.

"we should be certain to allow sufficient time for investigators Mace and Clay to gather as much of the follow-up information developed during our interviews." (Ex. 81 at IT-INVEST/0684.)  The memorandum further confirms that Phillips anticipated that he would be involved in instructions to the investigators:  "we should continue to work through the normal chain of command to ensure that both Mr. Mace and Mr. Clay are progressing towards those identified follow-up issues and that they have sufficient time to gather that information." (*Id.*)

Savine has stated that Phillips gave instructions to the investigators.  Savine's November 2003 e-mail told Gaur that certain notations in his summaries "represent the follow up instructions that Garrison and I issued to the undercover investigators during our August 03 interviews." (Ex. 78.)  In November 2005, Savine informed Parsons, "I also typed in the actual instructions that Garrison and I gave to Clay and Mace when we met them in August 2003." (Ex. 56.)  As recently as January 2006, Savine reminded Phillips and Gaur that, "My notes indicate that Garrison and I instructed Mace to 'follow up' on Caucasian employee Darwin Proehl's statement that plaintiffs Harris (Ice) Jenkins and Ike Heflin were responsible for the graffiti . . . ." (Ex. 57.)

In short, the Littler attorneys directed International how the investigation should proceed, monitored the investigation while it was in progress, advised International about issues raised by the investigation (including ethical issues), and directed the investigators to follow up on leads regarding Named Plaintiffs.  The fact that International's in-house counsel, rather than the Littler attorneys, retained the investigators does not release the Littler lawyers from their ethical obligations.  They, like Boardman and Savine, violated Rules 4.2 and 5.3.

**B.**     **The Attorneys Violated Rules 4.3 and 8.4 by Causing the Investigators to Make False Statements to Class Members and to Conceal the Fact That They Were Agents of International's Lawyers**

Under Rule 4.3, a lawyer dealing with an unrepresented person (such as prospective Class Members) "shall not state or imply that the lawyer is disinterested. . . . When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the

matter, the lawyer shall make reasonable efforts to correct the misunderstanding."  Under Rule 8.4(c) it is "professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." (The false statements to Named Plaintiffs also violate Rule 8.4(c).)  Those who act on an attorneys' behalf also must not "state or imply" that they are disinterested.  *See* Rules 4.3 and 5.3.  To avoid a misunderstanding, they must "identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person."  Rule 4.3, Comment 1; *Air Crash*, 909 F. Supp. at 1123-24 (attorneys and their agents must "fully disclos[e] their representative capacity and the true motive behind" the communication).  As with Rule 4.2, attorneys are responsible for the acts of their non-lawyer assistants.  *See* Rules 5.3 and 8.4(a); *see also Upjohn Co.*, 768 F. Supp. at 1214-15 ("When a lawyer hires a non-lawyer to do his work, the lawyer must make reasonable efforts to ensure that the non-lawyer accomplishes his task in compliance with the standards governing the conduct of lawyers."); *Monsanto Co. v. Aetna Cas. and Sur. Co.*, 593 A.2d 1013, 1020 (Del. Super. Ct. 1990) ("[A]ttorneys . . . are accountable and must supervise the investigators in order to assure that the type of misleading conduct [Rule 4.3 violations] that has previously occurred will not happen in the future."), *vacated in part by* 1190 Del. Super. LEXIS 421 (Del. Super. Ct. 1990) (deferring partial sanction pending development of a full factual legal record).

In *Air Crash*, the plaintiff's attorneys hired consultants who sent a questionnaire to Defendants' employees.  909 F. Supp. at 1118-19.  The court held that the attorneys violated Rule 4.3 because the cover letter "contained misleading information regarding the true purpose underlying the distribution of the questionnaire."  *Id.* at 1123.  Specifically, the letter did not disclose that the questionnaire was prepared at the attorneys' request, and it went to "great lengths to persuade the recipient of its neutral and unbiased character."  *Id.*  The court held, "Such deception, which is undertaken or at least condoned by Plaintiffs' Counsel through their intermediary, is a paradigm example of conduct prohibited by Rule 4.3."  *Id.*  The fact that the

attorneys did not actually draft the letter and questionnaire was "irrelevant with regard to their accountability" because a lawyer "can not evade his professional and ethical obligations by delegating the job of developing and distributing deceptive materials to a paid expert or consultant." *Id.* at 1124.

In *Upjohn*, the defendant's lawyers hired investigators to interview the plaintiff's former employees about information relating to the lawsuit. 768 F. Supp. at 1212. In the interviews, the investigators did not "clearly identify themselves as working for attorneys who were representing a client who was involved in litigation against Upjohn, nor adequately state the purpose of the interview." *Id.* In affirming the magistrate judge's imposition of sanctions, the district court held that the investigators misled the former employees and failed to take reasonable measures to clarify their misconceptions. *Id.* at 1215, 1217.

Similarly, *Monsanto* held that defendants' attorneys violated Rule 4.3 by hiring investigators who interviewed plaintiff's former employees without identifying their true purpose. *Monsanto*, 593 A.2d at 1015-16. The court held that the unrepresented party must always retain "ultimate control" to decide whether "to talk to an opposing lawyer after he has been duly warned," and held the attorneys were responsible for failing to properly supervise their investigators. *Id.* at 1017, 1020.

In addition to the contacts with Named Plaintiffs, the undercover investigators spoke with Class Members on at least 64 occasions about racial graffiti, racial slurs, nooses, and the racial environment at International (CM/ECF Docket 150, Ex. A), and on 16 of those occasions, asked specifically about the lawsuit ("I asked him if he was part of the lawsuit.") (*Id.*) On none of these occasions did the investigators disclose that they were agents of International's attorneys; they went to great lengths to keep that information secret. The investigators posed as International employees, and lied about their identities. (Ex. 32.) This violated rules 4.3 and 8.4(c), as *Air Crash*, *Upjohn*, and *Monsanto* make clear.

As shown above, International's attorneys knew about, condoned and ratified their investigators' deception, and they never instructed the investigators not to deceive the Named Plaintiffs and the Class Members.  Boardman knew that his investigation would involve deception and failed to direct the investigators to refrain from making false statements.  (Ex. 101 at 103-105 ("Implicit in my hiring undercover investigators was to use false statements.").)  After reading the daily reports, the lawyers unquestionably knew that the investigators were using deception when speaking to Named Plaintiffs and Class Members; yet they never directed the investigators to stop using those tactics.  (Exs. 102 at 11-13; 104 at 46-47.)  As the Eighth Circuit explained in *Midwest Motor Sports*, 347 F.3d at 700, deceptive tactics used in an undercover investigation "fall squarely within Model Rule 8.4(c)'s prohibition of 'conduct involving dishonesty, fraud, deceit or misrepresentation.'"  Each of the attorneys violated Rules 4.3 and 8.4(c).

International's attorneys have argued that some deception is necessary in litigation, (Ex. 101 at 104-05); otherwise, they say, a company "could never do an undercover investigation."  (Ex. 109, 4/19/06 hearing tr., at 38.)  This is similar to the unsuccessful argument the attorneys made in support of the undercover investigation in *Monsanto*:  "[Telling the truth in civil litigation] is, of course, a very attractive proposition.  But, I would like to visit with your Honor further examination of that proposition, because while that might be nice in a perfect world, it is not the way the system operates in litigation in this country."  *Monsanto*, 593 A.2d at 1015.  The court responded that it was "compelled in the strongest way possible to reject counsel's observations as being so repugnant and so odious to fair minded people that it can only be considered as anathema to any system of civil justice under law."  *Id.*  The court concluded simply that in civil litigation, "one who is in search of the truth must tell the truth."  *Id*. at 1016.  The same is true here.[15]

---

[15]     International's lawyers also violated Rule 8.4 by causing the investigators to secretly record conversations at the plant.  Such activity is unethical for attorneys to conduct, even if it is otherwise legal in the relevant jurisdiction, *Parrot v. Wilson*, 707 F. 2d 1262, 1271 (11th Cir. 1983).  Because attorneys are held to a higher standard than "mere legality," *id.*, they

## IV.   INTERNATIONAL'S ATTORNEYS' FALSE STATEMENTS TO THE COURT VIOLATED RULES 3.3 AND 4.1

"People often get in hot water not so much for the original misdeed, but for the cover-up."

*Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1064 (7th Cir. 2000).  In trying to hide their

involvement in an unethical investigation, International's attorneys have made numerous false

statements of fact in their written and oral representations to the Court.  Under Rule 3.3 of the

Indiana RPC, an attorney may not knowingly make a false statement of material fact or fail to

correct a false statement of material fact previously made to the Court.  *See Cleveland*, 200 F.3d at

1067-68 (applying Illinois' almost identical version of Rule 3.3).  Assertions may be made to the

court only when the lawyer knows them to be true or believes them to be true based on a reasonably

diligent inquiry.  Rule 3.3, Comment 3.  *See American Int'l Adjustment Co. v. Galvin*, 86 F.3d

1455, 1460 (7th Cir. 1996) (citing Indiana RPC 3.3, Comment 3).  Lawyers who "come[ ] to know"

of the falsity of evidence previously offered shall take reasonable remedial measures," including

disclosure to the tribunal.  Rule 3.3(a)(3).

Similarly, Rule 4.1 states that in representing a client, a lawyer shall not make a false

statement of material fact.  A misrepresentation occurs when a lawyer incorporates or affirms a

statement of another that the lawyer knows to be false.  Rule 4.1, Comment 1.  Partially true but

misleading statements or omissions that are the equivalent of the false statements violate the rule.

Rule 4.1, Comment 1.

---

are liable if they know that their investigators are making secret recordings.  *See, e.g., Midwest Motor,* 347 F.3d at 699-700; *Anderson v. Hale,* 202 F.R.D. 548, 555-59 (N.D. Ill. 2001); *Smallwood,* 365 F. Supp. 2d at 698.  Savine and Phillips knew that the investigators were secretly recording conversations, (Exs. 83 at 13; 105 at 92-94; 60 at 3), and the digital recordings were cited in the daily reports, which Boardman, Parsons and others regularly read.  Curiously, these recordings have disappeared.  (Ex. 115.)

**A.      David Parsons Violated Rules 3.3 and 4.1**

Plaintiffs' opening brief on the motion for sanctions suggested that Parsons made misrepresentations to the Court about his firm's involvement in the undercover investigation. Discovery has confirmed those misrepresentations.

**1.      Parsons' Statements about the "Engagement" Were Untrue.**

At the February 1, 2006, hearing on the motion to quash, in discussing the undercover investigation, Parsons expressly told the Court, "I wasn't involved in that engagement." (Ex. 107, 2/1/06 hearing tr., at 12.) In fact, he expressed outrage that anyone would even suggest he played a role. (*Id*. at 12-13, 45-46.) Parsons stuck to that story in responding to the motion for sanctions, which stated that the Littler attorneys "played *no role* in the engagement of the investigators," and continued to accuse Plaintiffs' counsel of "wild speculation" in seeking discovery on the topic. (CM/ECF Docket 143 at 7, 13.) Discovery has proven Parsons' statements untrue. As shown above, six weeks before the undercover investigation began, Parsons wrote a 15-page memorandum to Boardman, titled "Undercover Investigation Guidelines." (Ex. 82.) There, Parsons directed who should hire the investigators, how the investigators should conduct the investigation, and what direction should be given to the investigators. (*Id*.) Parsons specifically advised that the investigators should not "identify the plaintiff-employees in the current lawsuit and [should] give minimal practical direction to the investigators." (*Id*.) Parsons wrote another memorandum to Boardman, titled "Proposed authorization language for retaining investigators," in which he recommended language for obtaining approval from International's Board of Directors for the undercover investigation. (Ex. 54.) Both of these memoranda refute Parsons' repeated representation that he played "no role" in the engagement of the undercover investigators.[16]

---

[16]      Parsons' insistence at the February 1 hearing that if he were "running the show," he would have directed the investigators differently is belied by the fact that we was, in fact, running the show. (Exs. 54, 82.)

### 2. Parsons' Statement about "No Contact" with Investigators Was False.

At the February 1 hearing, Parsons emphatically told the Court, "I'm telling you, at least from the perspective of the lawyers of Littler Mendelson, we had no contact with these people . . . ," meaning the investigators.  (Ex. 107 at 46.)  Littler's billing statement proved Parsons' statement untrue.  (Ex. 10.)  As explained above, Littler partner Phillips interviewed the investigators for the entire day of August 13, 2003.  (Exs. 10; 105 at 6-7.)  Parsons discussed the interviews with Phillips both before and after they occurred.  (Exs. 10; 102 at 26, 90-92; 105 at 65, 67.)  There is no doubt that Parsons' statement to the Court that the Littler attorneys "had no contact" with the investigators was untrue.  Only when Parsons realized that Plaintiffs had proof that his statement was untrue did he finally admit to the Court that he "misspoke."  (Ex. 109 at 58-59.)

### 3. Parsons' Statements That International's Attorneys Never Directed the Investigators to Contact Anyone in Particular Were Untrue.

At the February 1 hearing, Parsons also told the Court, "we didn't direct anyone to talk to anybody about any subject.  That is, the lawyers involved, including Mr. Boardman and the other in-house lawyers at International Truck and Engine, were not involved in that."  (Ex. 107 at 11-12.)  Parsons also stated, "Unlike the case in Jones, which we cited to the Court in our reply brief, we did not direct these activities of the investigators, nor did anyone in-house at International Truck direct these activities."  (Ex. 107 at 12.)  Parsons made these statements to the Court even though he had received an e-mail from Savine only two weeks earlier, stating that he and Phillips *had* instructed the investigators to "follow up" with certain individuals.  (Ex. 57.)  Of course, Parsons' representation was untrue, and Boardman has admitted that he personally gave the initial directions.  As shown above, later directions came from him and Savine, and from Phillips.

Three months after making telling the Court that none of International's lawyers had directed the investigators, Parson acknowledged that this was untrue and apologized for his "inaccuracy."  (Ex. 66.)  This apology was the second time in two months that Parsons admitted he

had made a misrepresentation to the Court.  Notably, Parsons submitted this apology at the last possible moment before International produced to Plaintiffs' counsel documents proving his prior statements untrue.[17]

Parsons' Motion to Clarify, (Ex. 66), said that he did not realize that his prior statements were untrue until after he reviewed the documents.  Even if this were true, (it is not, *see* Ex. 57), it is not an excuse.  Rule 3.3 requires that lawyers perform a reasonably diligent inquiry *before* making assertions to the Court.  Rule 3.3, Comment 3.  It is clear that Parsons either lied to the Court, or made statements of fact to the Court without any basis.  It also appears that he failed to correct his "misstatement" that none of International's attorneys, including in-house counsel, had ever directed the investigators, until he knew he would be found out.  *See Parker v. Pepsi-Cola General Bottlers, Inc.*, 249 F. Supp. 2d 1006, 1011 n.2 (N.D. Ill. 2003) (what is "most regrettable" about attorney's Rule 4.2 contact is that he "persist[ed] in refusing to take responsibility for his actions by offering flimsy, unsupported defenses in such a contumacious manner.")

> **4.    The Statements about Parsons' Knowledge of the Investigators' Contacts with the Named Plaintiffs Are Not Credible.**

Parsons also appeared less than forthcoming when he told the Court about his lack of knowledge of the investigators' contacts with Named Plaintiffs:

> The Court:    I know you reviewed the investigators' notes.  It is not clear to me that you particularly reviewed that part of the notes where it says, yes, we talked to the plaintiffs about -- or we asked them about the lawsuit, how is the lawsuit going, or words to that effect.  So did you, during the course of the investigation, know that those types of questions, however limited, had been asked?
>
> Mr. Parsons:    As I sit here today, Judge, I don't recall whether I didn't take notice of that, whether I was looking in that kind of detail, or whether if – I

---

[17]    On April 28, 2006, Plaintiffs sought documents relating to International's counsel's involvement with the investigation.  (CM/ECF Docket 156.)  International refused to produce most of the documents, but on May 8, 2006, this Court ordered many of them produced.  (CM/ECF Docket 157.)  International produced those documents on May 12, 2006, less than an hour after Parsons filed his "Motion to Clarify."  (Ex. 66.)

> just don't remember looking at it.  You will see – I mean, it is in my
> time entry so, obviously, I looked at them in 2003, those reports, at
> some point in time.  But whether it escaped my attention – for
> example, as Mr. Jones said, two of the Named Plaintiffs, Glen [sic,
> should be Gwen] LNU, last name unknown, whether that escaped my
> attention or I saw it and noticed it was non-substantive conversation
> about -- when it was raised by the investigator, I just can't recall as I
> sit here today – or stand here today.

(Ex. 109 at 49-50.)  Discovery has proven that Parsons knew during the course of the investigation

that the investigators had asked the Named Plaintiffs about the lawsuit.  He reviewed the daily

reports themselves on 22 occasions (*see* p. 4); and he reviewed the summaries prepared by Savine

and Gaur, which filled in the Named Plaintiffs' last names and stated that an investigator had

spoken to them about the lawsuit.  (Exs. 102 at 71-76; 10, entries for 7/10/03; 40; 59.)[18]  On July

14, 2003, Parsons reviewed and edited a memorandum that, among other things, "addressed the

issue of the contact with the Named Plaintiffs."  (Exs. 104 at 10-11; 10.)  Later that same day,

Parsons met with International representatives, including in-house counsel Boardman and Savine,

and the agenda specifically included a discussion of the investigators' contacts with the Named

Plaintiffs.  (Exs. 38; 10, entry for 7/10/03.)  Two months later, Parsons reviewed and edited a

memorandum from Phillips to Savine, which discussed the investigator's "conversation with any

Plaintiff."  (Exs. 81 at IT-INVEST/0684-85; 105 at 14-15.)  Finally, Phillips testified that before he

interviewed the investigators, he probably spoke with Parsons about the investigators' contacts with

the Named Plaintiffs on the subject of the lawsuit.  (Ex. 105 at 67-68.)

　　It is hard to believe that Parsons could not recall at the April 19 hearing whether he had any

knowledge about the investigators' contacts with the Named Plaintiffs while the investigation was

ongoing.  Parsons had flagged that very issue – ethical problems with investigators contacting

---

[18]　　Although Parsons testified that he could not recall whether the summaries he
reviewed referred to contacts with the Named Plaintiffs, Exhibit 59 is a summary dated August 7,
2003, that describes several contacts with Named Plaintiffs.  Parsons' fee bill shows that he
reviewed a summary the very next day, August 8, 2003.  (Ex. 10.)

Named Plaintiffs about the subject matter of the lawsuit – in his November 13, 2002, memorandum to Boardman, (Ex. 82), and Plaintiffs had raised the issue in their response to International's Motion to Quash, filed just a few months before Parsons' statements to the Court.

### B.   Garrison Phillips and Gary Savine Made False Statements to the Court

Phillips and Savine both submitted affidavits to the Court on January 19, 2006.  Phillips' states, "I never directed Messrs. Clay or Mace, or anyone else from NASS, to talk to any particular individuals, including, the named Plaintiffs in this case or the class member employees whom they represent."  (Ex. 87.)  Savine's states, "I never directed Messrs. Clay or Mace, or anyone else from NASS, to initiate contact with any particular individuals at the Indianapolis Engine Plant, or to otherwise talk to any of the named Plaintiffs in this case."  (Ex. 86.)  These sworn statements are false.  As explained above, Phillips' and Savine's notes of their interviews with the investigators prove that they had instructed the investigators to follow up on certain leads by speaking with specific Class Members, including Milburn Chandler, Emmanuel Griffin, Twala Smith, and John Wade.  (Exs. 39 at IT-INVEST/0052, IT-INVEST/0057; 61 at LM0012, LM0024-25; 84 at 10; 105 at 40-45, 56-59.)  Phillips' September 2003 memorandum to Savine also proves that they gave specific instructions to the investigators.  (Ex. 81 at IT-INVEST/0684.)  Savine's e-mails to the Littler attorneys also confirm that both he and Phillips instructed the investigators to follow up with certain individuals.  (Exs. 56; 57; 78.)  Amazingly, at his deposition, Phillips continued to maintain that his affidavit was accurate.  (Ex. 105 at 82.)

As for Savine, his e-mail to Gaur and Phillips about his affidavit attempts to draw a distinction between directing the investigators to make a "*first* contact" as opposed to instructing them to "reach out an reestablish prior contacts with other African American employees of the engine plant."  (Ex. 57.)  (Emphasis in original.)  Even if such a distinction mattered (which it does not) the affidavit that Savine signed and submitted to the Court fails to make this distinction between initiating a first contact and initiating a re-contact.  Savine's affidavit states that he never

directed anyone to "initiate contact," which would lead the reader to believe that he did not direct

them to initiate either a first or a later contact.  Unlike Savine's e-mail, where he makes it clear that

he can truthfully say he did not tell the investigators to "initiate" *only* if it means "initiate a first

contact," Savine and/or the Littler attorneys decided to omit any distinction in the affidavit and

instead submitted an affidavit that unquestionably concealed the truth.  At best, the affidavit

violates Rule 3.3, Comment 3 ("There are circumstances where failure to make a disclosure is the

equivalent of an affirmative misrepresentation."); more likely, it is an outright falsehood.

  **C.**  <u>Shanthi Gaur Made False Statements to the Court</u>

    **1.**  **Defendant's Reply In Support of Its Motion to Quash Contained False Statements.**

  On January 19, 2006, Gaur signed and filed Defendant's reply in support of its Motion to

Quash, including the Phillips and Savine affidavits.  (CM/ECF Docket 103.)  Gaur thus vouched for

the truth of the affidavits, although she unquestionably knew that they were untrue.  (Exs. 56; 57;

78, e-mails to Gaur discussing both Savine's and Phillips' directions to the investigators.)

  In that pleading, Gaur wrote, "No one at International, let alone International's attorneys,

ever directed Investigators Clay and Mace to speak to any particular individual."  (CM/ECF Docket

103 at 4.)  As shown above, Exhibits 39, 56, 57, 61, 78, 81, 83, 84, and 85 prove otherwise.  Gaur

also knew this was untrue because, earlier that day, she received Savine's e-mail proposing the

"first contact" revision to his affidavit discussed above, which made clear that Savine and Phillips

*had* instructed the investigators to follow up on leads by speaking with specific individuals.  (Ex.

57.)  Yet Gaur told the Court that no one at International ever directed the investigators "to speak to

any particular individual."  Gaur has never corrected or apologized for this false statement.

    **2.**  **Defendant's Response in Opposition to Plaintiffs' Motion for Sanctions Contained False Statements.**

  On March 24, 2006, Gaur signed and filed International's Opposition to Plaintiffs' Motion

for Sanctions, containing numerous statements that discovery has proven untrue.  First, it repeatedly

states that "no one from the law firm was involved in the engagement of the undercover investigators." (CM/ECF Docket 143 at 3, 7, 11, 16.)  As shown above, Exhibits 54 and 82 prove otherwise.  Second, as in Defendant's reply in support of its motion to quash, this pleading also repeatedly states that "no one from the law firm ever gave any instructions or directions to the undercover investigators as to whom to interview or contact." (CM/ECF Docket 143 at 3, 5, 6, 7, 11, 13, 16.)  Again, as shown above, Exhibits 39, 56, 57, 61, 78, 81, 83, 84, and 85 prove otherwise.  Remarkably, Gaur has insisted that the statements made at the February 1 hearing were "accurate." (CM/ECF Docket 143 at 7.)

Another untrue statement in this brief appears on page 3 in footnote 3, which states, "Despite the use of 'LNU' (last name unknown) designation by the investigators and the attorney affidavits to the contrary, Plaintiffs' counsel has made the unsubstantiated assertion that the investigators were directed to seek out the named Plaintiffs."  Yet the notes of attorneys Phillips and Savine show this is exactly what the investigators were told to do.  (Exs. 39 at IT-INVEST/0054 (Carver instructed them "to get as much information out of [the Named Plaintiffs] as possible about their basis for the lawsuit."); 61 at LM0020 (Carver told them "to specifically address the lawsuit with the Plaintiffs.").)  Even worse, Gaur signed this pleading after receiving an e-mail from Savine stating, "its [sic] possible that Carver's instruction to contact [Named Plaintiff Robert] Coleman came from someone either in Security or Law at International." (Ex. 57.)

Finally, Gaur made the following representations on page 11 of the pleading:

Ms. Gaur's "summary" – which was performed during the same time period – was also focused on the potential discipline and other follow-up that needed to be done as a result of the conclusion of the investigation.  Although Plaintiffs imply that the summary must have included an account of the conversations with the named Plaintiffs on the subject of the lawsuit, *Plaintiffs have only supposition to support this assertion.*  Indeed, there is absolutely no detail as to the particular dates or issues that were summarized.  There is likewise no identification of which investigator's notes were summarized by Ms. Gaur, much less any indication that the particular investigator had conversations with the named Plaintiffs on the dates in question.

(CM/ECF Docket 143 at 10-11.)  Gaur's deposition testimony and Exhibit 40 (the "summary" itself) prove that Gaur was attempting to mislead the Court in violation of Rules 3.3 and 4.1.  (Ex. 104 at 6-7, 13-15.)  Exhibit 40, which Gaur helped draft, contains six entries summarizing conversations the investigators had with Named Plaintiffs Moore and Norris.  (Ex. 104 at 6-7, 13-15.)  Gaur admitted that she may have personally inserted the last names of Named Plaintiffs Moore and Norris on the summary.  (Ex. 104 at 15.)  When Gaur made these representations to the Court, Plaintiffs did not have Exhibit 40 to prove Gaur's statements untrue.  Plaintiffs now have the exhibit, and it speaks for itself.  There is no question that, contrary to the pleading that Gaur signed and submitted to the Court, the summary that she drafted "included an account of the conversations with the named Plaintiffs on the subject of the lawsuit."  Gaur, too, has violated Rules 3.3 and 4.1

## V.   INTERNATIONAL VIOLATED FEDERAL RULE OF CIVIL PROCEDURE 26(E) BY FAILING TO SUPPLEMENT ITS DISCOVERY RESPONSES REGARDING THE UNDERCOVER INVESTIGATION

Plaintiffs' first and second sets of interrogatories and requests for production required International to describe and produce all documents relating to (1) all investigations, internal or external, regarding racial harassment, (2) the existence of racial graffiti and nooses, and (3) International's responses, steps, and exercises of reasonable care to remove, eliminate, remedy or prevent the recurrence of racial graffiti.  (Ex. 117, Interrogatory 3 and Requests 9 and 34; Ex. 118, Request 14.)  International responded to these requests in February 2002 – before the undercover investigation began.

Under Rule 26(e), International had a duty to supplement its responses, which it did not do, even though documents relating to the undercover investigation unquestionably were responsive to these requests.  Nor did International provide Plaintiffs with a privilege log, which is a prerequisite to any assertion of privilege.  *Hobley v. Burge*, 433 F.3d 946, 947-48 (7th Cir. 2006).  *See* Rule 26(b)(5) (when withholding documents on the ground of privilege, "the party shall make the claim expressly").  Instead, International chose to conceal (1) the fact that it was conducting an

undercover investigation directly related to issues underlying the lawsuit, (2) the fact that the investigation was being run by counsel, thus invoking privilege rules but subjecting it to ethical constraints, and (3) all the documents related thereto.

When the investigation was over, International announced on June 1, 2004, that it had occurred. (Ex. 22.) Stunned that International had made such an investigation surreptitiously and without providing even attorneys'-eyes-only discovery, Plaintiffs immediately demanded that International supplement its discovery responses. (Ex. 25.) International refused, cited privilege, and continued its failure to produce a privilege log, despite Plaintiffs' October 2004 reminder of its duty to provide one. (Exs. 27; 28.) After many lengthy discussions with International regarding the documents, Plaintiffs filed a motion to compel, which this Court granted on May 9, 2005. (Docket 237.) International appealed, and on July 20, 2005, Judge Young affirmed this Court's ruling ordering production of the NASS documents. (Docket 249.) But International still did not produce them. The matter was again raised on September 15, 2005, in a conference call with the Court, and International was again ordered to produce the documents, this time by September 30, 2005. (CM/ECF Docket 7.) Finally, a full 33 months after the investigation began International produced the NASS daily reports.[19]

Plaintiffs had a right to know about the existence of those documents *when they were created* so that Plaintiffs could timely challenge any assertion of privilege and investigate the

---

[19]    Plaintiffs recently learned that International did not produce all of the NASS reports, including all reports for the month of October 2003, Incident Reports 1 and 7 (which indicate that three white International employees used the racial slur "nigger"), and 15 other reports that detail racial conduct and possible perpetrators. Plaintiffs received the missing documents directly from NASS pursuant to a subpoena. This is the same subpoena that International moved to quash in December 2005. International purportedly filed with the Court "all" of the NASS reports on 4/21/06 (CM/ECF Docket 153), but the October 2003 reports, Incident Reports 1 and 7, and the 15 other reports were omitted from that filing. Plaintiffs have included the October 2003 reports in its appendix at Ex. 110, Incident Reports 1 and 7 at Ex. 111, and the 15 additional reports at Ex. 119.

circumstances reflected in those highly-relevant documents.[20]  By stonewalling for *almost three years* before finally disclosing these documents, International deprived Plaintiffs of the opportunity to investigate important issues related to this lawsuit in a timely manner.  Indeed, 26 depositions were taken while the undercover investigation was underway and while the reports were being withheld from Plaintiffs.  International, and not the Plaintiffs, had the benefit of those reports when it participated in those depositions, which included depositions of Named Plaintiffs.

The serious prejudice to Plaintiffs from International's wrongful withholding of evidence includes the fact that some of the most important evidence generated in the secret investigation has disappeared or been destroyed.  (Ex. 115.)  The digital recordings made – unethically – by the investigators retained by International's lawyers apparently contained candid statements by at least one white employee revealing racist attitudes and conduct.  If these tapes had been produced to Plaintiffs when they should have been, they likely would have been centerpieces of Plaintiffs' proof at trial.

International argues that telling Plaintiffs of the existence of the NASS documents would have destroyed the covert nature of the investigation.  But International's choice to conduct a covert, rather than overt, investigation cannot override the Federal Rules of Civil Procedure.  Once litigation begins, the Federal Rules impose obligations on parties to truthfully and completely answer interrogatories and requests for documents.  Fed. R. Civ. P. 33, 34.  Under the Rules, if a

---

[20]    International's assertion of privilege was improper because the attorneys knew that the investigators did not limit themselves to "'passive' information gathering," (which meant "observation and listening").  (Ex. 82 at 2 (Where International's counsel wrote, "the investigators should be limited to "passive" information gathering or *any privilege will be waived*.")  They also knew that the investigators did not follow the advice (or were not given the advice) that: "The investigators should <u>not</u> question International employees.  They should also avoid any follow-up questions. . . ."  (Ex. 82 at 2, emphasis in original.)  But even when International learned that the investigators were actively questioning Named Plaintiffs and Class Members, it still failed to produce the documents.  By concealing their unethical conduct regarding the investigation, which vitiated any privilege that may have applied, International's attorneys further deprived Plaintiffs of important discovery to which they were entitled.

party withholds information otherwise discoverable, it must do so expressly.  *See* Fed. R. Civ. P. 26(b)(5).  The 1993 advisory committee comments to Rule 26(b)(5) explain that "to withhold materials without such notice is contrary to the rule, [and] subjects the party to sanctions under Rule 37(b)(2)."  Withholding these documents and failing to submit a privilege log was a flagrant violation of these Rules and it calls for sanctions.

An additional discovery violation came to the Plaintiffs' attention recently.  On May 30, 2006, International produced 17 affidavits, signed in June and July of 2004 (one was unsigned, but "witnessed"), which were created during an investigation conducted by Bashen Consulting that allegedly followed up on leads learned through the undercover investigation.  (Ex. 112.)  The affiants explain that they either witnessed racial graffiti, racial slurs, and nooses, heard about them second-hand, or personally investigated the incidents.  (Ex. 113.)  These affidavits are unquestionably responsive to Plaintiffs' discovery requests, and International has not explained why it withheld them from production for almost two years.[21]

Had Plaintiffs known about the affidavits when they were created in the Summer of 2004, Plaintiffs could have deposed these individuals and followed up on leads from the new investigation when memories were fresh.[22]  Their testimony would have been highly relevant to other depositions in this case.  As with the NASS reports, International had the unfair benefit of the information contained in these affidavits throughout discovery, while the Plaintiffs did not.  This is another serious discovery violation that calls for serious sanctions.

---

[21]     Until recently, Plaintiffs assumed that the follow-up investigation was performed by "diversity consultants" of the Davis Wright Tremaine firm, whom International had brought to an earlier settlement conference.  (Ex. 28.)  Had International timely supplemented its discovery responses or produced a privilege log identifying the documents, the true consultants would have been revealed.

[22]     Plaintiffs did depose two of them, Robert Canter and Clarence Spangler, but at that time, Plaintiffs knew nothing about their affidavits signed six months earlier and thus had no ability to inquire about the incidents reported there.

## VI.   Recommended Sanctions as to International

International's attorneys' violations of Rules 3.3, 4.1, 4.2, 4.3, 5.3, and 8.4 of the Indiana

Rules of Professional Conduct, coupled with its violations of Federal Rule of Civil Procedure 26(e),

require that sanctions be imposed.  International itself was complicit with its outside counsel and

attempted to benefit from all of this wrongdoing.  Sanctions are therefore appropriate against the

company itself.  Because this case is on the eve of trial, the most appropriate forms of sanctions are

to (1) bar International from using the wrongfully-withheld materials for any purpose; (2) deem all

key facts contained in those documents admitted as part of the District Court's Rule 52 findings;[23]

and (3) pay the fees and costs their misconduct has caused Plaintiffs to incur.

### A.   Exclusion of Evidence

International must be barred from using at trial, for any purpose, any evidence obtained as a

result of the undercover investigation, including any follow up on leads learned through it.  That bar

should include, but not be limited to, all the NASS reports and any evidence relating to the follow-

up work by Bashen Consulting, including evidence that might emanate from the 17 affidavits

recently produced.

The exclusion of evidence improperly obtained by an investigator is a widely-accepted

sanction.  *E.g., Trans-Cold Express, Inc.*, 440 F.2d 1216, 1219 (7th Cir. 1971) (affirming trial

court's exclusion of evidence improperly obtained by party's investigator); *Midwest Motor Sports*,

347 F.3d at 701 (affirming district court's exclusion of evidence obtained by investigator's

improper Rule 4.2 contacts); *Air Crash*, 909 F. Supp. at 1125 (barring evidence learned through

improper Rules 4.2 and 4.3 contacts); *Upjohn*, 768 F. Supp. at 1212, 1218 (affirming magistrate

judge's order excluding evidence obtained by party through investigator's improper Rule 4.3

contacts); *Monsanto*, 593 A.2d at 1021 (excluding evidence obtained from improper Rule 4.3

---

[23]      Neither party has made a jury demand, and so the case is a bench trial.  (Ex. 116.)

contacts during undercover investigation), *clarified by Monsanto Co. v. Aetna Cas. and Sur. Co.*, No. 88C-JA-118, 1990 Del. Super. LEXIS 421, at *4 (Del. Super. Ct. Dec. 4, 1990) (temporarily vacating exclusion of evidence, but reaffirming that, "I believe that excluding all evidence obtained as a result of the investigatory conduct which I found to be in violation of the Rules is an appropriate remedy).[24]  International's misconduct in this case easily qualifies for the sanction of a bar order as in the cases cited above.[25]

### B.    Facts Deemed Admitted

The exclusion of evidence is far from an adequate remedy here, however, because it is exactly what International wants.  Due to the meritoriousness of the Plaintiff class's claims, the information learned in International's investigations actually *confirms* the Plaintiffs' allegations of a racially hostile work environment and International's failure to deal with it effectively; thus, International's misconduct would be rewarded if exclusion of the evidence were the only remedy. *See* 1993 advisory committee comments to Rule 37(c) ("Preclusion of evidence is not an effective incentive to compel disclosure of information that, being supportive of the position of the opposing party, might advantageously be concealed by the disclosing party.  However, the rule provides the court with a wide range of other sanctions – such as declaring specified facts to be established . . . that, though not self-executing, can be imposed when found to be warranted after a hearing."); *see also* MOORE'S FEDERAL PRACTICE §37.61 (3d ed. 2002) (same); *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) ("The alternative sanctions

---

[24]    Exclusion of evidence is also a proper sanction for failure to supplement discovery responses.  *See* Fed. R. Civ. P. 37(c)(1) (failure to amend discovery responses pursuant to Rule 26(e)(2) prevents the party from using the evidence at trial).

[25]    Although International should not be allowed to use at trial evidence of the undercover investigation or its follow-up investigation, *Plaintiffs* should be allowed to admit that evidence at trial if the Court does not treat certain designated facts as established under Rule 37(b)(2)(A), as explained below.

referenced in [Rule 37(c)(1)] are primarily intended to apply when a party fails to disclose evidence helpful to an *opposing* party.")

Rule 37(b)(2) provides another essential tool: the Court should order that certain designated facts that emanated from the undercover investigation "be taken to be established for the purposes of the action." Rule 37(b)(2)(A). Rule 37(c)(1) expressly allows this sanction when a party fails to supplement its discovery responses under Rule 26(e)(2),[26] for it will help deter future misconduct.

Plaintiffs' Exhibit 114 lists facts that emanated from International's secret investigation; the source in the wrongfully withheld documents is noted in that chart. Plaintiffs urge the Court to deem these facts established, and take them as Findings of Fact under Rule 52, because International did not allow Plaintiffs access to this information at a time when they could have followed up and investigated further on their own. Too much time has gone by – and the case is too close to trial – for Plaintiffs to develop this information now. Discovery has closed, memories have faded, witnesses have died,[27] and digital recordings have mysteriously "disappeared." The case is set for trial in September, and the Plaintiffs deserve to have their claims heard without further delay due to International's misconduct.[28]

The courts have often ordered facts be taken as established as a sanction for a party's misconduct. *See, e.g., Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 412-14 (5th Cir.

---

[26]     Prior to 1993, Rule 37(b)(2) sanctions could be imposed only after a motion to compel under Rule 37(a). Rule 37(c) was amended in 1993 and 2000 to allow a court to impose Rule 37(b)(2) sanctions without a prior motion to compel when a party fails to supplement its initial disclosures or prior answers to discovery requests. *See* Rule 37(c)(1), advisory committee comments for 1993 and 2000.

[27]     Among these are International Human Resources officer Steve Goie and Class Member Lamar Johnson (who saw a noose), both of whom have died.

[28]     A belated production of documents does not preclude this sanction of deeming facts established under Rule 37(b)(2) and Rule 37(c). *Ohio v. Arthur Anderson & Co.*, 570 F.2d 1370, 1374-75 (10th Cir. 1978); *Royal Maccabees Life Ins. Co. v. Leon Malachinski, D.O.*, No. 96 C 6135, 2001 U.S. Dist. LEXIS 3362, at *25-26, *29-31 (N.D. Ill. Mar. 19, 2001).

2004) (affirming district court's order establishing fact that attorney was an alter ego of a corporation as a Rule 37(b)(2)(A) sanction for inadequate interrogatory responses); *Hilao v. Estate of Marcos*, 103 F.3d 762, 764-66 (9th Cir. 1996) (affirming district court's decision to deem a series of facts established as a Rule 37 sanction for failure to appear at a deposition); *Carlson v. Freightliner, LLC*, 226 F.R.D. 343, 372 (D. Ne. 2004) (ordering that certain facts be deemed established as a sanction for Rule 37 discovery violations because, *inter alia*, "plaintiffs have been denied information necessary to . . . thoroughly depose witnesses" and to investigate the defendant's claims); *Royal Maccabees Life Ins. Co. v. Leon Malachinski, D.O.*, No. 96 C 6135, 2001 U.S. Dist. LEXIS 3362, at *25-26, *29-31 (N.D. Ill. Mar. 19, 2001) (ordering that certain facts be treated as established as a Rule 37 sanction for improperly withholding documents).[29]

International's repeated, intentional, and inexcusable misconduct detailed above might justify a default judgment, *In re Golant*, 239 F.3d 931, 937 (7th Cir. 2001), and certainly requires that the facts contained in the wrongfully withheld materials be taken as established at trial. That sanction easily satisfies due process standards because the sanction is "just" and "relate[s] to the claim at issue." *Id.*, 239 F.3d at 938. This sanction is "just" (in fact, it is mild) given the extent and severity of International's ethical misconduct. This sanction also "relate[s] to the claim at issue" because the facts in Exhibit 114 are taken directly from the documents that were illegally developed by Internationals' lawyers and wrongfully concealed and withheld from the Plaintiffs, by methods including false statements to the Court. Deeming these facts established for trial is the most

---

[29]    Rule 37 sanctions technically apply only to International's discovery violations, but this Court may impose sanctions under its inherent powers for International's attorneys' ethical violations – conducted with the company's knowledge and approval. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980); *Andrew Corp. v. Beverly Manufacturing Co.*, 415 F. Supp. 2d 919, 926 (N.D. Ill. 2006) (using court's inherent power to sanction attorneys' unethical behavior by excluding evidence at trial because the client was partially at fault).

appropriate way to ensure that International and its attorneys do not benefit from their wrongdoing.[30]

### C.   <u>Attorneys' Fees and Costs</u>

Another sanction that must be imposed on International and its attorneys is payment of Plaintiffs' reasonable attorneys' fees and costs related to the issues discussed here.  International's misconduct has forced Plaintiffs' counsel to expend an enormous amount of time and resources fighting to obtain discovery materials that should have been handed over to them 3 ½ years ago. *See* Fed. R. Civ. P. 1 (the Rules are designed "to secure the just, speedy, and inexpensive determination of every action.")  The efforts expended due solely to International's misconduct include the Motion to Compel (Docket 155, 156, 157), the Motion to Reopen Discovery (CM/ECF Docket 55), the response to International's Motion to Quash (CM/ECF Docket 93), the Motion for Sanctions (CM/ECF Docket 132), the response to International's Motions to Seal or Restrict Access and to Withdraw and Substitute Document 45 (CM/ECF Docket 137, 138), and conducting discovery and supplemental briefing on the sanctions issue.  None of these would have been necessary had International and its attorneys followed the Rules of Professional Conduct and the Federal Rules of Civil Procedure as they were obligated to do.

Attorneys' fees and costs is a routine sanction for violation of the rules described above. *See, e.g., Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1199, 1211 (11th Cir. 1985) (affirming award of attorneys' fees and costs as sanction for improper Rule 4.2 contacts); *Blanchard v. Edgemark Fin. Corp*., 175 F.R.D. 293, 305 (N.D. Ill. 1997) (awarding attorneys' fees and costs as a sanction for improper Rule 4.2 contacts); *Schmitz v. Ing Securities, Futures & Options, Inc.*, No. 96 C 5754, 1997 U.S. Dist. LEXIS 13762, at *4 (N.D. Ill. Sept. 4, 1997)

---

[30]   One of the facts on Plaintiffs' Exhibit 114 – statements in entry No. 17 by white employee Scott Butterfield – should be deemed established for the additional reason that International failed to preserve and produce the digital recording of that conversation.

(awarding attorneys' fees and costs as sanction for improper 4.2 and 4.3 contacts); *Hammond v. City of Junction City, Kansas*, 167 F. Supp. 2d 1271, 1293-94 (D. Ks. 2001)  (awarding attorneys' fees and costs as a sanction for improper Rule 4.2 contacts); *Monsanto*, 593 A.2d at 1021 (awarding attorneys' fees and costs as a sanction for improper undercover investigation).

International's and its attorneys' misconduct have wasted both Plaintiffs' counsel's time, and, more importantly, the resources of the Court.

## VII.  SANCTIONS AGAINST THE ATTORNEYS INDIVIDUALLY

As discussed in Plaintiffs' opening brief on sanctions, there is a wide range of sanctions that the Court may impose on attorneys who violate the ethics rules.  Because International's attorneys' misconduct is an affront to this Court, Plaintiffs believe that the form this sanction should take must be left to the sound discretion of the Court.

## VIII.  CONCLUSION

For all the reasons stated above, International and five of its in-house and outside counsel should be sanctioned as described herein.

Respectfully submitted,

**GREG ALLEN,** *ET AL.*

Dated:  June 23, 2006.

s/ Fay Clayton
One of Their Attorneys

Fay Clayton
Angel M. Krull
Darlene M. Oliver
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 6060
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile

35

Samuel Fisher
Lee D. Winston
WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.
420 North 20th Street/1400 SouthTrust Tower
Birmingham, Alabama 35203
(205) 328-0640 – Telephone
(205) 254-1500 – Facsimile

Thomas A. Brodnik
STARK DONINGER & SMITH
50 South Meridian Street, Suite 700
Indianapolis, Indiana 46204
(317) 638-2400 – Telephone
(317) 633-6618 – Facsimile

Richard Hailey
RAMEY & HAILEY
3815 River Crossing Pkwy.
Indianapolis, Indiana 46240
(317) 848-3249 – Telephone
(317) 848-3259 – Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2006, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

Thomas A. Brodnik
STARK DONINGER & SMITH
tbrodnik@sdsfirm.com speterson@sdsfirm.com

Fay Clayton
ROBINSON CURLEY & CLAYTON
fclayton@robinsoncurley.com

Terence Leslie Fague
COOLIDGE WALL, L.P.A.
fague@coollaw.com

Edward W. Feldman
MILLER SHAKMAN & BEEM, LLP
efeldman@millershakman.com, tstaunton@millershakman.com, odom@millershakman.com

Samuel Fisher
WIGGINS CHILDS QUINN & PANTAZIAS LLC
sfisher@wcqp.com

Shanthi Gaur
LITTLER MENDELSON
sgaur@littler.com srunge@littler.com

Richard Douglas Hailey
RAMEY & HAILEY
office@sprynet.com, rhailey@sprynet.com

Linzey D. Jones
PUGH JONES JOHNSON & QUANDT PC
ljones@pjjq.com, , mrojas@pjjq.com

Walter Jones, Jr.
PUGH JONES JOHNSON & QUANDT PC
wjones@pjjq.com, mrojas@pjjq.com

Angel M. Krull
Cynthia Hyndman
ROBINSON CURLEY & CLAYTON
akrull@robinsoncurley.com, nball@robinsoncurley.com

Emily Nicklin
KIRKLAND & ELLIS
enicklin@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS, LLP
mnomellini@kirkland.com

Darlene M. Oliver
ROBINSON CURLEY & CLAYTON
doliver@robinsoncurley.com, dmshields@robinsoncurley.com

David J. Parsons
LITTLER MENDELSON PC
dparsons@littler.com dknoblock@littler.com

Garrison L. Phillips
LITTLER MENDELSON, P.C.
gphillips@littler.com

Anthony B. Ratliff
STARK DONINGER & SMITH
aratliff@sdsfirm.com mhaecherl@sdsfirm.com


s/ Fay Clayton
Fay Clayton