UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREG ALLEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:02-cv-0902-RLY-TAB |
| | ) | |
| INTERNATIONAL TRUCK AND ENGINE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR SANCTIONS**

**I.     Introduction.**

Defendant hired a private investigation company to conduct an undercover investigation into allegations of racial hostility at its Indianapolis facility.  Thereafter, Plaintiffs served subpoenas in their effort to depose the undercover investigators.  This touched off a discovery dispute that resulted in a February 1, 2006 hearing on Defendant's motion to quash these and other subpoenas.  During that hearing, Defendant's lead counsel, David Parsons of the law firm Littler Mendelson, made various representations to this Court that Littler Mendelson's attorneys were not involved with, and did not direct, this undercover investigation.

Parsons' representations, however, were undermined by Defendant's attorney billing records, which the Defendant inadvertently filed as a summary judgment exhibit.  These billing records established that Parsons and other members of Littler Mendelson were actively involved in assisting and directing the undercover investigation.  Subsequent discovery raised additional concerns regarding defense counsel's contacts with represented and unrepresented parties.  As more fully set forth below, defense counsel has demonstrated a disturbing disregard for the rules

of ethics.  As a result, the Magistrate Judge recommends that Plaintiffs' motion for sanctions [Docket No. 132] be granted.

At the same time, however, the Court notes that Plaintiffs' counsel have also acted inappropriately.  Plaintiffs' counsel knew that the Defendant had inadvertently filed its billing records.  Plaintiffs' counsel should have alerted Defendant to this fact immediately.  Instead, not only did Plaintiffs' counsel make no attempt to bring this error to Defendant's attention, Plaintiffs' counsel manipulated this error into a perceived litigation advantage.  Making matters worse, Plaintiffs' counsel made various excuses as to why they supposedly believed it was proper to display needless gamesmanship with these billing records.  So while the Magistrate Judge has found that Defendant's counsel's conduct warrants sanctions, as set forth below Plaintiffs' counsel's conduct also falls below an acceptable ethical level.

## II.     Background.[1]

### A.     The undercover investigation and early attorney involvement.

During the fall of 2002, Defendant's general counsel, Robert Boardman, initiated an undercover investigation concerning racial graffiti and the general racial environment at Defendant's Indianapolis facility.  [Docket No. 195, p 38.]  Prior to and during the course of the investigation, Boardman sought advice from Defendant's outside counsel with the law firm Littler Mendelson.  [*Id.* at p. 92.]  Prior to the investigation, Parsons advised Boardman that: "the

---

[1] The billing records prompting Plaintiffs' motion for sanctions refer to Defendant's outside counsel by initials:  David J. Parsons ("DJP"); Allan G. King ("AGK"); Shanthi V. Gaur ("SVG"); Keith C. Hult ("KCH"); Frederick L. Schwartz ("FLS"); Garrison L. Phillips ("GLP"); and Marni B. Helfand ("MBH").  These billing records also refer to Defendant's now-retired General Counsel, Robert Boardman and Defendant's senior counsel, Gary Savine and Sharon Booker-Brown.

2

investigators should be hired by Defendant's in-house counsel or by Littler Mendelson," "employee[s] must be made 'sufficiently' aware that the questioning is for the purpose of allowing [Defendant] to obtain legal advice or if not possible investigators should be limited to 'passive' information gathering. . . ."  [Docket No. 195, Ex. 82.]

Parsons further advised Boardman that Defendant should not "identify the plaintiff-employees in the current lawsuit and . . . give minimal practical direction to the investigators." [*Id*.]  Parsons provided Boardman "authorization language for retaining investigators" that stated "the primary purpose of this request, and the investigation conducted by you and/or your agents as counsel for [Defendant] will be to provide [Defendant] with legal advice."[2]  [Docket 194, Ex. 54.]  Parsons did not advise Defendant to affirmatively instruct the undercover investigators not to speak with named Plaintiffs about the subject matter of the lawsuit or not to make false representations to named Plaintiffs or Defendant's employees generally.

Boardman retained the private investigation company North American Security Solutions ("NASS").  Before the investigation commenced, Boardman met with "the number two guy" at NASS, Ralph Fussner.  [*Id*. at p 91.]  Boardman instructed Fussner to "find out who the graffiti artists were" and return a full report on the environment of the plant.  [*Id*.]  He informed Fussner that there was a pending lawsuit concerning racial graffiti.  [*Id*.]  He did not direct Fussner to tell his investigators not to talk to the named Plaintiffs about the lawsuit.  [Docket No. 195, Ex. 101, p. 93.]  He did not instruct his legal staff to take measures to prevent investigator contacts with Plaintiffs during the course of the investigation.  [*Id*. at p. 102.]

The investigation began in January 2003 and continued through May 2004.  Once the

---

[2] This language was largely adopted by Defendant.  [Docket No. 194, Ex. 55.]

investigation commenced, John Martinicky, Defendant's director of corporate security, passed follow-up instructions to investigators. [Docket No. 195, Ex. 101, pp. 123-24.] Based on statements attributed to Martinicky, one investigator, Dante Clay, understood that his "mission" was "to find out if there was anything to support the lawsuit."[3] [Docket No. 205, Ex. 1, p. 19.] Boardman regularly received copies of daily investigation reports for his review throughout the investigation. Copies of those reports also were forwarded to Parsons and Gary Savine, Defendant's senior counsel. [Docket No. 194, Ex. 55, p. 94; Docket No. 196, Ex. 102, pp. 36-37, 66.] Parsons forwarded copies to Littler Mendelson shareholder Shanthi Gaur. [Docket No. 196, Ex. 102, p. 29.]

Investigators were not informed which employees were Plaintiffs in this action. [*Id*. at p. 82.] The investigators, posing as Defendant's employees, recorded conversations with Defendant's employees. [Docket No. 194, Ex. 60; Docket No. 195, Ex. 83.] On a number of occasions during the investigation, NASS investigators initiated contact with Defendant's employees, including named Plaintiffs.[4] On at least three occasions, an investigator asked Plaintiff Gwen Moore specifically about the lawsuit. [Docket No. 194, Ex. 59.] Investigator Clay continued to discuss the lawsuit with Gwen Moore and Joanne Norris until he was instructed not to discuss the lawsuit with Plaintiffs.[5] [Docket No. 205, pp. 58, 60.] As late as December 2003, an investigator had a conversation with Moore and Norris about alleged racist

---

[3] Martinicky denies telling the investigators anything about the lawsuit. [Docket No. 205, Ex. 3, p. 41.]

[4] The exact number is not certain.

[5] Curiously, Clay cannot recall, even generally, who instructed him or when he was instructed. [Docket No. 205, Ex. 1, pp. 22-23.]

conduct by Cincinnati police.  [Docket No. 205, Ex. 2, p. 70.]

At some point during the investigation, Boardman noted that investigators had discussed the lawsuit with a named Plaintiff.  [*Id*. at p. 95.]  Boardman took no specific action as a result of learning this information.  [*Id*. at pp. 96, 105.]

**B.      Littler Mendelson statements to the Court regarding attorney involvement.**

After learning of the undercover investigation, Plaintiffs sought to depose the investigators and Robert Boardman.  Defendant moved to quash those depositions.  At the February 1 hearing regarding Defendant's motion to quash, David Parsons, a shareholder with Littler Mendelson, made the following statements, among others, pertaining to Littler Mendelson's involvement in the undercover investigation:

> "Now, do I regret some of the language that was used by the investigators?  Yes, I do. But, as our affidavits made clear, we didn't direct anyone to talk to anybody about any subject.  That is, the lawyers involved, including Mr. Boardman and the other in-house lawyers at International Truck and Engine, were not involved in that."  [Feb. Tr. p. 11, lns. 22-25; p.12, lns. 1-2.]

> "we did not direct these activities of the investigators, nor did anyone in-house at International Truck direct these activities."  [Feb. Tr. p. 12, lns. 5-11.]

> ". . . they [the investigators] weren't told -- we didn't know anything.  But whatever direction they were given, should they have been told, 'Hey, you are not supposed to talk about the lawsuit' again, I wasn't involved in that engagement, but, yes, certainly, if I was running the show I guess I would say, 'You are directed not to talk about the lawsuit.'"  [Feb. Tr. pp. 12-13.]

> "So there is a missing nexus here between what the investigator has written, which Your Honor asked me about, and some lawyer directing that investigator to ask about the lawsuit.  That has not been shown and will never be shown.  And I'll say in that respect, Judge, I guess in order to clear my good name, I wouldn't object to -- I never communicated in writing with any of these people."  [Feb. Tr. pp. 44-45.]

> "And I'm telling you, at least from the perspective of the lawyers of Little Mendelson, we had no contact with these people and certainly did not direct them to talk about the lawsuit with these plaintiffs."  [Feb. Tr. p. 46.]

These statements resulted in Plaintiffs filing the instant motion for sanctions.  [Docket No. 132.]  The Court held a sanctions hearing on April 19, 2006.  At the April 19 sanctions hearing, Parsons conceded that during the February 1 hearing on the motion to quash he had incorrectly stated that no Littler Mendelson attorneys had any contact with the investigators. [April Tr. pp. 54-55.]  Although he had an opportunity to fully clarify his statements regarding other matters (such as the extent to which he reviewed investigation summaries, and as discussed below, Garrison Phillips' meeting with investigators) he did not.  Gaur acknowledged reviewing the investigators' notes.  [April Tr. p. 40.]  She admitted seeing that the investigators spoke with named Plaintiffs, but when questioned by the Court in April, she could not recall when she first noted this interaction.[6]  [*Id*.]

### C.     Specific attorney involvement during the investigation.

These inadvertently filed billing records reflect a scenario quite different than the one Parsons represented to the Court.  Littler Mendelson's billing records between June 9, 2003 and September 28, 2003 are replete with references to time spent by Littler Mendelson attorneys, including Parsons, regarding the undercover investigation.  [Docket Nos. 45; 132; 190, Ex. 10.] For example, these records reflect that Littler Mendelson shareholder Garrison Phillips "prepared memorandum re: discoverability of undercover investigation report at the Indianapolis facility and the effects of such disclosure on the litigation" (7/12), "reviewed summaries of investigation notes. . . ." (7/21, 8/05, 8/06, and 8/08), conferenced with Defendant's in-house counsel regarding the undercover investigation (6/17; 7/03), and even met with the investigators

_____

[6] During her subsequent deposition, she recalled that it was probably sometime during July 2003.  [Docket No. 205, p. 13.]

6

(8/13).  [*Id.*]

These records reveal that Parsons had lengthy conversations with other Littler Mendelson

attorneys concerning "risks attendant to undercover investigation report going 'public'" and

other investigation-related matters (7/11, 7/15, 7/16), received and reviewed the investigation

reports on a regular basis, and met with Phillips before and after Phillips' meeting with the

investigators specifically about that meeting (8/12, 8/15).  [*Id.*]  On July 14, 2003, Parsons met

with Boardman, Savine, and others to specifically discuss investigator contact with named

Plaintiffs.  [Docket No. 190, Ex. 10; Ex. 38.]  Both Phillips and Parsons communicated with

Defendant's in-house counsel concerning "closing" the investigation (7/18, 7/21, 8/21).  [Docket

190. Ex. 10.]  In September 2003, Phillips recommended that:

> "we should be certain to allow sufficient time for investigators Mace and Clay to gather
> as much of the follow-up information developed during our interviews.  To that end we
> should continue to work through the normal chain of command to ensure that both Mr.
> Mace and Mr. Clay are progressing towards those identified follow-up issues and that
> they have sufficient time to gather that information."

[Docket No. 195, Ex. 81.][7]

Throughout July 2003, Gaur also performed work related to the investigation.  [*Id.*]

Specifically, Gaur prepared and finalized investigation summaries (7/14), conferenced with other

partners regarding "investigation memo and regarding interviews of investigators" (7/15), and

prepared memos concerning potential negative effects of disclosure of investigation...." (7/16,

7/17).  In preparing investigation summaries, Gaur filled in the last names of Plaintiffs Gwen

Moore and Joanne Norris.  [Docket No. 191, Ex. 40; Docket No. 196, Ex. 104.]  At the time she

---

[7] Martinicky claims responsibility for closing this investigation.  [Docket No. 205, Ex. 3,
p. 93.]

7

filled in these names, she knew Moore and Norris were named Plaintiffs.  [Docket No. 196, Ex. 104, p. 15.]  Gaur did not advise Defendant or the investigators that they should not contact named Plaintiffs about the lawsuit, though she directed an associate to research the issue of contact with named Plaintiffs.  [*Id*. at p. 8.]

Garrison Phillips and Gary Savine met with investigators for a number of hours on August 13, 2003.  Phillips knew prior to meeting with the investigators in August 2003 that an investigator had initiated contact with a Plaintiff about the lawsuit.  [Docket No. 196, Ex. 105, p. 31.]  Phillips did not recall giving the investigators any instruction during the August meeting [*Id*. at p. 34.]  During the August meeting, Savine and/or Phillips directed investigators to follow up on information the investigation had learned, including follow-up with potential class members.[8]  [Docket No. 191, Ex. 39; Docket No. 194, Ex. 61.]  For instance, Savine and/or Phillips "instructed DM [an investigator] to follow up on lead" with Darwyn Proehl, one of Defendant's employees [Docket No. 191, Ex. 39, p. 50], and requested that investigators try to get one of Defendant's African American employees to cite examples of racist conduct [Docket

---

[8] Littler Mendelson disputes that Phillips instructed the investigators to do anything. Whether instruction came from Phillips, Savine, or both is not significant to the Court.  By all accounts, Phillips was, at the very least, present when Savine instructed the investigators to follow up on previously learned information with Defendant's employees.  By failing to affirmatively instruct otherwise, Phillips implicitly ratified the instructions Littler Mendelson alleges were given by Savine only.

No. 191, Ex. 39, p. 52; Docket No. 194, Ex. 61, p. 12].[9]  During the meeting with the investigators, Phillips and Savine learned that Wayne Carver -- a NASS case manager -- allegedly instructed at least one investigator to get as much information from Plaintiffs as possible about the lawsuit and to specifically ask questions targeted at the lawsuit.  [*Id*. at 54.]  There were other items of information on which Savine and Phillips instructed the investigators to follow up, and Savine communicated this to the Littler Mendelson attorneys as early as November 14, 2005.  [Docket No. 194, Ex. 56.]

In January 2006, Savine e-mailed Gaur to clarify, for the purposes of a draft declaration, that he did not instruct the investigators to initiate contact if "initiate" meant "make first contact."  [*Id*. at Ex. 57.]  Regardless, he signed a declaration stating that "I never directed Messrs. Clay or Mace, or anyone else from NASS, to initiate contact with any particular individuals at the Indianapolis Engine Plant, or to otherwise talk to any of the named Plaintiffs in this case."  [Docket No. 103, Ex. 3.]  Gaur used that declaration in support of arguments made to the Court.  [*Id*.]

### D.     Discovery matters relevant to Plaintiffs' motion for sanctions.

Plaintiffs' first and second sets of written discovery requested information relating to: (1) all investigations, internal or external, regarding racial harassment; (2) the existence of racial graffiti and nooses; and (3) Defendant's responses, steps and exercises of reasonable care to

---

[9] Subsequent to the April 19 hearing, Defendant acknowledged that in-house counsel Gary Savine and outside counsel Garrison Phillips "participated in conversations in which it appears that each of the two investigators was asked to obtain further information from certain non-plaintiff employees with whom the investigators had previously spoken" during an August 13, 2003 meeting with investigators.  [Docket No. 159, ¶ 4.]  Counsel apologized for the inaccuracies in their previous statements regarding their involvement in the undercover investigation.  [*Id*.]

remove, eliminate, remedy or prevent the recurrence of racial graffiti.  [Docket No. 198, Exs. 117-18.]  While Defendant responded to these requests before the investigation began in February 2002, it did not supplement its responses to produce responsive information or a privilege log until ordered to do so by the Court at various stages of this litigation.  For instance, Defendant only provided information regarding the investigation after being ordered to do so twice in 2005.  Even then, Defendant did not produce a number of investigation incident reports.  [Docket No. 189, p. 28.]  The Court provided the parties with subsequent instruction regarding the scope of permissible discovery on several occasions beginning in April 2006.  Despite this instruction, Defendant's counsel persisted in withholding discoverable information.  Plaintiffs orally moved to compel that production on May 17, 2006.  The Court reviewed the documents at issue and determined that, in many instances, portions of those documents were discoverable, and ordered them produced.

On May 30, 2006 Defendant produced 17 affidavits signed between June and July 2004, without explanation for why they were previously withheld.  [*Id*. at p. 30.]  Tape recordings created during the investigation were not retained or produced.  [Docket No. 198, Ex. 115.]  According to NASS, these tape recordings cannot be recovered because the computer server on which they were stored crashed and was replaced sometime in 2006.  [*Id*.]

## III.   Discussion.

### A.    Violations of the Rules of Professional Conduct.

Plaintiffs assert that Defendant and its counsel engaged in a slew of ethical violations in both Indiana and Illinois.  The involvement of two different jurisdictions would appear at first blush to raise the question of whether to apply the rules of professional conduct for Indiana or

10

Illinois.  However, with the exception of Rule 4.4, which the Court discusses below only as it relates to Indiana Rule 4.4,[10] the Indiana and Illinois rules of professional conduct at issue in this matter are substantially similar and do not require more specific delineation.  These rules focus on the "duties of attorneys, not the rights of parties."  *Parker v. Pepsi-Cola General Bottlers, Inc.*, 249 F. Supp. 2d 1006, 1010 (N.D. Ill. 2003).  The Court finds it helpful to assess each distinct category of conduct complained of separately to determine whether any particular rule was violated.

> **1.   Counsel's involvement in the undercover investigation and investigator contact with Defendant's employees.**

Plaintiffs assert that five of Defendant's counsel -- Boardman, Savine, Parsons, Phillips and Gaur -- violated Rules of Professional Conduct 4.2, 4.3, 5.3, and 8.4 when they: (1) failed to fully disclose the instance of an undercover investigation; (2) directed and/or caused the undercover investigators to have contact with represented parties and employees who were potential members of the class; and (3) allowed the investigators to give false information about who they were to the Plaintiffs and other employees.  [Docket Nos. 93, 132, 189; Feb. Tr. pp. 24-38.]  Plaintiffs assert that counsel directed and/or caused the undercover investigators to have contact with named Plaintiffs about the substance of the underlying litigation and other employees under false pretenses, in violation of these rules.

Under Rule 4.2, a lawyer may not ethically communicate "about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law or a court order."

_____

[10] Illinois Rule 4.4 lacks the subpart b contained in Indiana's rule 4.4.

Rule 4.2 "preserves the integrity of the lawyer-client relationship by prohibiting contact, absent consent or legal authorization, with the represented party" and recognizes the unfair advantage an attorney can wield over an untrained laymen.  *In re Air Crash*, 909 F. Supp. 1116, 1121 (N.D. Ill. 1995).  It is "designed to prevent counsel from overreaching and exploiting uncounseled employees into making ill-considered statements or admissions."  *Id.* (internal citation omitted).  In lay terms, "lawyers (and investigators) cannot trick protected employees into doing things or saying things they otherwise would not say or do."  *Hill v. Shell Oil Co.*, 209 F. Supp. 2d 876, 880 (N.D. Ill. 2002).

With respect to unrepresented employees, Rule 4.3 mandates that "in dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested."  As with Rule 4.2, an attorney's agent could not do what the attorney himself could not do.  *U.S. v. Smallwood*, 365 F. Supp. 2d 689, 696 (E.D. Va. 2005).  Thus, neither an attorney nor his agent can mislead an unrepresented employee into believing that they are a disinterested party when the attorney is acting on behalf of his client.  *Air Crash*, 909 F. Supp. at 1123-24.

Rule 5.3 provides "with respect to a nonlawyer employed or retained by or associated with a lawyer: . . a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved. . . ."  Rule 5.3(b) and (c).  Lastly, under Rule 8.4, it is professional misconduct for a lawyer to "engage

12

in conduct involving dishonesty, fraud, deceit or misrepresentation" or "engage in conduct that is prejudicial to the administration of justice."  Rule 8.4(c) and (d); *Smallwood*, 365 F. Supp. 2d at 698.

Plaintiffs argue that these rules apply even though NASS conducted the investigation with its own investigators because an attorney cannot do through others what the rules prohibit that attorney from doing directly.  Defendant contends that the undercover investigation comported with all ethical constraints and that any contact with named Plaintiffs was "infrequent, non-substantial" and unintentional.  [Docket No. 143, p. 3.]  Defendant argues that none of the attorneys involved instructed the investigators to contact named Plaintiffs.  [Docket No. 205, p. 2.]  Moreover, Defendant asserts that any contact with Plaintiffs and discussion regarding the lawsuit did not persist throughout the investigation and Plaintiffs suffered no prejudice as a result of any improper contact.  [Docket Nos. 203, 205.]

Defendant relies heavily on *Jones v. Scientific Colors, Inc*., 201 F. Supp. 2d 820 (N.D. Ill. 2001).  Similar to the inquiry in this case, the *Jones* court also had to determine if an undercover investigation that resulted in contact with named plaintiffs by investigators implicated ethical violations on behalf of counsel representing a corporate defendant.  *Id*.  In *Jones*, the owner of the investigative service testified that he was not directed to speak with any particular employees nor did defendant's counsel direct the focus of the undercover investigation.  *Id*. at 826.  Moreover, counsel never -- directly or indirectly -- told either of the investigators to communicate with anyone.  *Id*. at 828.  The *Jones* court, with little analysis, concluded the record was insufficient to warrant attorney disqualification much less sanctionable ethical violations.  *Id*. at 834.

13

The case at hand differs from *Jones* in several critical ways.  Most notably, in this matter Defendant's in-house and outside counsel were integrally involved in the investigation from its conception to close.  In *Jones*, it was the human resource director and the defendant company's corporate officers, not the general counsel, that initiated the investigation and retained the investigation service.  *Id*. at 825-26.  Any involvement of counsel came after the decision to conduct an investigation was made and an investigator was hired.  In this case, Defendant's in-house counsel decided, albeit in concert with the head of security, that an undercover investigation was necessary and sought the advice of Littler Mendelson on how to conduct it.  Defendant's counsel -- both in-house and outside -- were actively involved in this investigation's conception, execution, and termination.

With respect to the investigation itself, *Jones* is inapposite to this case as well.  The *Jones* case lacks any evidence of review of daily summaries at the regular interval present in this case and by the number of counsel.  In this matter, three shareholders from Littler Mendelson as well as in-house counsel reviewed daily summaries on a regular basis.  While an attorney was present at a meeting or two with investigators in *Jones*, that case lacks any evidence that attorneys actively interviewed and affirmatively instructed investigators to the extent the record in this case shows Savine and/or Phillips interviewed and instructed investigators.  In this case, Savine and Phillips not only met with the investigators for the better part of the day, Phillips discussed this meeting with Parsons before and after the meeting.

Finally, in-house counsel, with advice from Littler Mendelson, determined when and how the investigation should be closed.  *Jones* shares no such similarity.  Based on the totality of the evidence, *Jones* is distinguishable because the counsel in the case at bar were significantly

14

involved at all stages of this investigation.

Moreover, counsel should have known that improper conduct with named Plaintiffs was occurring given the number of attorneys who reviewed investigation-related documents and the frequency with which they reviewed investigation summaries.  While the evidence does not establish that Defendant's counsel affirmatively directed the investigators to contact Defendant's employees, including named Plaintiffs, the Court simply cannot condone Defendant's ostrich-styled defense.  Defendant's counsel's culpability is compounded by their failure to affirmatively advise, instruct or otherwise act to prevent contact with represented employees or to prevent contact with unrepresented employees under false pretenses.

Boardman and the Littler Mendelson attorneys also dispute that Rules of Professional Conduct 4.3 and 8.4 limit undercover investigations, and point to ABA opinions and other non-binding authority.  [Docket No. 203, pp. 5-6.]  This authority is of little assistance to the Court primarily because the cited portions do not address the circumstance of investigator misrepresentation to employees of a defendant firm where those investigators are acting on behalf of counsel to gather information from employees who are potential class members in a pending lawsuit.  Counsel's reliance on *Fair Automotive Repair, Inc. v. Car-X Serv. Sys.*, 128 Ill App. 3d 763 (Ill. Ct. App. 1984), is misplaced because that court did not address the equivalent of Rule 4.3.  Even if it had, the case is factually distinct from this case.

The Court finds that these rules do apply here, and counsel should not only have detected the improper conduct but should have taken reasonable steps to remedy it more expediently.  Thus, the Court concludes that counsel Boardman, Savine, Parsons, Phillips, and Gaur violated Rules 4.2, 4.3, 5.3, and 8.4.

15

### 2.        Representations made by counsel to the Court.

Rule 4.1 specifies that "in the course of representing a client a lawyer shall not

knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to

disclose a material fact to a third person when disclosure is necessary to avoid assisting a. . .

fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."  Moreover, Rule 3.3

proscribes false statements of law or fact by a lawyer made knowingly to a tribunal.  It further

contemplates that lawyers must correct any false statements of material law or fact previously

made by a lawyer to a tribunal.

Plaintiffs submit that Gaur, Phillips, and Savine violated Rules 3.3 and 4.1 when they

filed affidavits that omitted their full involvement in the undercover investigation.  Plaintiffs

contend that Parsons and Gaur violated these rules when they represented that no one from

Littler Mendelson had contact with the investigators or that no one at International, let alone

International's attorneys, ever directed the investigators to speak to any particular individual.

[Docket No. 132, pp. 4-8; Docket No. 189, pp. 19-25.]

Defendant's counsel initially stated that the "Littler Mendelson lawyers [had] truthfully,

accurately and explicitly represented to the Court that no one from the law firm was involved in

the engagement of the undercover investigators and no one from the law firm ever gave any

instructions or directions to the undercover investigators as to whom to interview or contact."

[Docket No. 143, p. 3.]  Later they modified their contention to allow for Parson's inaccurate

February statements to the Court by characterizing them as unintentional "factual mistakes

[made] in the heat of battle."  [Docket No. 205, p. 7.]

With respect to counsel's affidavits,[11] Defendant and its outside counsel argue that the information is factually accurate.  Specifically, they represent that the "affidavits accurately convey that the firm had no involvement in the directions given to NASS or the investigators." [*Id.* at p. 5.]  In particular, Phillips testified that he "never directed Messrs. Clay or Mace, or anyone else from NASS, to talk to any particular individuals, including the named Plaintiffs in this case or the class member employees whom they represent."  [Phillips Aff. ¶ 4.]  Defendant and its counsel assert that this testimony, in concert with the other testimony from Littler Mendelson counsel, "clearly and explicitly provide only that the Littler Mendelson attorneys all had 'no involvement' in directing anyone from NASS to talk to any particular individuals. . . ." [Docket No. 143, p. 5.]

While conceding that in some respects certain statements were incorrect,[12] Defendant and its counsel argue that any misstatements were not knowing or intentional.  They further argue that these statements must be construed in the context of the initial engagement of the investigation and "directions to the investigators at the outset of their investigation."  [Docket No. 143, p. 7.]

The Court finds that Parsons knowingly made false statements of material fact regarding the involvement of Littler Mendelson attorneys in the undercover investigation at the February 1

---

[11] Defendant attached affidavits from Parsons, Gaur, Phillips, Savine and others to its materials in support of its motion to quash.  [Docket No. 103.]

[12] Littler Mendelson attorneys were not the only counsel guilty of incorrect statements. Incredibly, deposition counsel for Boardman and Parsons incorrectly portrayed the status of their *pro hac vice* motions.  Both separately represented in open court that *pro hac vice* motions had been filed on their behalf when in fact none had been filed.  These motions were filed only after the Court directly confronted counsel on this matter.

hearing and failed to fully correct all of his misstatements at the April 19 hearing.  At the
February hearing, Parsons emphatically stated that no one from Littler Mendelson had any
contact with NASS or its investigators.  The billing statements show this statement to be false.
Littler Mendelson attorney Garrison Phillips met with investigators, and Parsons -- himself
having met with Phillips before and after the meeting -- was fully aware of that crucial fact
before he made this misrepresentation.  Moreover, Phillips, in tandem with in-house counsel
Gary Savine, guided the focus of the investigators' inquiry to some extent by directing them to
gather certain types of follow-up information.  At the April hearing, Parsons still represented that
none of the Littler Mendelson attorneys directed the investigation and painted a picture of
minimal involvement.  Subsequent discovery has rebutted his testimony.

Yet, Parsons' conduct is not the only troubling behavior among Defendant's counsel.
The Court is also bothered by Garrison Phillips' and in-house counsel Gary Savine's affidavits
and Gaur's reliance on those affidavits.  Phillips' testimony that he "never directed Messrs. Clay
or Mace, or anyone else from NASS, to talk to any particular individuals, including the named
Plaintiffs in this case or the class members employees whom they represent" was belied by
Defendant's belated discovery production.  He may not have directed the investigators to talk to
named plaintiffs, but he certainly had a part in directions given to the investigators to follow up
with defendant's employees, including potential class members.  Tellingly, unlike Parsons,
Phillips has not addressed his erroneous testimony.  Savine signed an affidavit representing that
he did not instruct any investigator to "initiate" contact when, as previously set forth, he knew
that "initiate" was subject to an inaccurate interpretation.

The tardy production further undermines Gaur's representations to the Court that no one

at International ever directed the investigators to speak with employees including named

Plaintiffs.  She further indicated that affidavit testimony from Savine and Phillips was true even

though she knew or had reason to know that Savine, and possibly Phillips, instructed the

investigators to contact employees in follow-up to previous contacts.  [Docket No. 194, Ex. 57.]

Equally troubling is Gaur's submission and reliance on these affidavits knowing that their

veracity was questionable.  Gaur's defense that she did not receive Savine's qualifying e-mail

because she was absent from the office the day he sent it is dubious.  Counsel cannot reasonably

expect the Court to believe that a shareholder with a major law firm would not have some

protocol in place for e-mail review in her absence or that she would not have eventually

reviewed e-mail upon return.  Thus, the totality of the evidence shows that Parsons, Phillips,

Savine, and Gaur violated Rules 3.3 and 4.1(a).[13]

> **3.      Plaintiffs' counsel's conduct regarding billing records.**

Though the focus of this decision thus far has been on the conduct of Defendant's

counsel, the behavior of Plaintiffs' counsel with respect to Defendant's counsel's billing records

is also disconcerting.  Plaintiffs' counsel waited nearly three months before notifying Littler

Mendelson that its billing records had been filed with the Court in October 2005.  Defendant

contends that Indiana Rule of Professional Conduct 4.4(b) required Plaintiffs' counsel to return

or at the very least provide notice of the errantly filed billing records.  [Docket Nos. 143, 205.]

Plaintiffs' counsel dispute that they had any ethical or legal obligation to provide such notice.

[Docket No. 150, p. 8.]  First, they argue that Rule 4.4 is inapplicable because the time records

---

[13] The Court rejects Littler Mendelson's argument that the Court cannot decide this issue
without first holding an evidentiary hearing.  The Court did so on April 19 and has provided
counsel a full opportunity to present evidence in its defense by way of supplemental briefing.

were not "sent" to Plaintiffs.  [*Id.*]  In the alternative, they assert that some ambiguity existed

concerning the records' application to summary judgment.  [*Id.*]  At the April hearing, Plaintiffs'

counsel also indicated that a review of Defendant's summary judgment filings led them to

conclude that Defendant had affirmatively verified filings -- including the billing records -- were

filed correctly.

Rule 4.4(b) unequivocally states, "a lawyer who receives a document relating to the

representation of the lawyer's client and knows or reasonably should know that the document

was inadvertently sent shall promptly notify the sender."  None of Plaintiffs' counsel's

arguments that they acted ethically with respect to the inadvertently filed billing records pass

muster.  The commentary to this rule discussing "document" forecloses counsel's chief

contention that they did not have any ethical obligation under this rule because they did not

"receive" the bills in question.  The commentary states plainly "for purposes of this rule,

'document' includes e-mail or other electronic modes of transmission subject to being read or

put into readable form."  Service of documents via the Court's CM/ECF system lies squarely in

the category of information contemplated by this rule.  Counsel's assertion that they did not

"receive" these billing records because they were published on the Court's electronic docket is

not well-taken.

The Court can make short work of counsel's remaining justifications for their conduct.

None of the attached billing records has any arguable relation to Defendant's summary judgment

motion.  Counsel's contention that Littler Mendelson verified that the summary judgment

attachments, including the billing records, were intentionally filed is not supported by an

examination of the record.  Instead, the record demonstrates only that Defendant's counsel, after

experiencing technical difficulties electronically filing its summary judgment filings, verified that it had filed "all of the documents relating to Defendant's Motions for Summary Judgment" on October 28, 2005.  [Docket No. 48.]   Plaintiffs' attempt to stretch this representation beyond its obvious purpose reflects poorly on Plaintiffs' counsel.

Plaintiffs' counsel's conduct in "secretly" holding these billing records from Defendant for months before filing their sanctions motion runs afoul of Rule 4.4.[14]  Plaintiffs' counsel, Fay Clayton, conceded to the Court that the reason, in large part, that these records were retained was to test the veracity of Parsons' statements regarding Littler Mendelson's involvement in the undercover investigation.  Indeed, Clayton requested a written record of the February hearing so that she could compare Parson's testimony with the billing records.  The Court does not look kindly on such gamesmanship.  Plaintiffs' counsel failed in their ethical obligation to promptly return these documents upon discovery, or at the very least, notify opposing counsel of their filing.[15]  Plaintiffs' counsel compounded their ethical transgression by articulating arguments, pretextual in part, to the Court when a more candid acknowledgment of their strategic reasons for withholding these documents was more appropriate.  Plaintiffs' counsel violated Rule 4.4 and are hereby admonished for such conduct.

---

[14]Of course, had Defendant's counsel been more careful in filing its summary judgment materials, and/or reviewing what was actually filed, Defendant would have avoided this mistake or learned of it promptly.  Obviously, however, this did not occur in the instant case.

[15] Defendant could thus have promptly moved to have the billing records stricken from the record or sealed from public view.  Indeed, in denying the request that Defendant ultimately made to do so, the Court relied in relevant part on the length of time the records had been in the public domain.  [Docket No. 146, pp. 2-3.]

### B.      Rule 26(e) violation.

Rule 26(e) requires Defendant to "seasonably amend a prior response to an interrogatory,

request for production, or request for admission if the party learns that the response is in some

material respect incomplete or incorrect and if the additional or corrective information has not

otherwise been made known to the other parties during the discovery process or in writing."

Fed. R. Civ. P. 26(e)(2).  Plaintiffs assert that Defendant delayed production of evidence relevant

to the undercover investigation, or, in some instances, failed to produce evidence in

contravention of Rule 26(e).  [Docket No. 189, pp. 26-29.]  Plaintiffs allege that Defendant did

not timely supplement its discovery responses to fully produce investigation-related evidence or

produce in the alternative a privilege log.  [Docket No. 189, pp. 27-30.]  Plaintiffs argue that this

delayed production tainted other discovery efforts and resulted in the unavailability of other

crucial evidence.  [*Id.*]

Defendant asserts that "Plaintiffs should not be allowed to seek further relief for a

discovery dispute which was resolved in their favor nine months ago."  [Docket No. 204, p. 3.]

Defendant opposes Plaintiffs' motion for any discovery-related sanctions.  Defendant and its

counsel posit that the production delay in this case is a normal discovery consequence.  [See

Docket No. 204, p. 2-4.]  This defense presupposes that Plaintiffs seek relief only for

Defendant's refusal to produce the NASS reports it produced to Plaintiff on September 30, 2005.

To this extent Defendant misunderstands Plaintiffs' underlying claim for relief.

Plaintiffs' claim is more expansive.  In addition to Defendant's failure to more timely

supplement its responses, Plaintiffs seek relief for Defendant's failure to produce all reports for

the month of October 2003, incident reports 1 and 7, fifteen other NASS reports, audio-taped

22

interactions between the investigators and its employees, and 17 affidavits signed in June and July 2004.  [Docket No. 189, pp. 30.]  The prejudice to Plaintiffs was not "cured by International's production of all the reports in its possession on September 30, 2005" as Defendant argues because some of this evidence no longer exists (audio-taped conversations) and Plaintiffs conducted and defended a wealth of depositions without the benefit of these documents.

Furthermore, Defendant did not provide a privilege log until May 2006, and Plaintiffs could not move to compel what they did not know existed.  With respect to NASS documents, Defendant may not have had possession of each and every document, but it did have some control considering NASS was its in-house counsel's agent.  Absent any evidence that Defendant requested these documents from NASS and that NASS refused to produce them, Defendant is not absolved of its responsibility to diligently investigate the whereabouts of all responsive documents and produce the same.

The Court finds that Defendant failed to comply with Rule 26(e) when it did not timely supplement its responses to include information regarding the audio-tape conversations, the documents NASS recently produced, and the 17 affidavits Defendant ultimately produced.

### C.      **Appropriate sanctions**.

Plaintiffs do not argue for any particular sanction against Defendant and its counsel. Instead, Plaintiffs detail the range of possible sanctions and then contend it is up to the Court to decide which sanction is most appropriate.  [Docket No. 189, pp. 30-35.]  A federal district court has the inherent ability to discipline an attorney for, among other things, ethical violations.  *In re Aircrash*, 909 F. Supp. at 1124; *See also Equal Employment Opportunity Commission v. Midwest*

*Emergency Associates, LTD.*, 2006 WL 495971 at * 8 (N.D. Ill. Feb. 27, 2006) ("A district court has wide discretion concerning whether to impose sanctions and, if so, what the sanctions should be in order to uphold the applicable rules of ethics. . . ).  In determining whether sanctions are appropriate, a court may consider "the seriousness of the violations and whether the violations were intentional, as well as the nature and extent of prejudice suffered or likely to be suffered by the parties in the future as a result of the violation." *In re Aircrash*, 909 F. Supp. at 1124.  With respect to violations of the Rules of Professional Conduct, at least one district court in this circuit has commented that a violation of the rules does not require intentional conduct, stating "instead . . . these Rules are more in the nature of strict liability." *Id.*  Courts may further "consider the prejudice to the judicial system and the potential for punishment and deterrence when assessing sanctions." *Parker*, 249 F. Supp. 2d. at 1012.

Likewise, Rule 37(c)(1) provides for "appropriate sanctions" when a party, without substantial justification, fails to make a required discovery response or supplement a prior response.  The ability to sanction falls squarely within the discretion of the district court, which "is in the best position to . . . settle any discovery disputes" that arise in litigation.  *Gile v. United Airlines, Inc.*, 95 F.3d 492, 495 (7th Cir. 1996); *see also Claiborne v. Wisdom*, 414 F.3d 715, 724 (7th Cir. 2005) (noting that a court has the inherent power to impose sanctions even where "the misconduct has somehow slipped between the cracks of the statutes and rules covering the usual situations" if "the situation is grave enough to call for them").  A party may avoid sanctions if it can demonstrate substantial justification for a discovery violation or the court finds that the violation in the absence of any substantial justification was harmless.  *Musser v. Gentiva Health Services*, 356 F.3d 751, 755 (7th Cir. 2004).  Where a court determines that sanctions are

necessary, "the sanction selected must be one that a reasonable jurist, apprised of all of the circumstances, would have chosen as proportionate to the infraction." *Salgado v. General Motors Corporation*, 150 F.3d 735, 740 (7th Cir. 1998).

Contrary to Plaintiffs' assertion that "sanctions are appropriate against the company itself," the Court finds that fault for most of any wrongdoing lies with Defendant's counsel.  It was Defendant's counsel conduct -- not Defendant's -- during the undercover investigation, discovery, and before the Court that precipitated Plaintiffs' motion for sanctions.  Thus, the Court endeavors first to determine what sanctions best fit counsel's conduct.  Plaintiffs initially raised the prospect of disqualification.  [Docket No. 132.]  "Prohibiting lawyers who violate ethical requirements from further participating in the legal proceedings to which the violation pertains is one way to renew the public's faith in the integrity of the legal profession and in the fairness of the judicial proceedings."  *Andrew Corp. v. Beverly Manufacturing Co.*, 415 F. Supp. 2d 919, 926 (N.D. Ill. Feb. 16, 2006).

But, "attorney disqualification is a 'drastic remedy which courts should hesitate to impose except when absolutely necessary [because] it may create . . . delay and deprive parties of their chosen legal advisor.'"  *Id.* at 925 (*quoting City of Waukegan v. Martinovich*, 2005 WL 3465567, at * 3 (N.D. Ill. 2005)).  Disqualification is not an automatic result of an ethical violation.  *SWS Financial Fund A v. Salomon Brothers, Inc.*, 790 F. Supp. 1392, 1400 (N.D. Ill. 1992).  As the *SWS* court noted, "given the costs imposed by disqualification and the theoretical availability of alternative means of enforcement of the disciplinary code, a court should look to the purposes behind the rule violated in order to determine if disqualification is a desirable sanction."  *Id.* at 1401.  Given the purposes of the ethical rules discussed previously,

disqualification is not an appropriate remedy.[16]  The procedural posture of this case and its close

proximity to trial further weigh against disqualifying counsel, as such a remedy would have an

unintended punitive consequence against Defendant.  With respect to counsel's violation of

Rules 4.2, 4.3, 5.3, and 8.4, the Magistrate Judge recommends a public reprimand for Boardman,

Savine, Parsons, Gaur, and Phillips.[17]  Because Littler Mendelson's counsel's conduct includes

prejudicial dilatory discovery tactics and misrepresentations to the Court, the Magistrate Judge

recommends additional sanctions against them for violations of ethical Rules 4.1 and 3.3 and

discovery Rule 26.  Accordingly, the Court focuses its discussion on the propriety of monetary

sanctions.[18]

  The battery of available remedies for an attorney's ethical or discovery violation include

monetary sanctions.  *Blanchard v. Edgemark Financial Corporation*, 175 F.R.D. 293, 303 (N.D.

Ill. 1997); Fed. R. Civ. P. 26(g) and 37.  Defendant and its counsel do not necessarily dispute

this.  As addressed above, they dispute that they committed any violations.  Having found to the

contrary, the Magistrate Judge believes that monetary sanctions are appropriate.  It is difficult to

---

[16] Nor would a default judgment be just under these circumstances.

[17] With respect to Boardman and Savine, the Court is mindful that in some instances they acted in good faith upon advice from Littler Mendelson counsel and finds that this is a mitigating factor that weighs against any additional sanction.  Nevertheless, the Magistrate Judge finds a public reprimand fitting for Boardman and Savine.  Although they are not counsel of record for the Defendant, this Court may properly sanction them.  As general counsel, Boardman was the Defendant's agent for litigation purposes, and participated as the Defendant's representative at various proceedings.  Savine served as senior counsel for the Defendant for litigation purposes, and signed a misleading affidavit filed with the Court.

[18] Plaintiffs pose alternative remedies of exclusion of evidence, or admission of facts presented in evidence.  Not only are these inherently conflicting remedies, but they shift any burden from Defendant's counsel to Defendant.  Accordingly, the Court rejects both of these suggestions and finds any further discussion unnecessary.

separate the delay in production from the ethical violations, and it is likely that one flowed from the other.  While Defendant's outside counsel posit that the production delay in this case is a normal consequence under the Federal Rules of Civil Procedure [Docket No. 204, pp. 2-4], this alone does not allow them to escape penalty.  While it is true that the rules permit a party to object to certain requests and delay production pending the outcome of the inevitable motion to compel, a party that chooses that path does so at its own peril because Rule 37 contemplates "reasonable expenses incurred in making the motion [to compel]. . . ."[19]

To dissuade any such future transgressions, the Magistrate Judge recommends that Littler Mendelson reimburse Plaintiffs' reasonable attorney fees and costs associated with Plaintiffs' opposition to Defendant's motion to quash and in support of its motion for sanctions, including the April hearing.  Plaintiffs are not entitled to any fees or costs associated with discovery conducted consequent to the motion for sanctions.  This discovery, while a consequence of the motion for sanctions, was either not critical to the Court's determination or too inextricably entwined with discovery on the merits of this case.

Moreover, as noted at the outset, Plaintiffs' counsel's failure to promptly notify the Defendant of the inadvertently filed billing records amounted to needless gamesmanship. Prompt notification, as required by the rules, may well have eliminated or at least minimized the discovery squabbles and related battles that followed.  It would be inequitable to permit Plaintiffs, as part of the instant motion, to recover all of their attorneys fees for satellite litigation

---

[19] Rule 37 does allow a non-moving party to escape reasonable fees under certain exceptions, none of which apply to this matter.  Defendant and its counsel cannot show substantial justification for its dilatory approach to discovery nor was it harmless to the Plaintiffs.

that Plaintiffs likely could have avoided by simply complying with their ethical obligations.

Given the September 19 trial date in this matter, the Magistrate Judge recommends that Plaintiffs submit materials in support of their fees with any fee petition that they file with the Court should they prevail at trial. If Defendant prevails at trial, the Magistrate Judge recommends that Plaintiffs file their fee petition regarding the matters specified herein within fifteen days of entry of final judgment.

## IV. Conclusion.

For all these reasons, the Magistrate Judge recommends that Plaintiffs' motion for sanctions [Docket No. 132] be granted. The Magistrate Judge recommends that Defendant's counsel Robert Boardman, Gary Savine, David Parsons, Shanthi Gaur, and Garrison Phillips be publicly reprimanded for violating professional conduct rules 4.2, 4.3, 5.3, and 8.4.

The Magistrate Judge further recommends that Littler Mendelson attorneys David Parsons, Garrison Phillips, and Shanthi Gaur also be found to have violated professional rules 3.3 and 4.1, as well as Federal Rules of Civil Procedure 26(e), and that these violations warrant monetary sanctions. Accordingly, the Magistrate Judge recommends that the law firm Littler Mendelson be ordered to reimburse Plaintiffs' reasonable attorneys' fees and costs associated with Plaintiffs' opposition to Defendant's motion to quash and in support of Plaintiffs' motion for sanctions, including the April 2006 hearing. Discovery fees and costs consequent to Plaintiffs' motion for sanctions shall not be reimbursed as part of this order. Plaintiffs may include these reasonable fees and costs in any fee petition that they file with the Court should they prevail at trial. If Defendant prevails at trial, the Magistrate Judge recommends that Plaintiffs file their fee petition regarding the matters specified herein within fifteen days of final

28

judgment.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1), and failure to file timely objections within ten days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  09/06/2006

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

29

Copies to:

Thomas A. Brodnik
STARK DONINGER & SMITH
tbrodnik@sdsfirm.com

Rocco Calamusa Jr.
Russell W. Adams
WIGGINS CHILDS QUINN & PANTAZIS
LLC
rcalamusa@wcqp.com

Fay Clayton
ROBINSON CURLEY & CLAYTON
fclayton@robinsoncurley.com

Terence Leslie Fague
COOLIDGE WALL WOMSLEY &
LOMBARD
fague@coollaw.com

Edward W. Feldman
MILLER SHAKMAN & BEEM LLP
efeldman@millershakman.com

Samuel Fisher
WIGGINS CHILDS QUINN &
PANTAZIAS LLC
sfisher@wcqp.com

Shanthi Gaur
LITTLER MENDELSON
sgaur@littler.com

Richard D. Hailey
RAMEY & HAILEY
office@sprynet.com

Cynthia H. Hyndman
ROBINSON CURLEY & CLAYTON PC
chyndman@robinsoncurley.com

Linzey D. Jones
PUGH JONES JOHNSON & QUANDT PC
ljones@pjjq.com

Walter Jones Jr.
PUGH JONES JOHNSON & QUANDT PC
wjones@pjjq.com

Angel Marie Krull
ROBINSON CURLEY & CLAYTON P.C.
akrull@robinsoncurley.com

Emily Nicklin
KIRKLAND & ELLIS
enicklin@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS LLP
mnomellini@kirkland.com

Darlene M. Oliver
ROBINSON CURLEY & CLAYTON PC
doliver@robinsoncurley.com

David J. Parsons
LITTLER MENDELSON PC
dparsons@littler.com

Garrison L. Phillips
LITTLER MENDELSON, P.C.
gphillips@littler.com

Anthony B. Ratliff
STARK DONINGER & SMITH
aratliff@sdsfirm.com

30