**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| **GREG ALLEN, *et al.*,** | ) | **Civil Action No.** |
| | ) | **IP02-C-0902-Y/K** |
| **Plaintiffs,** | ) | |
| | ) | **The Honorable** |
| **v.** | ) | **Richard L. Young** |
| | ) | |
| **INTERNATIONAL TRUCK AND ENGINE** | ) | **Magistrate Judge** |
| **CORPORATION, f/k/a NAVISTAR INTERNATIONAL** | ) | **Tim A. Baker** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF SETTLEMENT**

## I.   THE HISTORICAL BACKGROUND OF THIS SETTLEMENT

In 2000, the twenty-seven (27) Named Plaintiffs in this case filed EEOC charges alleging,

*inter alia*, a pervasive pattern of racial harassment at the International Truck and Engine Corp.'s

("ITEC") Engine Plant in Indianapolis, Indiana (the "Plant").  On October 16, 2001, on behalf of

themselves and all current and former Plant African-American employees, the Named Plaintiffs

brought suit in federal court in Chicago, alleging, among other claims, a racially hostile

environment at the Plant.  These 27 Named Plaintiffs included twenty-two (22) then-current

African-American employees and four (4) former African-American employees of ITEC.[1]  On

May 21, 2002, the case was transferred to this Court.[2]

---

[1]       One (1) additional Named Plaintiff, Mathew Whitfield, who never worked at the
Plant, brought a hiring claim.  This claim is not being settled by the Consent Decree.

[2]       An additional class action hiring claim, focusing on ITEC's Chicago-area plant,
was not transferred to this Court.  That claim was settled in the federal court in Chicago and
given final approval in December 2004.

The Consent Decree, a copy of which is attached as Exhibit A, was preliminarily approved by the Court on March 8, 2007.  Individual notice was sent to Class Members by First Class Mail shortly thereafter.  As discussed below, the reaction of the Class to the proposed settlement has been unanimously favorable.  There can be no question that the standards of Rule 23, Fed. R. Civ. P., are satisfied and that the Consent Decree should be given final approval by the Court.

### A.      The Pre-Trial Phase of This Case

The five- (5-) year pretrial phase of this case was intense and thorough.

#### 1.      Discovery

Between October 16, 2001, when this case was filed, and September 19, 2006, when trial began, extensive discovery was conducted.  It included many dozens of depositions, numerous document requests, and multiple sets of interrogatories.  Discovery also spawned numerous hard-fought discovery motions, including motions to compel and motions to quash.  In addition to run-of-the-mill discovery issues, in 2005, Plaintiffs' counsel learned that ITEC had been conducting an undercover investigation of racial harassment at the Plant (the "Undercover Investigation") without informing Plaintiffs, and without producing the fruits of that Undercover Investigation in discovery.  Extensive motion practice related to the ethical implications of the Undercover Investigation and its discoverability followed, and hearings were conducted before both Magistrate Judge Tim A. Baker, who was supervising discovery, and the District Court on these and related subjects.

#### 2.      Initial Settlement Talks

Beginning in 2003, settlement negotiations, mediated by Magistrate Judge Baker, were conducted.  These settlement conferences often lasted a full day or longer.  They were conducted

in Judge Baker's courtroom, and they were typically attended by dozens of Named Plaintiffs, together with Class Counsel, as well as numerous defense representatives.  From his role in supervising discovery, Judge Baker was familiar with the facts and legal issues, but the parties also supplied confidential settlement statements to facilitate the process.  While some progress was made with regard to the injunctive relief that might be agreed to, no settlement was achieved.

On September 9, 2003, the Court granted ITEC's motion to add, as Rule 19(a) parties, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("IAW") and Local 98 (jointly, the "Unions").  The Unions did not participate in settlement talks, however, until after a monetary settlement had been agreed to, in September 2006.

### 3.    Class Certification

In early 2003, the class certification motion was briefed and argued in both the District Court and the Seventh Circuit, and on July 28, 2004, this Court certified a racially hostile environment class under Rules 23(b)(2) and (3), Fed. R. Civ. P.

Notice of the Certification was sent to the Class, and only two (2) potential Class Members exercised their right to exclude themselves from the Certified Class.  Even after Class Certification, however, ITEC continued to oppose class treatment of the case, and up to the date of trial, ITEC brought a series of motions that were, in essence, motions to decertify the Class. After highly-contested briefing and argument on these motions, Plaintiffs retained the right to proceed as a class action.

**4.    Summary Judgment and Other Motions**

In May 2005, the Defendants filed twenty-six (26) summary judgment motions. These motions were thoroughly briefed, through surreplies, and argued orally to this Court. Meanwhile, sanctions motions relating to ITEC's Undercover Investigation were briefed, additional discovery was taken, and these matters were argued before Magistrate Judge Baker, who issued a Report and Recommendation on September 6, 2006.

**5.    The Final Pre-Trial Settlement Efforts**

Once the motions for summary judgment were resolved, a trial date for the Phase I Trial, on the common issues, was set. As the September 19 trial date approached, the District Court suggested that the parties make one more effort to settle, and the Court enlisted Magistrate Judge Lawrence to mediate. Once again, mediation statements were prepared and sent to the Magistrate Judge on a confidential basis, and Judge Lawrence made a fresh attempt at brokering a settlement. Again, the efforts were unsuccessful. As in the past, dozens of Named Plaintiffs played an active role in the negotiations.

**6.    Final Pre-Trial Filings**

Shortly before trial, a large number of motions *in limine* were filed by both parties, and they were briefed and argued before the District Court. These highly-contested motions included requests to exclude witnesses, to exclude evidence, and to obtain rulings on the admissibility of key pieces of evidence, such as the documents generated by ITEC's Undercover Investigation, minutes of ITEC's Diversity Council meetings, and the admissibility of reports by the Office of Federal Contract Compliance Programs ("OFCCP"). Plaintiffs' counsel filed their extensive exhibit list, charts of deposition designations as to witnesses who would be unavailable, their witness list, and their trial brief. ITEC made similar submissions in the final weeks before trial.

B.    **The Trial**

1.    **Testimony and New Revelations**

Trial began September 19, 2006.  Because it was a court trial and not a jury trial, the District Court committed to hearing testimony in an intensive and efficient fashion, beginning at 8:30 in the morning, and lasting until 6:00 p.m., or later.  Almost from the outset, the trial was punctuated by a variety of motions from both sides, several of which led to oral arguments.  The trial was attended by most of the Named Plaintiffs and by many other Class Members, including several who were scheduled to testify during trial.  On the first day alone, Class Members Robin Fouce, Michael Ruggs, Patrick Freeman, JoAnn Norris, and Greg Allen testified to the racial slurs, graffiti, nooses, and other forms of racial harassment to which they were exposed at the Plant, together with their efforts to prevail upon management to remedy them.  As the trial progressed, Plaintiffs' counsel called both third-party witnesses, such as Spencer Smith of the OFCCP and members of ITEC management, who testified as adverse witnesses.  Additional Class Members, including several more Named Plaintiffs, also described the racial harassment they suffered at the Plant and ITEC's failure to address the problems adequately.

The participation of the Class Members in the trial was invaluable to the Plaintiffs' case, and they consulted regularly with Plaintiffs' counsel on many key issues of fact.  Indeed, the District Court publicly praised the participation of the Class Members, thanking them for their attendance, their interest, their attention, and their courtesy.  (*See* Transcript ("Tr.) 09/25/06 at 14.)

As the Court is well aware, certain documents produced by ITEC on the first day of trial, coupled with revelations from certain of ITEC's employees from the witness stand during the trial, led Plaintiffs' counsel to seek an order allowing them personally to secure and inspect the

Plant's premises to determine whether additional relevant evidence existed but which had not

been produced in discovery. *See, e.g.*, Tr. 09/22/06 at 6-42. The Court granted this request, and

Plaintiffs' counsel's efforts were rewarded by the discovery of actual physical nooses that had

been withheld by ITEC from discovery, and drawers full of photographs of racial graffiti and

other records of racially hostile acts that had occurred at the Plant, including literally thousands

of pages of reports documenting graffiti posted in the Plant's bathrooms. But for Plaintiffs'

counsel's tenacity, and the Court's willingness to entertain this somewhat unusual request for an

on-premises inspection in the midst of trial, *see* Rule 34(a)(2), Fed. R. Civ. P., these documents

and the alarming physical evidence, some of which had been withheld from discovery for nearly

five years, would never have seen the light of day. Not surprisingly, these events led Plaintiffs'

counsel to make a series of motions relating to ITEC's and its representatives' conduct

throughout discovery and at trial. At ITEC's request, the Court agreed to take those motions

under advisement, and the trial continued. *See, e.g.*, Tr. 09/22/06 at 28, 37-38, 42.

## 2.    Renewed Settlement Talks After the First Week of Trial

At the end of a rather dramatic week of trial testimony, including the delivery into the

courtroom of a great many nooses and other materials that had been seized by Plaintiffs' counsel

from the Plant the previous day, and after the adverse examination of ITEC's Loss Prevention

Manager, William A. Seagraves, on the subject of these new discoveries, on Friday, September

22, 2006, Judge Young summoned counsel into chambers (Tr. 09/22/06 at 177) and suggested

another attempt at settlement. The Court met privately with counsel for each side over the course

of the next several hours.

After a private consultation with their clients, including both Named Plaintiffs and other

Class Members who were in attendance at the trial, Plaintiffs' counsel conveyed their clients'

agreement to renew the $9 million monetary demand that had been made and authorized by the Class Representatives earlier, on the condition that strict and meaningful injunctive relief be a part of a consent decree that would be entered as an order of the Court.

### 3.   The Settlement in Principle

On Monday, September 25, 2006, ITEC, represented by its trial counsel from the law firms of Littler Mendelson and Pugh Jones & Johnson, and by ITEC's new, additional counsel from the law firm of Latham & Watkins, advised the Court that ITEC agreed to Plaintiffs' terms. ITEC's general counsel, Stephen Covey, was also present in Court, and he confirmed ITEC's outside counsel's representations.

On the record in the courtroom, and in the presence of several dozen Named Plaintiffs and other Class Members, the principal terms of the settlement were recited and agreed to. Specifically, Plaintiffs' counsel, Samuel Fisher, advised the Court that the Class Representatives and Plaintiffs' counsel had agreed to accept $9 million in monetary relief for damages, fees and costs, which they had further agreed would be divided with $4.5 million to be paid into a Class Fund for the benefit of the Named Plaintiffs and the Class, and the other $4.5 million in settlement of Plaintiffs' counsel's costs and fees to date.  (Tr. 09/25/06 at 6)  (Plaintiffs' counsel fees and costs exceeded that figure by a substantial amount.)  Plaintiffs' counsel insisted, however, that the money be deposited into escrow promptly so that interest on the monetary award would go to the benefit of the Class and their counsel, and ITEC agreed.  Plaintiffs' counsel Fay Clayton stressed the fact that Plaintiffs' agreement to the monetary terms was conditioned upon ITEC's commitment to enter into a consent decree that would provide stringent

and meaningful ongoing injunctive relief for a substantial period of time to address the racial

harassment issues at the Plant.[3]

The Court, well-aware of the claims and the arm's-length nature of the settlement,

applauded the parties' agreement:  "Of course, the matter of how the fees are determined and

how the class claims are paid is certainly a matter left to the Plaintiffs and their counsel to make

those determinations . . . [t]he parties have worked very hard in coming to this negotiation.  I'd

been apprised of the status of the negotiations throughout, and I want to thank you for your hard

work up to this point in getting this matter resolved."  (Tr. 09/25/06 at 11-12.)

Before adjourning to allow counsel to begin work on the settlement documents, the Court

reminded the parties of the importance of settlement in general and the reasonableness and

appropriateness of this settlement in particular:  "Without settlement, this matter could drag out

for another two or three years . . . [t]he attorneys have worked very hard to represent their

respective clients, and certainly the Court would not approve of anything that it did not think was

a reasonable resolution of the matters here at hand."  (Tr. 09/25/06 at 13.)

Over the next five months, in another series of difficult negotiations, the parties

hammered out the specifics of the injunctive relief that are now contained in the Consent Decree.

Judge Lawrence once again provided assistance, and by March 8, 2007, the Consent Decree was

agreed to by the parties.

### 4.    Preliminary Approval

Being fully familiar with the claims and defenses, as well as the difficult and intense

negotiations between the parties, the Court gave its preliminary approval to the settlement on

---

[3]      It was also noted that while certain of the individual claims, for discrimination apart from racial harassment, would be part of the settlement, several other claims were specifically excluded.  *See* § II.C below.

March 8, 2007.  Notice was sent to Class Members, and Class Members were given a second opportunity to file opt-out requests as well as objections, which were due May 21, 2007.

Although the terms of the Consent Decree allowed up to twenty (20) opt-outs, including up to five (5) Named Plaintiffs, only one (1) new opt-out request was filed, by a non-Named Plaintiff, Mr. Shafter J. Briscoe, Jr., an employee who we understand to be a member of ITEC management.  The decision by all the other Class Members to remain in the Class is significant.

Even more significant, however, is the fact that no objections whatsoever were filed – perhaps a record in class action litigation.  Without question, the response of the Class to the notice of this settlement is a strong testament to its fairness, reasonableness and adequacy.

Thus, after more than six (6) years of ferocious litigation, these claims may be put to rest. Most importantly, as discussed below, the stringent ongoing monitoring for at least five (5) years, which is required under the Consent Decree, and the willingness of extraordinarily well-qualified individuals to serve on the Oversight Committee and as Monitors, should ensure material and much-needed changes in the racial climate at ITEC's Engine Plant.  This will redound to the benefit of not only the Class and future African-American employees at the Plant, but also to ITEC's entire workforce and to ITEC itself.

     C.     **Claims Excluded From the Settlement**

It is important to note that there are certain claims raised in the original Complaint, or that arose thereafter,  that will survive this settlement.  These are Mathew Whitfield's hiring claim, Donna Jackson's training claim, Michael Ruggs's termination claim, Gwendolyn Moore's September 2006 retaliation claim, and any other claims that may have arisen after the Court's Preliminary Approval of the Consent Decree on March 8, 2007 (Consent Decree, ¶ 11, ¶ 74).

## II.    THE SETTLEMENT

### A.    The Monetary and Injunctive Relief

The monetary value of the proposed settlement is $9 million, plus interest accrued since

October 2006,[4] plus the monetary value of certain other undertakings by ITEC, including the

work of the Oversight Committee and monitors over the next five (5) years.  The Consent Decree

requires that ITEC provide (and pay for) training for both hourly and supervisory employees

(Consent Decree, ¶¶ 18, 28-29), that ITEC pay the costs of the Claims Administrator up to

$25,000 (¶ 70), and that ITEC pay up to $800,000 for the work of the Oversight Committee in

the first two (2) years (¶ 37).  In addition, ITEC will pay the fees and costs of the monitors and all

fees and costs of attorneys and consultants, plus any fees incurred on the Class's behalf as a

result of matters that need to be brought to the attention of the Court or an Arbitrator by the

Oversight Committee (¶ 37).

Importantly, there will be no reversion of any of the $9 million to ITEC under any

circumstances – a point Plaintiffs fought for long and hard since 2003.  Rather, the full amount of

the Class Fund – $4.5 million, plus interest – will be divided among Class Members pursuant to

detailed guidelines contained in the Consent Decree.  Under the Consent Decree, ¶ 65, the Class

Fund will be distributed, first, to eligible Class Members as follows:

> •    Fifteen Thousand and No/100 Dollars ($15,000.00) for the
> emotional distress suffered for his/her leadership

---

[4]    Although Plaintiffs' counsel's fees far exceed $4.5 million, Plaintiffs' counsel agreed to accept this amount in full settlement of their fees and costs to date (except with regard to work on the excluded claims of Jackson, Ruggs, Whitfield, and Moore), and the Class Representatives have agreed that Plaintiffs' counsel should receive this amount.  Upon payment of the $9 million by ITEC in settlement, $4.5 million was deposited to comprise the Class Fund and the remaining $4.5 million to a separate fund for legal fees and costs.

throughout the preparation for and filing, litigation, and settlement of this lawsuit;

• Fifteen Thousand and No/100 Dollars ($15,000.00) for the emotional distress suffered for assuming the risks and notoriety related to being Named Plaintiffs in this class action litigation, including the potential liability for ITEC's taxable legal costs had ITEC litigated this action to a conclusion in its favor;

• Fifteen Thousand and No/100 Dollars ($15,000.00) for the emotional distress suffered in bringing to light the facts culminating in the filing and litigation of this class action;

• Ten Thousand and No/100 Dollars ($10,000.00) paid to the certain Named Plaintiffs who are releasing their right to appeal the March 2, 2006 and May 15, 2006, Orders of the Court granting summary judgment for the emotional distress related to their individual claims of discrimination; and

• The balance to Named Plaintiffs and Class members who timely submit and properly fill out Statement of Claim forms as provided above.

The balance of the Class Fund will be allocated pursuant to evaluations of Class Members' claims by the Claims Administrator using the guidelines contained in ¶ 69 of the Consent Decree:

Seniority at ITEC's engine plant in Indianapolis, Indiana; whether they filed an EEOC charge alleging racial harassment or the exposure to a racially-hostile work environment at ITEC's Indianapolis engine plant before September 19, 2006; whether they actually observed a noose at the engine plant; whether they had a racial slur directed to them at the engine plant; whether they heard racial slurs directed to other African-Americans at the engine plant; whether they observed racial graffiti at the engine plant; whether they paid for a medical doctor to treat them for emotional distress, mental anguish, and pain and suffering due to the racial harassment and the racially-hostile work environment they were exposed to, and if so, the total amount of money paid for such medical treatment prior to September 19, 2006; whether they missed time from work from October 18, 1997 to September 19, 2006 due to their racial harassment or their exposure to a racially-hostile work

> environment that can be verified by records of a licensed medical
> doctor; whether they were retaliated against for their involvement
> in this suit or for complaining about racial harassment at the engine
> plant; whether they provided deposition testimony in this case;
> whether the provided or were scheduled to provide testimony at
> trial; whether they provided an affidavit utilized as part of the
> litigation of this case; whether they participated in class
> certification and mediation; whether they are executing a general
> release or al limited release.

The fact that there was no objection to these guidelines or any other part of the proposed settlement is another important indication of how fair, reasonable and just the terms of the settlement are to all members of the Class, regardless of the extent of the racial harassment each individual Class Member experienced.

At least as important as the monetary relief, the injunctive relief provided under the Consent Decree goes well beyond the formulations that had been tentatively agreed to during the earlier rounds of settlement talks.  In fact, just prior to the Preliminary Approval hearing, the Court commented that the Consent Decree appeared to be the most extensive injunctive relief the Court had seen to date.  Strict injunctive relief is appropriate here.  Based on the revelations from ITEC's Undercover Investigation, plus those that were made during trial, on top of what had been learned in the normal course of discovery, Plaintiffs insisted on, and ITEC agreed, that the injunctive relief must include mandatory training on racial discrimination and harassment for all of ITEC's salaried and hourly workers, including new employees (¶ 18(g)); confidential and reliable complaint procedures for reporting race-based harassment discrimination and retaliation (¶ 19); and record-keeping requirements with regard to interview notes, credibility assessments, and complaint forms.  The Consent Decree requires that ITEC will retain records of complaints, even where no conclusion is reached, for a minimum of seven (7) years (¶ 55).  Supervisors and managers who fail to report racial harassment discrimination or retaliation will receive

"substantial discipline up to and including termination" for any such failure (¶ 55).  All of these materials will be available to the Oversight Committee and to the monitors (¶¶ 21-25).

### B.  The Oversight Committee and Monitors

Plaintiffs' counsel are proud of the members it will name to the Oversight Committee, subject to the approval of the Court.  Those whom Plaintiffs have asked, and who have agreed, to serve are:  Retired District of Columbia Court of Appeals Judge, Former Counsel to the President and Former Congressman Abner J. Mikva; Former Assistant United States Attorney General for Civil Rights Bill Lann Lee; and Former Magistrate Judge Vanzetta Penn McPherson of the Middle District of Alabama.  Subject to the Court's confirmation, Mr. Lee and Judge McPherson will also serve as Monitors under the Consent Decree.[5]

Under ¶¶ 31 through 54 of the Consent Decree, the Oversight Committee has extensive powers to review, evaluate, modify, and add to ITEC's policies, procedures, and practices with regard to racial relations at the Plant.  For at least two (2) years, the Oversight Committee will focus on these critical tasks.  In addition, two (2) monitors will oversee the implementation of the Consent Decree and will monitor ITEC's investigation of complaints of racial harassment that occur in the future.  The monitors will be in place for the entire five (5) years of the Consent Decree.  Plaintiffs are confident that the caliber of the individuals who have been chosen by Plaintiffs, together with the members who will be selected by ITEC, should ensure great progress in remedying the racial problems that have plagued the Plant for over a decade.

---

[5]     Attached at Exhibit B are biographical materials of Plaintiffs' proposed Oversight Committee Members and Monitors.

III.     **THE STANDARDS FOR FINAL APPROVAL OF A SETTLEMENT**

On the final approval motion, the court's review "is limited to the consideration of

whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred*

*Technology and Telecommunications, Inc.*, No. IP 00-1232-C B/S, 2001 U.S. Dist. Lexis 13115,

at *30 (S.D. Ind., August 28, 2001), *citing Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).  *See*

*also Cusack v. Bank United of Texas FSB*, 159 F.3d 1040, 1041 (7th Cir. 1998).  We begin with

the premise, emphasized by this Court on September 25, 2006, that settlement is always

preferable to litigation.  Not only does a settlement provide an immediate recovery to the

plaintiffs, but in light of the inevitable risks, it adds an extra and valued element of certainty:

"Courts look upon the settlement of lawsuits with favor because it promotes the interests of

litigants by saving them the expense and uncertanties of trial, as well as the interests of the

judicial system by making it unnecessary to devote public resources to disputes that the parties

themselves can resolve with a mutually agreeable outcome.  Compromise is particularly

appropriate in complex class actions." *Hispanics United DuPage County v. Village of Addison*,

988 F. Supp. 1130, 1149 (N.D. Ill. 1997), citing *Newman v. Stein*, 464 F.2d 689 (2nd Cir. 1972).

No one can doubt the wisdom of the Seventh Circuit's observation that compromise is the

essence of settlement, and it is particularly appropriate in complex class action cases like this.

*See Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir.

1980) ("In the class action context in particular, there is an overriding public interest in favor of

settlement.") (citations omitted).

The standards for final approval of a class action settlement are well-established in this

Circuit, and most district judges apply some version of the factors listed in *Hispanics United*

*DuPage County*, 988 F. Supp. at 1149:  "(1) the strength of plaintiff's case on the merits

balanced against the amount offered in settlement; (2) the defendant's ability to pay; (3) the

complexity, expense and likely duration of further litigation; (4) the amount of opposition to the

settlement; (5) the presence of collusion in reaching a settlement; (6) the reaction of members of

the class to the settlement; (7) the opinion of competent counsel; (8) the stage of the proceedings

and the amount of discovery completed; and (9) the public interest." *See also Uhl*, 2001 U.S.

Dist. Lexis 13115, at *32.

Final approval should be granted to a class action settlement if the court determines that

the "compromise, taken as a whole, is fair, reasonable and adequate." *Hispanics United*, 998 F.

Supp. at 1149, *citing Isby*, 75 F.3d at 1196.  The court's review of a proposed settlement entails

"a careful inquiry into the fairness of the settlement to the class members before allowing it to go

into effect." *Mars Steel Corp. v. Continental Illinois National Bank and Trust Co.*, 943 F.2d

677, 682 (7th Cir. 1987).

## IV.   THIS CASE EASILY MEETS THE STANDARDS FOR APPROVING THE SETTLEMENT

Rarely has a case so completely satisfied the relevant factors for final approval of a

settlement.  With the possible exception of the second factor (defendant's ability to pay, which is

irrelevant here, as discussed below), each of the nine *Hispanics United* factors resoundingly

favors final approval of the settlement that is being presented to the Court here.

### A.    The Strength of Plaintiffs' Case Balanced Against the Amount of the Settlement

The most important factor is the first, the strength of the plaintiffs' case on the merits as

compared with the amount offered in settlement.  *Uhl*, 2001 U.S. Dist. Lexis 13115, at *32.  No

one could possibly be in a better position to make an informed assessment of this factor than the

District Court, which has presided over the case for more than five (5) years, which has ruled on all the class motions, the summary judgment motions and a host of other motions, which heard nearly a week of trial testimony, and which participated actively in the settlement discussions that finally achieved the settlement.

The Court is well aware of the strengths of the claims of the Plaintiff Class as a whole, as well as the legal and factual issues that individual Class Members would face in the Phase II Trial on the measure of damages.  The Court is aware that some Class Members were exposed to acts of racial harassment personally, others indirectly; some were exposed to racial harassment repeatedly, others more seldom; some suffered greatly, others withstood the harassment. Because the guidelines contained in the proposed settlement takes these and other relevant factors into consideration, the Court is in an excellent position to assess how the amount offered here in settlement, and the guidelines that will be used by the Claims Administrator to allocate the Class Funds among the Class Members, measure up against the strengths of the Class Members' claims.

### B. ITEC's Ability to Pay

Plaintiffs submit that the second factor, ITEC's ability to pay, has little, if any, applicability here.  Plaintiffs' counsel did not discount their demand in any way for exigencies of hardship or insolvency, and the $9 million monetary portion of the settlement was paid into escrow promptly.  Rather, they demanded a full, fair measure of relief without regard to ITEC's ability to pay.  There is nothing about the second factor that in any way impugns the settlement here.

C.     **The Complexity, Expense and Likely Duration of Further Litigation**

Commenting on other class action settlements, courts have observed, "If this case were to be litigated to its conclusion rather than settled, resolution would be complex, time-consuming, and expensive," factors favoring settlement. *Krangel v. Golden Rule Resources*, 194 F.R.D.501, 507 (E.D. Pa. 2000). *See also Hispanics United*, 988 F. Supp. at 1130, finding the third fairness factor satisfied and noting, "[T]his litigation has already been extremely expensive, and continued litigation would likely at least equal that expense again." Those statements are equally applicable to this case.

The fact that this case has been litigated hard for almost seven years demonstrates that if it were not settled, it would continue for at least the two or three years that the Court predicted on September 25, 2006. The Phase I trial might well have been completed with only another week of testimony, but the Phase II damage trials would have consumed additional time and effort by the parties, their counsel, and the Court. It does not take much imagination to predict that ITEC would have appealed each step of the way, and presumably sought reconsideration of rulings favorable to Plaintiffs in between, as ITEC has done in the past. Even after a verdict in favor of all the Plaintiffs on the common hostile environment issues, the expense and duration of the damages trials would have added significantly to the expense of the case in both time and money.

In addition to the Class claims, of course, the proposed settlement resolves most of the individual discrimination claims that are separate from the hostile environment claims. These individual claims would have required appeals by the Plaintiffs, and if those were successful, full trials on the merits, and the possibility of further appeals. The third *Hispanics United* factor clearly favors settlement.

**D.**   **The Amount of Opposition to the Settlement**

As noted above, this case may be unique in the annals of class action litigation:  not a single Class Member, not a single opposing party, not a single Rule 19 party, *no one has raised any objection to the settlement*.  In response to the notice's invitation to object and/or opt-out, the only filing was one single opt-out notice by an African-American member who is believed to have been a member of ITEC's management.  Without a question, the fourth *Hispanics United* factor mandates final approval of this settlement.

**E.**   **The Absence of Collusion In Reaching the Settlement**

Like the fourth factor, it is hard to imagine a case with less "collusion."  As both the District Court and the Magistrate Judge are well aware, this case was fought tooth and nail for over six (6) years.  Not only were all the negotiations conducted by vigorous adversaries, but the Court's active involvement in mediation, first through Magistrate Judge Baker, next through Magistrate Judge Lawrence, and finally through the District Court itself, ensured that there could be no collusion.  In addition, the fact that the negotiations were conducted by highly-experienced lawyers on both sides, with the active participation of more than two dozen well-informed Named Plaintiffs and Class Members, guaranteed that neither side made any concessions for any reason other than the desire to obtain a fair, reasonable and adequate settlement.

**F.**   **The Opinions of Competent Counsel**

The Seventh Circuit has emphasized that, in determining whether a settlement is fair, reasonable and adequate, "the court is entitled to rely heavily on the opinion of competent counsel."  *Armstrong*, 616 F.2d at 325.  The Court is familiar with counsel for the Plaintiff Class; in approving Plaintiffs' counsel's appointment to represent the Certified Class, the Court

examined the lead lawyers' biographies and relevant experience.  We submit that, collectively,

Plaintiffs' counsel have brought a wealth of experience to the case, and have demonstrated their

competence to litigate and try class actions cases, and race discrimination cases in particular.  In

addition to counsel's own knowledge and experience in these matters, Class Counsel have

engaged in extensive consultation with the leaders of the Plaintiff Class, who include numerous

able and insightful Class Representatives.  The view of Class Counsel, and of the Class

Representatives, is entitled to great weight in determining that the settlement for which final

approval is sought is indeed fair, reasonable and adequate.

### G.      The Stage of the Proceedings and the Amount of Discovery Completed

Once again, this case presents one of the clearest examples of a settlement that was

achieved at a stage of proceedings and after an amount of discovery that is as sufficient as any

court could possibly ask.  The case had proceeded through an untold number of discovery

motions, numerous substantive motions, the production and examination of tens of thousands of

documents, many dozens of depositions, and even a week of trial before this settlement was

achieved.  It is hard to imagine how any group of Plaintiffs' counsel could have a better sense of

the strength of their case than Class Counsel and their clients here.  Without question, the stage

of the proceedings and the amount of discovery completed establish conclusively that the

settlement is fair, reasonable and adequate.

### H.      Public Interest

It is always in the public interest to settle a lawsuit, assure both sides of certainty, and

preserve the further resources of the court.  *Goldsmith v. Technology Solutions Co.*, 1995 U.S.

Dist. Lexis 15093, at *6 (N.D. Ill. Oct. 10, 1995) ("There is an overriding public interest in favor

of settlement.").  This settlement does something else as well.  It provides for important ongoing injunctive relief that should go a long way to ensure the cessation of racial harassment and discrimination at the ITEC Plant.  It will benefit not only the members of the Class, but all other African-Americans who work there in the future, all non-African-American employees (who will have the benefit of a harassment-free workplace), and ITEC itself.

## CONCLUSION

For all the reasons stated above, the proposed settlement of this case, as embodied in the Consent Decree, which was preliminarily approved by the Court on March 8, 2007, easily satisfies the standards of being fair, reasonable and adequate, and warrants this Court's approval in full.

WHEREFORE, Plaintiffs ask the Court to:

(1)     Grant final approval of the settlement;

(2)     Enter the Consent Decree, which is attached as Exhibit A, as an Order of this Court;

(3)     Appoint the following individuals to the Oversight Committee created by the Consent Decree:

(a)     The Honorable Abner J. Mikva,

(b)     Bill Lann Lee, and

(c)     The Honorable Vanzetta Penn McPherson;

(4)     Appoint Mr. Bill Lann Lee and The Honorable Vanzetta Penn McPherson as Monitors under the Consent Decree.

Respectfully submitted,

**GREG ALLEN,** *et al.*

Dated:  June 13, 2007.                          /s/ Fay Clayton                                      
                                                         One of Their Attorneys

Fay Clayton
Darlene M. Oliver
Angel M. Krull
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile

Samuel Fisher
Rocco Calamusa, Jr.
WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 328-0640 – Telephone
(205) 254-1500 – Facsimile

Richard Douglas Hailey
RAMEY & HAILEY
3815 River Crossing Parkway
Indianapolis, Indiana 46240
(317) 848-3249 – Telephone
(317) 299-0600 – Facsimile
*(Local Counsel)*

## CERTIFICATE OF SERVICE

I, Fay Clayton, hereby certify that on June 13, 2007, I electronically filed a **Memorandum in Support of Plaintiffs' Motion for Final Approval of Settlement** with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Thomas A. Brodnik
STARK DONINGER & SMITH
tbrodnik@sdsfirm.com speterson@sdsfirm.com

Rocco Calamusa
WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.
rcalamusa@wcqp.com

Fay Clayton
ROBINSON CURLEY & CLAYTON
fclayton@robinsoncurley.com

Terence Leslie Fague
COOLIDGE WALL, L.P.A.
fague@coollaw.com

Edward W. Feldman
MILLER SHAKMAN & BEEM, LLP
efeldman@millershakman.com, tstaunton@millershakman.com, odom@millershakman.com

Samuel Fisher
WIGGINS CHILDS QUINN & PANTAZIAS LLC
sfisher@wcqp.com

Shanthi Gaur
LITTLER MENDELSON
sgaur@littler.com srunge@littler.com

Richard Douglas Hailey
RAMEY & HAILEY
office@sprynet.com, rhailey@sprynet.com

Angel M. Krull
ROBINSON CURLEY & CLAYTON
akrull@robinsoncurley.com, nball@robinsoncurley.com

Emily Nicklin
KIRKLAND & ELLIS
enicklin@kirkland.com

Mark J. Nomellini
KIRKLAND & ELLIS, LLP
mnomellini@kirkland.com

Darlene M. Oliver
ROBINSON CURLEY & CLAYTON
doliver@robinsoncurley.com, dmshields@robinsoncurley.com

David J. Parsons
LITTLER MENDELSON PC
dparsons@littler.com dknoblock@littler.com

Garrison L. Phillips
LITTLER MENDELSON, P.C.
gphillips@littler.com

Anthony B. Ratliff
STARK DONINGER & SMITH
aratliff@sdsfirm.com mhaecherl@sdsfirm.com

Laurence H. Levine
LATHAM & WATKINS LLP
laurence.levine@lw.com

Mark S. Mester
LATHAM & WATKINS, LLP
mark.mester@lw.com

/s/  Fay Clayton