UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREG ALLEN, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:02-cv-902-RLY-TAB |
| | ) | |
| INTERNATIONAL TRUCK AND | ) | |
| ENGINE CORPORATION, n/k/a/ | ) | |
| NAVISTAR INTERNATIONAL | ) | |
| CORPORATION, | ) | |
| Defendant. | ) | |

**THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING MATTHEW WHITFIELD'S FAILURE TO HIRE CLAIMS AND
PRELIMINARY EVIDENTIARY RULINGS**

Plaintiff, Matthew Whitfield, was a former Named Plaintiff in a class action

Complaint filed on October 16, 2001. The twenty-six Named Plaintiffs were current or

former employees of defendant, International Truck and Engine Corporation, n/k/a

Navistar International Corporation's Indianapolis, Indiana, facility, who alleged that

Navistar discriminated against them by subjecting them to racial harassment, improper

testing, denial of on-the-job training, and denial of overtime and seniority.[1] Whitfield, the

twenty-seventh Named Plaintiff, was an unsuccessful job applicant, who alleges Navistar

---

[1] In September 2006, following several days of trial, the parties reached a monetary
settlement and requested additional time to consummate a complete and final resolution of their
class claims. The resolution of the class claims culminated in a Consent Decree, approved by the
court in June 2007.

1

subjected him to "continual racial discrimination with respect to hiring" from 1996 to

1999, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq.

("Title VII"), and 42 U.S.C. § 1981 ("Section 1981").  Because Whitfield was the sole

plaintiff asserting failure-to-hire claims, and his claims were not certified as part of the

class action, the court ordered his claims tried separately.  *See* Order denying Defendant's

Motion for Severance and granting Defendant's Motion for Separate Trial, JAMS Docket

# 251.  The parties tried this case before the court on June 20, June 21, and September 13,

2012.  Being duly advised, the court finds that Whitfield failed to prove, by a

preponderance of the evidence, that Navistar discriminated against him by failing to hire

him for open positions in its Indianapolis facility.

Before addressing the court's findings of fact, the court must address two

preliminary issues: (1) the timeliness of Whitfield's claims; and (2) evidentiary issues and

objections the court took under advisement at trial.

## I.    PRELIMINARY MATTERS

### A.    Timeliness of Whitfield's Claims

While the same substantive standard for liability applies to claims under Title VII

and Section 1981, *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996),

there are different limitations and restraints on bringing the claims.  Before bringing suit

under Title VII, a plaintiff must exhaust his administrative remedies by filing a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC"), or

comparable cooperating state agency, within 300 days of the alleged discriminatory

2

conduct. *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 921-22 (7th Cir. 2007).

Failure to file a timely charge with the EEOC leaves a plaintiff without recourse in the

courts for a Title VII claim. *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 860

(7th Cir. 2005). A plaintiff is under no such exhaustion requirement when bringing a

cause of action under Section 1981, but he must bring the claim within two years of the

alleged discriminatory conduct if it arises out of the pursuit of employment or within four

years if the claim is based on post-hire conduct. *Fane v. Locke Reynolds, LLP*, 480 F.3d

534, 539 (7th Cir. 2007); *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 n. 4

(7th Cir. 2004).

      In the present case, Whitfield filed his charge of discrimination with the EEOC on

May 16, 2000. For purposes of his Title VII claim, no discriminatory conduct prior to

July 21, 1999, would be actionable, and for purposes of his failure to hire claim under

Section 1981, the statute of limitations would bar any action based upon Navistar's failure

to hire him prior to May 16, 1998. Because the substantive liability standards are the

same, proof of discriminatory conduct by Navistar from May 16, 1998, forward would

sustain a claim for damages.

    **B.**    **Evidentiary Issues and Objections Taken Under Advisement**

        **1.**    **Objection to Whitfield's Exhibit 1032**

      Whitfield's Exhibit 1032 was offered into evidence during the direct examination

of  Whitfield, and Navistar objected to its admission on the basis of lack of

authentication. Exhibit 1032 is a one page undated exhibit of handwritten notes made by

someone who was apparently attempting to verify and calculate the past work experience of Whitfield.  It was listed on Whitfield's Exhibit List (Docket # 420) as "Union Notes regarding Whitfield's Experience."  The term "Union" in that exhibit refers to the United Auto Workers ("UAW" or "Union"), the local bargaining unit for Navistar's hourly employees.  Counsel for Whitfield represented that it was a document provided to the EEOC by Navistar, and was obtained by Whitfield when he pursued the EEOC investigative file during discovery in this matter.  Counsel for Navistar did not deny that the document came from the EEOC's files, but stated for the record that there is confusion as to whether the document was provided to the EEOC by the company or by the Union.

The same document is listed as an exhibit on "Defendant's Final Exhibit List" (Docket # 379), filed on September 30, 2011, and is described by Navistar as "Handwritten computation of Journeyman years/months."  On June 13, 2012, Navistar filed its objections to Plaintiff's listed exhibits (Docket # 433), and no objection was made to Whitfield's "Union Notes" exhibit.  However, on June 18, 2012, Whitfield filed his Supplemental Objections to Defendant's Final Exhibit List (Docket # 435), objecting to Navistar offering this same exhibit, claiming the contents are hearsay statements without probative value and no identifiable author.  To sum up this peculiar situation, Whitfield offered into evidence an exhibit that both he and Navistar listed on their exhibit lists, but to which he posed a written objection prior to trial.  Navistar has objected to the admissibility of this same exhibit under circumstances similar to Whitfield's.

Because, as will be discussed in more detail later, the Union was acting as an agent of Navistar when it took steps to verify the past experience of Whitfield, the court will admit Exhibit 1032 as relevant evidence that either someone from the Union or Navistar made notes of their attempt to calculate Whitfield's verifiable work experience as an electrician.  Navistar's objection is overruled.

### 2.      Hearsay Objection During Testimony of Willie Jones

At trial, the court took under advisement Navistar's hearsay objection to the testimony of Willie Jones, a Navistar electrician foreman, regarding a discussion he had with the Union's Skilled Trades Committeeman, George Bunton, over the Union's verification of Whitfield's past work experience.  Whitfield argued that the testimony should be allowed because it is an admission of a party or its agent under FED. R. EVID. 801(d)(2). Navistar contends that the Union is a separate entity that has not been named as a party.  It further contends that its agreement with the UAW required it to allow the Union Committeeman to verify the experience level of any new skilled trades hire. Whitfield argues that the labor agreement does not require the Company to defer to the Union with respect to verifying the work experience of a skilled trades candidate.

The court does not read the labor agreement to require that the Company defer to the Union's determination of a candidate's past work experience.  In relevant part it states:

> An employee must provide proof to the satisfaction of the Company of his journeyman status prior to his date of entry into the skilled trades classification.  This proof shall be reviewed with the Skilled Trades

Committeeman prior to the employee's entry into the skilled trades classification.

According to the plain language of the labor agreement, it is the Company which must be satisfied with regard to an employee's journeyman status.  Moreover, the problem with Navistar's argument is that, regardless of why it allowed the Union to be ultimately responsible for verifying a candidate's experience, Navistar, as the employer, has voluntarily given or negotiated away this part of the hiring process to the Union.  Consequently, the Union is Navistar's agent for purposes of determining a skilled trades candidate's level of experience for hiring purposes.

Rule 801(d)(2) provides that a statement made by a party's agent concerning a matter within the scope of that agency, is not hearsay.  Accordingly, Navistar's hearsay objection to Jones's testimony with regard to what Bunton told him about Whitfield's work experience is overruled.

### 3.   Whitfield's Submission Regarding Evidence From Previous Trial (Docket # 438)

Following the first day of the bench trial, Whitfield filed what he titled "Plaintiff's Trial Submission Regarding Evidence from the Allen, et al. vs. International Trucking Trial September 19-22, 2006."  The submission asks the court to allow the admission into evidence of fifty-nine exhibits from the class action trial as well as the testimony of nineteen witnesses.  Navistar objects for numerous reasons, but most particularly on grounds that the class action was a separate trial.  Whitfield argues that while he is not a member of the class that was certified under this cause number, his claim is still part of

the same "case," and he is offering the evidence to establish the existence of a hostile racial environment within the Navistar engine plant during the time period he was seeking employment.

Whitfield has provided the court with no authority which would support his request for the admission of exhibits from a previous trial, which, in fact, was settled prior to completion.  The court's order of July 20, 2005, explicitly provides that the continued inclusion of Whitfield's claim under the same cause number was for the purpose of allowing discovery to continue efficiently with respect to all claims.  (*See* Docket # 251).  In that Order, the court also specifically stated that Whitfield's claim would be tried separately and that "[i]t is likely that undue prejudice and confusion will result if the facts pertaining to the other 26 Plaintiffs' claims are presented in the same trial where Whitfield's claims are heard."  (*Id.*).

The court finds no basis in the law for a blanket admission of exhibits and testimony from a previous trial; nor is it timely for Whitfield to identify and set forth such exhibits and testimony, for the first time, one day into the court trial.   To the extent racial tension within the plant is relevant to Whitfield's claims, several of Whitfield's witnesses testified to that tension, making the exhibits and testimony which he seeks to be admitted duplicitous.  The court will not admit into evidence the exhibits and testimony designated by Whitfield in his submission.  (Docket # 438).  Navistar's objection to the same is, therefore, sustained.

### 4.     Objection to Admission of Rule 30(b)(6) Deposition of Roy Civils

At the conclusion of Whitfield's case in chief, he offered into evidence the deposition transcript of Roy Civils, who Navistar had designated as one of its witnesses responsive to a notice of deposition pursuant to FED. R. CIV. P. 30(b)(6).  Navistar objected to the admission of the entire deposition transcript of the witness because much of his testimony during the deposition related to the class action.  In his post-trial briefing, Whitfield has referred to only two portions of the deposition, both of which address Navistar's delegation of the verification of a skilled trades candidate's prior experience to the Union and the Union's lack of involvement in any other part of the hiring decision.  However, because (1) the court has consistently denied the admission of complete deposition transcripts without designation, (2) Whitfield offered the entire deposition transcript into evidence without explaining its relevance or designating the particular testimony relevant to his case, and (3) Navistar's delegation of the verification of prior experience to the Union has been firmly established by other evidence in the case, the court sustains Navistar's objection and will not admit the Rule 30(b)(6) deposition of Roy Civils into evidence.

### 5.     Objection and Motion to Exclude Defendant's Expert Witness (Docket # 455)

After the first two days of trial in this matter, the court adjourned, but kept the record open for purposes of allowing the testimony of Dr. Robert Barkhaus, Navistar's vocational expert, who had yet to be made available for deposition.  The court agreed to

reconvene on September 13, 2012, following the expert's deposition.  Whitfield filed a

motion to exclude Dr. Barkhaus's testimony (Docket # 455) on September 12, 2012, and

Navistar filed a response later that evening.  The court received the motion and response

on the eve of the final day of trial.  Consequently, because the court had limited time to

review and analyze the issues, and because of the constraints of the calendar with respect

to availability of the witness, counsel, and the court for rescheduling, the court allowed

Dr. Barkhaus to testify the following morning.  At that time, the court advised the parties

that it would take the motion to exclude under advisement and treat it as a motion to strike

following the completion of live trial testimony.  The court now examines the arguments

raised by Whitfield with regard to the testimony of Dr. Barkhaus.

Whitfield poses several challenges to Dr. Barkhaus's report and testimony under

Federal Rule of Evidence 702.  Whitfield contends that Dr. Barkhaus's opinions are not

founded on sufficient facts or data, specifically complaining that he had not been

interviewed by Dr. Barkhaus, and that the expert witness had not read his trial testimony.

He also complains that Dr. Barkhaus "utilized a defunct database" to assess the

responsibilities of electricians and the availability of such positions at the time when

Whitfield was searching for jobs.

While he may not have interviewed Whitfield prior to providing his opinion, Dr.

Barkhaus did review his discovery deposition, a typical method for experts to obtain

relevant information, and Whitfield has provided no authority for his assertion that the

database used by Dr. Barkhaus was outdated or for the proposition that an expert cannot

9

testify unless he has heard what a witness said at trial.  As a result, the court will not strike his testimony on those bases.

Whitfeld next argues that Dr. Barkhaus's ignorance of the law with respect to Title VII or Section 1981 disqualifies him from testifying, as does his lack of familiarity with the fact that Whitfield was claiming race discrimination.  Again, Whitfield provides no authority for his assertion that a vocational expert should be familiar with federal discrimination laws in order to offer his opinion on the quality of Whitfield's efforts to obtain a job, and the court will not impose such a requirement.

Whitfield contends as well that Dr. Barkhaus's opinions cannot be tested and therefore are not trustworthy, failing the reliability requirement set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  As an overlay to this argument, Whitfield asserts that Dr. Barkhaus's opinions were conclusory or addressed areas where his expertise is lacking or not required.

The court agrees that some of Dr. Barkhaus's testimony addressed issues which require no special expertise.  For example, no special expertise is required to calculate the number of mistakes made by Whitfield on his resume or to calculate the months of experience his resume and the conflicting employer verification letters purport to show.  Dr. Barkhaus's testimony in that regard will be stricken because it is not founded upon any particular expertise and the same calculations can be made by the court from the documents and testimony of the fact witnesses.  A related expert opinion offered by Dr. Barkhaus that does offer some independent value, for purposes of the record, is that the

10

number of mistakes encompassed within the resume is significantly more than an employer would expect to find.  Because of the extraordinary number of mistakes made by Whitfield on his resume, a layperson might well reach that conclusion on their own, but the experience and expertise of Dr. Barkhaus does add some value to the analysis.

The court also agrees that Dr. Barkhaus's vocational expertise does not include an ability to distinguish what electrical experience and expertise might be applicable to any particular electrician's job.  To that end, the court will not assign any weight to his opinion regarding "construction based electricians' work versus maintenance based work" or the relative value of Whitfield's past substantive experience as an electrician, in particular.  Nor does the court credit any of Dr. Barkhaus's testimony with regard to whether the errors on Whitifeld's resume compromised his "fitness" for an electrician's job at Navistar.  Indeed, there is no evidence that anyone at Navistar or the Union saw the mistakes he made on his resume as impacting anything more than his ability to demonstrate the required eight years of verifiable experience as an electrician.

On the other hand, Dr. Barkhaus does have sufficient expertise and experience in the field of vocational analysis and outplacement to testify to the fact that experience alone in a particular trade does not automatically qualify one for all jobs performed by persons in that trade.  In other words, Dr. Barkhaus has no expertise specific to what an electrician might do in a particular job, but he does have the experience and expertise to opine that whatever skills were required and developed to perform a person's previous work as an electrician will impact his value to an employer looking to fill an electrician

position requiring a particular set of skills to efficiently execute that job.

Finally, Dr. Barkhaus opined on Whitfield's search for work.  His experience as an outplacement consultant certainly provides Dr. Barkhaus with the necessary background to assess Whitfield's efforts to procure a job in his trade.  Whitfield asserts that without interviewing him or hearing his trial testimony, Barkhaus's opinion is not based on sufficient data with regard to all the efforts Whitfield made to procure employment; therefore, it is not a reliable basis for asserting a failure to mitigate defense.  While there may be relevant information that a testifying expert did not consider in reaching his conclusions, such an argument goes more to the weight of his testimony as opposed to whether his opinion should be totally barred.  *See, Daubert,* 509 U.S. at 595-96; *see also, e.g., McCloud ex rel. Hall v. Goodyear Dunlop Tires North America, Ltd.,* 479 F.Supp.2d 882, 891 (C.D.Ill. 2007).  In any event, because of the court's findings regarding Whitfield's failure to carry his burden of proving discriminatory intent, evidence related to Whitfield's mitigation efforts becomes irrelevant.

In the end, the court finds Dr. Barkhaus's testimony to be helpful in only two ways.  It helps to support a logical conclusion that the more mistakes made in setting forth past experience on a resume, where the employer requires verification of the same, the more the likelihood there will be failed attempts to verify that experience and the process will render a result unsatisfactory to the employer.  His opinions also support a conclusion that the types of skills exercised and developed by a person in a particular skilled trade can differ from others, depending on the type of work within the trade that

they perform, and that there are areas of specialized expertise within a trade that not every person in that trade may have developed.

Having addressed these preliminary matters, the court now issues its Findings of Fact and Conclusions of Law Pursuant to FED. R. CIV. P. 52(a).

## II.   FINDINGS OF FACT

### A.   Navistar's Hiring Practices

1. The Navistar plant in Indianapolis, Indiana, included a foundry and an engine plant.[2]

2. During the time period relevant to Whitfield's claim, Navistar's Indianapolis engine plant hired many electricians.  The plant's need for electricians was relatively high between 1996 and 2000 because Navistar was going through a period of high production.

3. The Collective Bargaining Agreement between Navistar and the UAW categorized an electrician position as a "skilled trade," defined as follows:

    A.   A skilled tradesman shall mean any employee who is in a skilled trade classification as set forth in the Local Supplement.

    B.   A skilled trades journeyman is any employee who:

    (1)   Has served a bona fide apprenticeship and has a certificate which substantiates his claim of such service, or

    (2)   Has eight (8) or more years of practical experience and can substantiate it with proper proof, or

---

[2] Navistar's engine plant closed in January 2009.

      (3)     Has a UAW journeyman's card, which shall be considered as presumptive proof of qualifications under (1) or (2) above, or

      (4)     Has a journeyman's card from any other Union which has apprenticeship standards comparable to the UAW.

An employee must provide proof to the satisfaction of the Company of his journeyman status prior to his date of entry into the skilled trades classification.  This proof shall be reviewed with the Skilled Trades Committeeman prior to the employee's entry into the skilled trades classification.

Whitfield Ex. 1060.

4.     A Memorandum of Agreement between the Union and Navistar, in place from 1964 through the relevant time period, further provides that for each job opening that has an apprenticeable classification, Navistar need not consider any applicant unless he or she has graduated from an apprenticeship or has been classified in the apprenticeable classification for at least eight years and is able to demonstrate his or her qualifications for the job.  Whitfield Ex. 1004.

5.     When Navistar was considering hiring someone for an electrician position, it delegated to the UAW the responsibility of confirming that candidate's experience in the trade, in order to assure compliance with the Memorandum of Agreement.

6.     During the relevant time period, Daniel McDonald was the Manufacturing Resource Leader with authority to hire electricians.

7.     McDonald reported to George Powell, the Manufacturing Services Business Team Leader.

8.     Prior to 1999, George Bunton, the Union Skilled Trades Committeeman, had the

responsibility to assist in verifying Whitfield's past work experience.  In 1999,

Jerry Donahue took over that role.

### B.   Electrician Job Description

9.     The job description utilized by Navistar for an electrician during the relevant time

period was implemented in 1976, and read as follows:

> Diagnose and correct trouble, repair, overhaul, modify and perform major
> maintenance work on the more complex electronics of industrial machine
> tools and/or Plant equipment. Includes, but not limited to, numerical
> controls of machine tools (tape, etc.) electronic measurements, telemetering,
> automation electronics, solid state controls and devices, semi-conductor
> devices, photo-electronics, electronic transducers, health monitoring
> equipment, analog and digital computers, etc.  Must possess and apply
> knowledge of electronic components and circuits and make mathematical
> computation in diagnosis of malfunctions. Test electronic components and
> circuits to locate defects using instruments such as oscilloscopes, signal
> generators, capacitor checkers, etc. Align, balance and calibrate equipment.
> Calibrate and service electronic testing equipment. In addition to being a
> qualified E-5-B Electrician, the employee must have successfully completed
> a Company approved electronics course of study and/or must have
> demonstrated proficiency in electronic theory and application through
> practical experience. Perform related mechanical and plant electrician
> (E-5-B) work. Direct and instruct helpers, apprentices, and lower classified
> electricians.

Whitfield Ex. 1001.

10.    In McDonald's opinion, the description did not accurately describe the necessary

qualifications for electricians from 1996 forward.

11.    As of 1996, Navistar was using new machinery involving programmable logic

controllers ("PLCs"), robots, and servo systems that did not exist in 1976.

15

C.     **1996 Application**

12.     Whitfield gained experience as an electrician from the Navy during his four-year

commitment in the 1980s.

13.     When that concluded, he worked as an electrician for various employers in

California.

14.     In 1996, Whitfield moved to Indiana, and applied to Navistar for the first time.

15.     Jones, an electrician foreman, contacted Whitfield for an interview.  Soon

thereafter, Whitfield was interviewed by McDonald and Jones.

16.     McDonald did not believe Whitfield had the type of experience Navistar required.

McDonald's impression of Whitfield's resume was that it primarily involved fire

systems, alarm systems, and electrical work.  Navistar electricians, by contrast,

conducted a large amount of work using computer controls and PLCs.

17.     Whitfield did not submit proof of UAW or equivalent journeyman's status.

18.     Whitfield's resume was replete with errors and omissions, including misspellings

and inaccurate dates of employment that did not match up with the verification

letters Navistar received from his past employers.

19.     Still, McDonald was willing to hire Whitfield, so he passed Whitfield's paperwork

to the Union for the Union to verify that Whitfield had the required eight years of

prior employment as an electrician.

20.     Several weeks after Whitfield applied in 1996, Jones contacted the Union Steward

at the time, Bob Barber.  Barber informed Jones the Union was having trouble

16

verifying his work experience, and that Whitfield should continue to work and supplement his experience.

21.    Ultimately, the Union was unable to verify two of Whitfield's former employers and informed McDonald of that fact.

22.    Because the Collective Bargaining Agreement precluded Navistar from hiring a skilled trades applicant absent Union verification of the applicant's qualifications, Navistar did not offer Whitfield a position as an electrician in 1996.

**D.    1997-1998 Submissions**

23.    In 1997, Whitfield submitted a resume to Navistar that the Company date stamped as received April 15, 1997, with additional information regarding his electrician work experience.

24.    Whitfield did not update the resume to correct inaccuracies he had provided as compared with the verification letters he had obtained from his previous employers.

**E.    Whitfield's File Folder**

25.    At some point in 1998, Jones had a discussion with Bunton regarding the Union's verification of Whitfield's experience as an electrician.

26.    Bunton told Jones that the Union was still having trouble verifying Whitfield's past employment, but after Jones reminded Bunton of Whitfield's additional recent experience with Raytheon, and informed him that Whitfield now had a journeyman's card, Bunton said, "I'm going to okay it."  (Tr., Vol. 1 at 166-67).

17

27.     Bunton gave Jones Whitfield's file that had been provided to the Union for

purposes of verifying Whitfield's experience.  Jones took the file to Jeff Thatcher,

Navistar's Human Resources Manager, to notify him that Whitfield had been

"cleared" by the Union.

28.     Jones opened the file and noticed the cover sheet had the word "black" written on

top of it.

29.     Jones asked Human Resources Manager, Jeff Thatcher, why the word "black" was

written in Whitfield's file.

30.      According to Jones, Thatcher responded that it must have been a mistake and that,

maybe, his secretary wrote that.

31.     In addition, Roy Civils, Senior Resources Generalist for Navistar from 1996-1998,

and again in 1999, testified that the Human Resources Department was responsible

for collecting and keeping information on the race of applicants for purposes of

compliance with the reporting requirements of its affirmative action program.

Civils also testified that it would not have been proper for the Union to receive

information regarding the race of an individual applicant.

**F.      1999 Application**

32.     In March 1999, Jones contacted Whitfield to inform him that Navistar was hiring

electricians.  At this time, according to Jones, he was the "acting" general foreman

in McDonald's absence.

33.     Whitfield updated his resume with his employment experience, adding his work

18

experience at Connor Corporation and Lloyd Electric.

34.   Whitfield's updated resume contained the same errors and omissions as the first. In addition, Whitfield provided incorrect addresses for both Connor Corporation and Lloyd Electric, and inaccurate dates of employment specifically with respect to Lloyd Electric.

35.   Whitfield presented an IBEW receipt dated February 28, 1999, purporting to show his journeyman's status.

36.   On March 17, 1999, Whitfield came to Navistar and completed a handwritten application for employment and pre-employment certification forms.

37.   Again, his handwritten application contained many errors and omissions, including inaccurate dates of employment.

38.   Whitfield met with Jones, who took him on a tour of the plant.  During that tour, they ran into Powell.

39.   Powell testified that he had an eight to ten minute casual conversation with Whitfield in his office.  Powell asked Whitfield about his experience as an electrician.

40.   Powell's impression was that Whitfield's background was primarily in installation and construction work, and that Whitfield had little experience with PLCs.

41.   In a subsequent conversation with Jones, Powell informed him that he thought Whitfield was a nice person, but that he lacked experience with PLCs.  PLC experience was important to Navistar because, according to Powell, 80% or 90%

19

of electrical work at the plant involved computer controls.

42. Jones testified that he wanted to hire Whitfield, but that Powell did not because he lacked sufficient computer control experience – i.e., PLC experience.

43. As a side note, Powell, supervisor to both Jones and McDonald, testified that Jones never had authority to hire electricians.  In fact, Powell testified that, even if McDonald was absent and Jones was acting as supervisor, Jones would not have hiring authority.

44. The Union attempted to verify Whitfield's employment.  Donahue, who replaced Bunton, assisted in the process.

45. Donahue sat in while a Union colleague attempted to contact two of Whitfield's prior employers by speaker phone.

46. They could not reach the former employers and therefore, could not verify that Whitfield had the required eight years of experience as an electrician.

47. The Union determined that Whitfield's experience was short by nine months.

48. Donahue testified that during the verification process, he was not aware of Whitfield's race.

49. Jones testified that he had no personal knowledge that anyone from the Union had seen the cover sheet with the word "black" written on it.

50. Whitfield was not offered the position of electrician with Navistar in 1999.

**G.     Other Electricians Hired by Navistar**

51. Between the time Whitfield first applied to Navistar for employment in the fall of

1996 and his last interview at Navistar in March 1999, Navistar hired nine or ten

electricians, only one of which (Donna Jackson) was African American.

52.    The Company hired six additional Caucasian electricians between Whitfield's

second interview in March 1999 and the end of October 2000.

53.    In total, fifteen or sixteen electricians were hired or admitted into the

apprenticeship program subsequent to Whitfield's first employment interview at

Navistar.   In chronological order, the hiring dates of those electricians were as

follows:

| | |
|---|---|
| R.C. Vickers | 9/30/1996 |
| F.E. Anderson | 10/14/1996 |
| D.K. Jackson | 10/28/1996 |
| J.M. Childers | 9/10/1997 |
| G.S. Kientz | 9/10/1997 |
| D.A. Dickison | 5/18/1998 |
| K.E. Weddel | 6/1/1998 |
| J.M. Gammon | 7/27/1998 |
| E.M. Pennington | 8/3/1998 |
| B.D. Yuddzukinas | 10/26/1998 |
| S.W. Barger | 3/29/1999 |
| D.E. Nicholas | 5/24/1999 |
| W.E. Shaw | 7/12/1999 |

K.L. Buckley          8/9/1999

E.S. Sharpnack        9/28/1999

R. Karsten            10/10/2000

54.   There is no evidence in the record concerning the pre-Navistar work history, years

of prior employment, or completion of an approved apprenticeship, for any

electricians hired during the relevant time period.  Whitfield's Exhibit 1010 was

prepared by McDonald from resumes and records of training provided by Navistar

post-hiring.

55.   Jones had no personal knowledge of any electrician hired into the electrical

department at Navistar who did not have eight years prior, verifiable experience or

who had completed an approved apprenticeship.

### III.   CONCLUSIONS OF LAW

1.   To the extent any of the foregoing findings of fact is a conclusion of law, it is

hereby adopted as a conclusion of law.  To the extent any of the conclusions of law

set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2.   A plaintiff claiming race discrimination under Title VII or Section 1981 can prove

his claim under either the direct or indirect method of proof.  *Diaz v. Kraft Foods

Global, Inc.,* 653 F.3d 582, 586-87 (7th Cir. 2011) (Title VII); *Blise v.

Antaramian,* 409 F.3d 861, 866-67 (7th Cir. 2005) (Section 1981).  Here, Whitfield

proceeds under both.

3.   Under the direct method, the plaintiff may show, either through direct or

22

circumstantial evidence, that the employer's decision to take the adverse job action

against him was motivated by a discriminatory purpose.  *Diaz*, 653 F.3d at 587.

4.      "Direct evidence is something close to an explicit admission by the employer that a

particular decision was motivated by discrimination; this type of evidence is rare,

but it 'uniquely reveals' the employer's decision to discriminate."  *Id*.

Circumstantial evidence allows the trier of fact to infer discrimination on the part

of the decision-maker through a chain of inferences.  *Id*.

**A.      Direct Case**

5.      Whitfield argues that he has direct evidence of discrimination based upon the

testimony of Jones, a witness called on his behalf, that the word "black" appeared

on a sheet of paper in the Human Resources file containing Whitfield's application

materials and resume.

6.       More specifically, Jones's testimony as to what he saw when he looked at the file

was as follows:

As I opened the folder, it had a cover sheet in it that said "black" on the top
of it.  I can't remember whether it was stapled or just written across, but it
was kind of like a shock.

(Tr., Vol. 1 at 168).

7.      Whitfield describes Navistar's use of the word "black" on his file as "racial

coding," and refers the court to cases where there was evidence that the employer

used a circle or other identifiable code on applications, thereby discreetly alerting

those in the hiring process to the fact that the applicant was African American.

23

> *See, e.g., Calloway v. Westinghouse Elec. Corp.*, 642 F.Supp. 663, 677 (M.D. Ga. 1986) (using circle in lower lefthand corner of front page of applications to denote African American applicants); *Pate v. Transit Dist.*, 1979 U.S. Dist. LEXIS 9443, at * 14 (N.D. Cal., Sept. 28, 1979) (personnel department race-coded all applications for clerical positions)

8.   Along with other conflicts in Jones's testimony, the court finds that his lack of clarity as to how the word "black" was affixed to a paper in the file cuts against his credibility as a witness.  For example, Jones testified that in 1998, he told Bunton that Whitfield had obtained a journeyman's card, when Whitfield himself confirmed that the card, which is dated and admitted into evidence, was issued in February 1999.  (*Compare* Tr., Vol. 1 at 84, *with* Tr., Vol. 1 at 159).

9.   Setting aside Jones's lack of recollection or clarity as to how the word "black" was affixed to the file papers, there is no additional evidentiary link in this case that would cause the court to find that the existence of the word "black" on a paper in Whitfield's file was an effort to racially code an application.

10.   In addition, there is no evidence of any other applications at Navistar submitted by African Americans having been marked in a similar fashion as Whitfield's.

11.   Use of the entire word "black," if meant to denote race, is not particularly discreet, so as to suggest a nefarious attempt to "code."

12.   Race identification was relevant to the collection of affirmative action compliance data by the Human Resources Department at Navistar, so the mere existence of

racial identification (if indeed the notation existed and that was what it was
intended to represent) is not necessarily an automatic indication of coding or
discrimination.  According to Jones, Thatcher, the Human Resources Manager he
approached regarding the fact that a sheet with the word "black" on it was in
Whitfield's file, stated that it must have been a mistake of some kind and that he
was not aware of any reason why it would have been in the file.  Importantly,
Donahue, the Union official who testified regarding his part in the attempt to
verify Whitfield's experience, stated that he saw nothing in Whitfield's file
indicating his race.

13.     In short, Whitfield has adduced no evidence that would link Jones's testimony
regarding the word "black" written on a sheet in Whitfield's file to an intent on the
part of Navistar to identify his race as a means to discriminate against him.  There
is no evidence that anyone other than Jones saw such a notation, nor evidence that
if it did indeed exist, it was not for the purpose of complying with the affirmative
action "applicant flow" requirements.  Finally, the fact that Jackson, an African
American female electrician, was interviewed and hired by Navistar during the
same time period (1996) that Whitfield first applied, negates any inference that
Navistar failed to hire Whitfield due to his race.

14.     For these reasons, Whitfield's direct case cannot survive.

        **B.      Indirect Case**

15.     As noted above, Whitfield may also use the indirect method of proof to prove his

claim of discrimination.  This method of proof requires him to first establish a prima facie case, consisting of four elements: (1) he was a member of a protected group; (2) he applied for and was qualified for an open position; (3) he did not receive the position; and (4) those who were hired to fill the position were not in the protected group and had similar or lesser qualifications.  *Jackson v. City of Chicago,* 552 F.3d 619, 622 (7th Cir. 2009) (citing *Jordan v. City of Gary, Ind.*, 319 F.3d 825, 833 (7th Cir. 2005)).  Whitfield's case falters on the second element.

16.  Whether a plaintiff has established the second element requires proof that the employer was seeking applicants and, additionally, a two-part analysis of the issue of qualifications: (1) the qualifications the employer requires or prefers, and (2) the qualifications the plaintiff possessed and communicated to the employer.  *See* 1 Lex K. Larson, *Employment Discrimination* §§ 8.02[3], 8.02[4] (2d ed. 2012).

17.  Whitfield elicited testimony from various witnesses that Navistar was hiring throughout 1996 to 2000.  Whitfield also claims that, subsequent to his first application for work at Navistar, he provided the Company with various updates to his resume and additional letters certifying some of his prior work.

18.  Whitfield did not establish, however, exactly when he provided Navistar with updates to his resume and when he provided Navistar with the additional verification letters.  In fact, the exhibits that were admitted into evidence establish that there are only two specific times when Whitfield actually "applied" for work at Navistar; in the fall of 1996 and March of 1999.

26

19. For the reasons explained in Section I.A. of this opinion, any claim Whitfield may have regarding his 1996 application is outside of the statute of limitations.

20. Whitfield nevertheless contends that, after he submitted his resume in 1996 and was turned down for employment, there was an ongoing obligation for Navistar to continue to consider him an applicant for any electrician position that Powell successfully obtained approval to fill.

21. The "continuing violation doctrine" applies to hostile work environment claims, but not to discrete acts of discrimination. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

22. An employment discrimination claim based on an employer's refusal to hire constitutes a discrete act of discrimination. *E.g.*, *Jackson v. City of Chicago*, 552 F.3d 619, 623 (7th Cir. 2009) ("Examples of ... discrete acts [of discrimination] are termination, failure to promote, denial of transfer, [and] refusal to hire.") (internal quotations omitted). Whitfield's "continuing violation" theory has no application to his claims.

23. To be deemed qualified for the position of electrician at Navistar, the applicant must have eight years of verifiable work experience as an electrician or a journeyman's card. Indeed, even Whitfield testified that he knew before he submitted his resume in 1996 that his experience as an electrician would have to be verified.

24. In addition, Jones, McDonald, and Powell testified that much of the electrical work

27

at the engine plant during the relevant time period required a person to work with, or on, PLCs, and that the Company preferred candidates with PLC experience.

25.   Based upon Whitfield Exhibit 1012, which is the best evidence of when open electrician positions were available to be filled, there would have been no electrician position approved for hire after a Caucasian electrician by the name of B.D. Yuddzukinas was hired in October 1998, until late March 1999, near the time Whitfield resubmitted his application.

26.   At that point in time (1999), the record supports the fact that there was a job opening at Navistar, and that Whitfield had a journeyman's card.

27.   The record is unclear who made the ultimate decision not to hire Whitfield in 1999.  Based upon the testimony at trial, the court infers that Jones did not hire Whitfield either because he did not have the authority to do so or, even if he could, he decided not to hire Whitfield in light of Powell's opinion regarding Whitfield's lack of PLC experience.  In either case, it was ultimately Powell's opinion regarding Whitfield's lack of PLC experience that was the driving force behind Navistar's decision not to hire Whitfield.

28.   Moreover, it cannot be ignored that Whitfield's resume, replete with errors making it nearly impossible to verify his work experience, did not help his chances at obtaining an electrician position at Navistar.

29.   Turning now to the fourth element of the prima facie case (similarly situated individuals), Whitfield's Exhibit 1012 indicates that an electrician was hired by

Navistar on March 29, 1999, May 24, 1999, and then again in August, September and October of that year.  The evidence also establishes that none of these electricians were African American.

30.   The fact that other Caucasian applicants for the open electrician position Whitfield sought were hired, when he was not, is insufficient to carry Whitfield's burden in this case.  *Vitug v. Multistate Tax Commission,* 88 F.3d 506, 516 (7th Cir. 1996) ("The simple failure to hire a minority applicant does not, without more, constitute discrimination.").  Instead, to carry his burden, Whitfield needed to also show that these Caucasian applicants who were hired over him were no more qualified than he.  *Jackson*, 552 F.3d at 622.

31.   There is no question from the testimony of several of the witnesses that, in addition to requiring a candidate to have a journeyman's card or eight years of experience as an electrician, Navistar preferred to hire electricians who had PLC experience because that was such a large part of the work performed by an electrician in the plant.  Yet, Whitfield failed to submit any evidence that would allow a fact-finder to find that the persons who were hired, when he was not, were persons with equal or less of this preferred experience.

32.   Without evidence to support a conclusion that these individuals were equally or less qualified, Whitfield has not carried his burden and no further analysis is required.  *Mitchell v. Dutchmen Mfg., Inc.*, 389 F.3d 746, 750 (7th Cir. 2004) ("Failure to satisfy any one element of the prima facie case dooms an employee's

29

retaliation claim.").

33.    Even if he had carried his burden, Powell's explanation of why he told Jones that

he was not impressed with Whitfield's  PLC experience is both believable and a

sufficient non-discriminatory reason for Navistar to have decided not to hire him.

*Stockwell v. City of Harvey*, 597 F.3d 895, 901-02 (7th Cir. 2010) (pretext requires

a showing that "the employer's reason is not credible or factually baseless").

## IV.    CONCLUSION

Whitfield applied for an open electrician position on two occasions: the fall of

1996 and March 1999.  Whitfield's failure to hire claim regarding his first application in

1996 fails for three reasons.  First, it is outside the statute of limitations.  Second,

Jackson, an African American was hired to fill one of the positions open at that time.

Third, the evidence overwhelmingly reflects that the numerous mistakes on Whitfield's

resume were the root cause of Navistar's ultimate decision not to hire him in 1996.

Although Whitfield eventually proved to Navistar that he met the minimum requirements

when he applied in 1999, Whitfield was unable to demonstrate that he had the preferred

experience with PLCs.  His inability to prove that those who were hired were equally or

less qualified than him, dooms his claim.

A separate final judgment shall issue in favor of Navistar and against Whitfield.

**SO ORDERED** this 29th day of March 2013.

 

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

31