UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREG ALLEN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:02-cv-00902-RLY-MJD |
| | ) | |
| INTERNATIONAL TRUCK AND | ) | |
| ENGINE CORPORATION, f/k/a | ) | |
| NAVISTAR INTERNATIONAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DAMAGES**

Plaintiff, Matthew Whitfield, an African-American, first applied for an electrician

position with Defendant, International Truck and Engine Corporation, f/k/a Navistar

International Corporation, in 1996. While the union was initially unable to verify that

Whitfield met the posted job requirements, it ultimately cleared him for hire in September

1998. At some point, a cover page with the word "black" was attached to his application.

In December 1999, Whitfield was unofficially told that Navistar would not hire him.

Navistar hired several white electricians with less experience than Whitfield during this

period.

Whitfield filed suit against Navistar in 2001, alleging that it discriminated in

hiring. He was a co-plaintiff with a certified class of 26 other African-American

employees who only alleged a racially hostile work environment. The court separated

Whitfield's hiring discrimination claim from that class action for trial, and ultimately

found in favor of Navistar. The Seventh Circuit reversed, and, pursuant to that decision, this court held that Navistar was liable to Whitfield for failing to hire him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The court took the issue of damages under advisement and heard oral argument on February 2, 2017.

A district court has "wide discretion" in fashioning remedies to make victims of discrimination whole. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013). *See also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 461 (1975) ("[T]he remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent."). After considering the evidence and the parties' submissions, the court finds that Whitfield is entitled to back pay, a tax-component award, lost pension benefits, prejudgment interest, compensatory damages, and punitive damages.

## I. Limitation for Misrepresentations

At the outset, Navistar alleges that Whitfield's damages should be limited due to misrepresentations and false statements in his applications. Specifically, it asserts that he provided incorrect dates of employment for several employers, and failed to provide any information for others. At trial, Whitfield admitted to making certain errors on his applications, and to signing Navistar's "pre-employment authorization and release" which states, "Falsification or omission of information will result in withdrawal of the application for employment consideration or discharge." (Filing No. 442, Transcript, Volume I ("Tr. I") 124:11-25).

In *McKennon v. Nashville Banner Publ. Co.*, the Supreme Court concluded, "In determining appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee . . . but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." 513 U.S. 352, 361 (1995). *See id.* at 362 ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if . . . the information might have gone undiscovered absent the suit."). Navistar highlights this language and emphasizes that the court should limit Whitfield's damages because he would have been discharged for these misrepresentations. *See Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) ("We know from *McKennon* that after-acquired evidence like this does not bar all relief, although it can limit recoverable damages.").

Importantly though, the *McKennon* Court established a hurdle that an employer must clear before it can invoke this doctrine: "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." 513 U.S. at 362-63. Navistar failed to meet that burden here. The language from Navistar's "pre-employment authorization and release" is relevant, but that alone cannot satisfy the *McKennon* standard. There was no testimony from anyone at Navistar that this boilerplate warning was actually enforced in practice. Moreover, no decision-maker from Navistar testified that Whitfield, in particular, would have been terminated solely because of those errors.

Showing that the decision would have been justified is not the same as proving that the decision would have been made. *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996) ("The inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not.") (*quoted in Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1048 (7th Cir. 1999)).

Accordingly, no limitation is warranted.[1]

## II. Back Pay

Back pay represents the wages a plaintiff would have earned but for the employer's adverse employment decision. In fashioning a back pay award, "[t]he court must 'do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred.'" *EEOC v. Ilona of Hung.*, 108 F.3d 1569, 1580 (7th Cir. 1997) (quoting *United States v. City of Chicago*, 853 F.2d 572, 575 (7th Cir. 1988)). "This process of recreating the past will necessarily involve a degree of approximation and imprecision." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 372 (1977). Recognizing this, the Seventh Circuit has held that "unrealistic exactitude is

---

[1] If a limitation was warranted in this case, it is unclear what form it would take. The *McKennon* Court explained that if the employer satisfies its burden, "neither reinstatement nor front pay is an appropriate remedy" for the employee. 513 U.S. at 362. But neither of those remedies are available here because the Indianapolis plant closed in 2008. For back pay, the court suggested that the employer should only be required to provide back pay "from the date of the unlawful [action] to the date the new information was discovered." *Id.* Unfortunately, Navistar does not explain when it discovered the errors in Whitfield's application materials.

not required" and any "ambiguities in what an employee . . . would have earned but for discrimination should be resolved against the discriminating employer." *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976). *Accord Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 889 (3d Cir. 1984) ("The risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim.").

The parties agree that Whitfield is entitled to back pay, and that the back pay period in this case is May 16, 1998-December 31, 2008. *See Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 442 (7th Cir. 2014). They disagree, however, on the exact amount to be awarded.

**A. Gross Back Pay**

If hired, Whitfield would have been classified as an E84 electrician. At Navistar's Indianapolis plant, all E84 electricians were paid the same hourly rate, regardless of seniority or other factors. (*See* Tr. I 240:5-8). Thus, the disparity in annual earnings among the E84 electricians is attributable solely to the difference in hours worked during the year, principally owing to the desire to work overtime. There is uncontroverted testimony that overtime at the Indianapolis plant was abundant and available to all electricians. (*See e.g., id.* 102:14-19, 183:19-184:12). Accordingly, Whitfield's earnings for each year would have been determined by the extent to which he took advantage of those overtime opportunities.

At trial, Whitfield testified that he would have worked all of the overtime that was available at Navistar, and emphasized that he did not turn down overtime opportunities in his other jobs. (*See e.g., id.* 100:18-101:6). He therefore posits that the court should use

the highest-paid electrician for each year as a comparator. Navistar, on the other hand, advocates for using Mr. Vickers as a comparator because he worked some overtime and he was the first electrician hired after Whitfield initially applied.

Both of these approaches have flaws. First, selecting the highest-paid electrician each year would produce an artificially high award. Notwithstanding Whitfield's testimony, it is simply not reasonable to assume that he would have been the highest earner every single year. Indeed, for the eleven years at issue in this case, the top-earner is different for each year. No single electrician had the highest earnings more than once from 1998 to 2008. This is understandable given that consistently working significant amounts of overtime can take a toll on the body and strain personal relationships.

Similarly, selecting Mr. Vickers as a comparator solely because of his hire date is odd given that the hourly rate for E84 electricians did not depend on seniority. Moreover, his earnings for 2006 and 2008 were unusually low, as compared to his earnings for other years.

The court finds that the most reasonable method of calculating Whitfield's gross back pay is using the average of the gross annual earnings for all electricians who worked overtime for each year. This compromise approach reflects Whitfield's claim that he would have worked significant overtime, but also ensures that he is not put in a better position than he would have been if he had actually been hired. *See Harper v. Godfrey Co.*, 45 F.3d 143, 149 (7th Cir. 1995) ("One purpose of Title VII is to put a plaintiff in the same position he/she would have been in had the discrimination not occurred, not in a better position.").

Unfortunately, that method is unavailable. Following oral argument, the court ordered the parties to jointly submit several charts representing different ways of calculating back pay, including this preferred method. The parties submitted these charts, but Whitfield claims that the wage data used to compute the averages is unreliable due to numerous internal errors and discrepancies (e.g., Curtis Jr. had 1999 Gross Earnings of only $391.85, but overtime pay of $13,125.54).[2] Additionally, he emphasizes that using averages would only be appropriate if the court excluded low-wage outliers, such as individuals who did not work a full year because they quit or were fired (e.g., in 2005, Shake's Gross Earnings were $9.43).

The court therefore finds that using Mr. Vickers' earnings, while not perfect, is the most reasonable method for calculating Whitfield's gross back pay. This is the person Navistar hired in lieu of Whitfield, so it is logical to use him as a comparator. Although Mr. Vickers' earnings for 2006 and 2008 were relatively low, the data reveals that earnings for all electricians were lower in 2006 and 2008. There is no information in the record explaining why this occurred. Most importantly, Whitfield actually suggested using Mr. Vickers as a comparator in his post-trial proposed findings. (*See* Filing No. 462 at 33). His sudden opposition to using Mr. Vickers post-remand is therefore unconvincing.

---

[2] Whitfield argues at length that the wage data is replete with errors, and even suggests that Navistar may have manipulated it prior to production. Yet, despite these "fatal flaws," he continues to advocate for using the highest-paid electrician as a comparator. This is a striking contradiction. Whitfield can only identify the highest-paid electrician and his/her gross earnings by consulting the wage data. Either the data is too flawed to use, or it is not. He cannot have it both ways.

Accordingly, Whitfield's gross back pay for each year is as follows:

| Year | Earnings |
|------|----------|
| 1998 | $47,481.86[3] |
| 1999 | $83,093.55 |
| 2000 | $78,714.30 |
| 2001 | $71,554.36 |
| 2002 | $64,820.38 |
| 2003 | $69,166.58 |
| 2004 | $83,843.55 |
| 2005 | $88,501.75 |
| 2006 | $4,662.72 |
| 2007 | $62,524.60 |
| 2008 | $32,417.88 |
| **TOTAL** | $686,781.50 |

The court must now determine what deductions, if any, are appropriate.

## B.  Period of Disability

Whitfield testified that while his application was pending at Navistar, he obtained employment at Amtrak.  (Tr. I 68:11-17).  He sustained an injury there in February 2002, and remained off of work until September 2004.  (*Id.* 127:11-128:13).  Navistar argues that this period of disability should be excluded from the back pay calculation.  According to Navistar, it is unreasonable to award Whitfield back pay during this time because he was physically unable to work.  Whitfield retorts that he would not have needed to take the job at Amtrak (and therefore would not have been injured there) if Navistar had not discriminated against him in the first place.[4]

---

[3] Whitfield's earnings for 1998 have been reduced from $75,970.98 to $47,481.86 to reflect that the back pay period begins on May 16, not January 1.
[4] Whitfield also alleges that Navistar waived this issue by failing to meaningfully discuss it until its post-liability brief on damages in November 2016.  The court assumes without deciding that Navistar did not waive the argument.

"Generally, a Title VII plaintiff can recover back pay only for the period the plaintiff is 'available and willing to accept substantially equivalent employment' elsewhere; courts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the back pay award." *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999) (quoting *Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir. 1985)). How this rule applies in a case like this–where a plaintiff who was unlawfully denied employment sustains an injury and becomes unable to work while mitigating his damages with a subsequent employer–has not been directly addressed by the Seventh Circuit.

The Federal Circuit's decision in *Martin v. Dep't of the Air Force*, 184 F.3d 1366 (Fed. Cir. 1999), while not precisely on point, is instructive. In *Martin*, the plaintiff was wrongfully terminated from his position as an aircraft mechanic and then later reinstated after appealing to the Merit Systems Protection Board. *Id.* at 1367. Between his removal and reinstatement, he was injured while working as a "wrecker driver/mechanic" with an automobile dealership. Because of that injury, he was physically unable to work for just over one year. *Id.* at 1367-68. The primary issue was whether the plaintiff was entitled to back pay for his period of disability pursuant to the Back Pay Act, 5 U.S.C. § 5596.

In its thorough discussion of the issue, the *Martin* court explained,

> Given that the purpose of the Back Pay Act is to place a wrongfully discharged employee back in the position he would have been in had the termination not occurred and to make the employee whole, equity and reason require that if such an employee is unable to work because of an accident or illness closely related or due to interim employment or arises because of the unlawful discharge, the period of disability should be included in a back pay period.

9

*Id.* at 1372. Because the plaintiff's "injury was closely related to the nature of his interim employment and was not a 'hazard of living generally,'" the court held that he was entitled to back pay for his period of disability. *Id. See Best v. Shell Oil Co.*, 4 F. Supp. 2d 770, 773 (N.D. Ill. 1998) (holding that the plaintiff was entitled to back pay under the Americans with Disabilities Act for a period when he was physically unable to work due to an injury sustained while mitigating damages).

Because Title VII and Section 1981 were also intended to "make the employee whole" and put him "back in the position he would have been in" but for the adverse employment decision, the *Martin* court's analysis applies here. Unfortunately, there is virtually no evidence in the record about Whitfield's injury at Amtrak. The only established facts are that (a) Whitfield "sustained an injury on the job," and (b) he was consequently "off work for two years." (Tr. I 127:11-21). The fact that he was injured "on the job" suggests that the injury was related to the interim employment, but that is not entirely clear. Other facts that are unknown but relevant to this inquiry include (a) whether Whitfield's job at Amtrak required him to perform the same or similar tasks under the same or similar conditions as he would have at Navistar, (b) whether light duty work was available at Amtrak, (c) whether light duty work would have been available at Navistar, and (d) whether Whitfield was physically capable of completing light duty work. Due to the sheer lack of evidence, it is impossible to determine whether the *Martin* standard is satisfied in this case.

The question then is who bears the burden of proving that this type of deduction is warranted. The Seventh Circuit has made clear that "[a] Title VII victim is presumptively entitled to full relief." *Hutchison v. Amateur Elec. Supply*, 42 F.3d 1037, 1044 (7th Cir. 1994) (*quoted in Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004)). Therefore, just as with the affirmative defense of failure to mitigate, an employer must bear the burden of proving that a back pay offset for a period of disability is appropriate. *See Ilona of Hung.*, 108 F.3d at 1580-81 ("If the victim of discrimination comes forward with evidence of the monetary harm that flowed from the employer's unlawful conduct, it is the employer's burden to prove that the victim failed to mitigate her damages *or that the requested damages are otherwise excessive*.") (emphasis added); *Hutchison*, 42 F.3d at 1044 ("Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages *or that damages were in fact less than the plaintiff asserts*.") (emphasis added). To hold otherwise would frustrate the statutory purposes of eradicating discrimination and making discrimination victims whole.

Navistar failed to meet its burden here. Therefore, Whitfield's period of disability shall not be excluded from his back pay award.

### C. Interim Earnings

Whitfield maintains that the court should not consider his interim earnings because Navistar neglected to elicit any testimony regarding those earnings at trial. Since Navistar failed to carry its burden, Whitfield posits that the court should ignore the fact that he was earning an income while attempting to get hired by Navistar, and provide him

with a full salary for each year in the back pay period.  In its Entry on Whitfield's Motion for Entry of Final Judgment, the court noted that, regardless of Navistar's alleged trial error, it was inclined to deduct Whitfield's interim earnings from his back pay award. The court now adopts that advisory ruling as its holding.

Initially, the court recognizes that establishing a plaintiff's interim earnings is generally the responsibility of the employer.  *See Ilona of Hung.*, 108 F.3d at 1580-81; *Hutchison*, 42 F.3d at 1044.  But the court must balance that judicially-imposed burden against the unambiguous language of the statute.  Title VII expressly requires the court to deduct interim earnings from a back pay award: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against *shall* operate to reduce the back pay otherwise allowable."  42 U.S.C. § 2000e-5(g)(1) (emphasis added). *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion.").

More importantly, granting Whitfield's request for back pay would confer an unjust windfall, which runs afoul of Congress' intent.  As already noted, "one of the main purposes of Title VII is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.'"  *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1091 (1983) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)).  Put another way, "The object of Title VII is not to provide plaintiffs with a windfall, but rather to restore them to the position they would have been in but for the wrongful acts of defendants."  *Stephenson v.*

*ALCOA*, 915 F. Supp. 39, 57-58 (S.D. Ind. 1995). The back pay award Whitfield seeks goes far beyond making him whole because he would effectively have earned two salaries for a period of eleven years.

Therefore, the court exercises its discretion and holds that Whitfield's interim earnings must be considered. According to the Social Security Administration, Whitfield's earnings are as follows:

| Year | Earnings |
|------|----------|
| 1998 | $21,607.50[5] |
| 1999 | $37,288.00 |
| 2000 | $30,319.00 |
| 2001 | $35,572.00 |
| 2002 | $5,342.00 |
| 2003 | $0.00 |
| 2004 | $17,518.00 |
| 2005 | $0.00 |
| 2006 | $432.00 |
| 2007 | $28,095.00 |
| 2008 | $47,333.00 |

### D. Failure to Mitigate

In addition to seeking an offset for interim earnings, Navistar maintains that the court should deduct an additional amount because Whitfield was both unemployed and underemployed during the back pay period. "[A] plaintiff alleging employment discrimination generally is required to mitigate damages by making diligent efforts to obtain reasonably comparable employment." *Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016). *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) ("An unemployed or

---

[5] Whitfield's earnings for 1998 have been reduced from $34,572.00 to $21,607.50 to reflect that the back pay period begins on May 16, not January 1.

underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g).").  The employer "bears the burden of proving a failure to mitigate, which entails showing not only a lack of 'reasonable diligence' but also 'a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence.'"  *Brown*, 827 F.3d at 616 (quoting *Hutchison*, 42 F.3d at 1044).  *See Franzen v. Ellis Corp.*, 543 F.3d 420, 429-30 (7th Cir. 2008) ("[A] person discharged--even illegally--cannot simply refuse to seek other employment and expect his former employer to pay his salary until he reaches retirement age.").

At trial, Navistar's vocational expert, Dr. Robert S. Barkhaus, testified that Whitfield "sent out approximately 52 résumés" from January 2005 to May 2007.  (Filing No. 459, Transcript, Volume III 479:20-25).  That equates to approximately two resumes sent per month.  In Dr. Barkhaus' opinion, that constitutes "a very minimal effort" because "a person who's doing a serious job search would have been making at least five to ten contacts a week."  (*Id.* 480:1-10).  (*See* Filing No. 446-2, Expert Report at 8 ("I would also state with a reasonable degree of certainty that based upon the records reviewed that Mr. Whitfield made a very poor attempt to find new employment between January 2005 and May 2007.")).  In his report, Dr. Barkhaus notes that he conducted a job search in December 2011 and found ten positions in the Indianapolis area that "an individual such as Mr. Whitfield should apply for if doing a job search." (*Id.*).  He then explains:

> Based on the unemployment data published by the *Bureau of Labor Statistics*, the unemployment rate for the Indianapolis Region from 2002 to 2007 for the month of October ranged from a high of 4.8% to a low of 3.8%

and an average of 4.4% unemployment. The published unemployment rate for the Indianapolis Region in October 2011 was 8.3% unemployment. Because of the much lower unemployment rate between 2002 and 2007, there is a high probability that the number of job opportunities would have been much greater than what I found in the job search research conducted in December 2011.

(*Id.*).

The report also contains a chart showing the number of electricians employed, their average hourly rate, and their average annual salary, for the Indianapolis area from 1998 to 2010:[6]

| Year | Employed Number | Average Hourly Rate | Average Annual Salary |
|------|-----------------|---------------------|-----------------------|
| 1998 | 5010 | $18.89 | $39,300 |
| 1999 | 2960 | $18.83 | $39,180 |
| 2000 | 3860 | $21.34 | $44,380 |
| 2001 | 3680 | $22.27 | $46,310 |
| 2002 | 3470 | $23.16 | $48,180 |
| 2003 | 3670 | $24.10 | $50,120 |
| 2004 | 4560 | $24.37 | $50,700 |
| 2005 | 4380 | $24.31 | $50,560 |
| 2006 | 4330 | $23.96 | $49,830 |
| 2007 | 4520 | $23.60 | $49,090 |
| 2008 | 5370 | $25.27 | $52,560 |
| 2009 | 3950 | $25.27 | $52,570 |
| 2010 | 3570 | $26.27 | $56,640 |

(*Id.* at 9).

Navistar asks that the court use Dr. Bakhaus' opinion to justify an offset for the entire back pay period. Yet, Dr. Barkhaus did not offer an opinion as to the entire back pay period. As set forth above, in order to succeed on its failure to mitigate defense, Navistar must show that (a) Whitfield did not use reasonable diligence in looking for

---

[6] "This information was obtained from the *Bureau of Labor Statistics*, Occupational Employment Statistics Section published by the United States Government." (*Id.* at 9).

employment, and (b) there is a reasonable likelihood that he might have found comparable work if he had exercised reasonable diligence. *Brown*, 827 F.3d at 616. Dr. Bakhaus only testified about Whitfield's diligence for the January 2005-May 2007 period. (*See* Tr. III 517:8-11 ("Q: [Y]ou have not been given the assignment nor are you offering any opinions on the extent of his job search other than for the period 2005 to 2007; am I correct? A: That is correct.")).

However, Dr. Bakhaus' testimony and report do establish that Whitfield failed to mitigate his damages for the January 2005-May 2007 period. He did not use reasonable diligence in attempting to find employment, and, based on a rational extrapolation of the data, there is a reasonable likelihood that he might have found comparable work if he had exercised reasonable diligence. Whitfield's recoverable back pay must be reduced to reflect his lack of mitigation efforts.

Whitfield opposes a deduction for failure to mitigate for several reasons. First, he asserts that because his application for employment was pending throughout the entire back pay period, his duty to mitigate never attached. In other words, he would only have been required to mitigate if Navistar had officially told him that he was not going to be hired. Whitfield noticeably fails to provide any authority for this argument. Yet, as a general rule, it does seem reasonable to conclude that a plaintiff's duty to mitigate in a failure-to-hire case begins when he is officially denied employment. This case is unique though–Whitfield's application was pending for many years, while most applications remain pending for a matter of days or weeks. Holding that Whitfield was not required to

mitigate his damages during the eleven-year back pay period would produce an unjust result. The court exercises its discretion and rejects this argument.

Second, Whitfield asserts that Dr. Barkhaus expressly testified that he was not offering his opinions to justify a back pay offset. He highlights the following exchange:

> Q: You're not presenting this information then to the Court to suggest that Mr. Whitfield should have an offset to whatever claim for backpay he's making based on these numbers, are you?
>
> A: I'm just -- no, I'm just stating that this is the average wage for electricians in the Indianapolis region during these periods of time.
>
> Q: I think I understand you.
>
> A: Right.
>
> Q: But I want to make sure for the Court that this information is not being presented to justify an offset to any backpay entitlement that Mr. Whitfield might be asserting; am I correct?
>
> A: No, that's correct, yeah.

(*Id.* 525:8-20). But Whitfield overlooks the fact that an expert witness may not necessarily know the precise legal argument his testimony will ultimately support. The fact that Dr. Barkhaus did not realize his opinion would be used to justify a failure to mitigate defense is immaterial. He is not an attorney, and he is not expected to know Navistar's legal strategy. As he explained, he was retained to opine on Whitfield's job search efforts and the employment opportunities during the relevant time period. The court, as trier of fact, determines whether his testimony warrants a back pay offset.

Third, Whitfield avers that Dr. Barkhaus' testimony should be excluded as unreliable pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). He

contends that Dr. Barkhaus' discussion of the overall unemployment rates in Indianapolis and the average salaries for electricians in Indianapolis do not provide "any insight" for the specific group at issue here–African American male electricians. This is because (a) the unemployment rate for African American men is generally higher than the overall unemployment rate, (b) women often earn less than their male counterparts, and (c) African American men often earn less than their white counterparts. Dr. Barkhaus acknowledged these possible sources of error. (Tr. III 520:6-12, 523:23-524:16). These discrepancies show that the data is not perfect, but that does not make Dr. Barkhaus' testimony wholly unreliable under *Daubert*.

As part of this argument, Whitfield also claims that Dr. Barkhaus admitted to having "no knowledge" of what efforts he made during the relevant period to find employment. (*See id.* 522:10 ("I don't know what efforts he did.")). That is false. Putting the carefully-selected excerpt from the transcript in its proper context reveals that Whitfield assigns far too much meaning to it.

> Q: What specific document or documents did you review [in order to conclude that Whitfield was not "utilizing newspaper ads" and making "at least five to ten contacts per week"]?
>
> A: Yahoo! Mail. That's all I used in making this conclusion was the document from Yahoo! Mail and the information published by the Bureau of Labor Statistics.
>
> Q: I see.
>
> Okay. What you mean is a document that was presented to the defendant in response to one of their requests for production to provide whatever documentation he had on his job search for a certain period of time?
>
> A: Yes.

Q: Okay.  All right.  Well, did that document tell you that the listings on that document represented the exclusive efforts that he had undertaken to find a job?

A: I don't know what efforts he did.  All I have is that document to go on; that's it.

Q: And if he testifies that he did other things other than what's listed on that document, then you would have to modify this opinion, wouldn't you?

A: That could change this opinion, yes.

(*Id.* 521:22-522:15).  As the full exchange reveals, Dr. Barkhaus was trying to convey that he was unaware of any job search efforts *outside of those listed in the document he was given*.  He did not literally mean that he was unaware of Whitfield's efforts, as he had already testified about the number of resumes Whitfield submitted.  (*See id.* 479:23-25).

Notably, Whitfield's counsel did not go on to discuss Whitfield's other job search efforts with Dr. Barkhaus.  Moreover, it is not clear that Whitfield actually did make efforts not listed in that document.  He fails to point to any testimony suggesting that.  The court will not disregard Dr. Barkhaus' opinion merely because he *might* have been given incorrect information.

The court must therefore determine what amount to deduct for Whitfield's failure to mitigate.  Using the average annual salaries set forth in Dr. Barkhaus' report is reasonable.  While they may not be perfect representations of what Whitfield could/should have earned, the chances of the numbers being too high (due to a failure to account for race) or too low (due to a failure to account for sex) likely balance each other

out. Additionally, Whitfield failed to provide an alternative method for calculating these figures. The court will deduct the average salaries for 2005 ($50,560.00) and 2006 ($49,830.00) from his gross back pay award. No deduction shall be made for 2007 because Dr. Barkhaus only reviewed Whitfield's job search efforts for January to May of that year. Whitfield's search for employment concluded because he began working for St. Vincent's Hospital on or about May 14, 2007.

Title VII requires the court to deduct *either* "[i]nterim earnings or amounts earnable with reasonable diligence," 42 U.S.C. § 2000e-5(g)(1), but not both. Accordingly, these amounts for 2005 and 2006 shall replace Whitfield's actual earnings for those years. A chart showing the final deductions for each year follows:

| Year | Deduction |
|------|-----------|
| 1998 | $21,607.50 |
| 1999 | $37,288.00 |
| 2000 | $30,319.00 |
| 2001 | $35,572.00 |
| 2002 | $5,342.00 |
| 2003 | $0.00 |
| 2004 | $17,518.00 |
| 2005 | $50,560.00 |
| 2006 | $49,830.00 |
| 2007 | $28,095.00 |
| 2008 | $47,333.00 |
| **TOTAL** | $323,464.50 |

**E. Net Back Pay**

Accordingly, Whitfield is entitled to a net back pay award of $363,317.00 [686,781.50 - 323,464.50].

### III. Tax-Component Award

In order to avoid an erosion of his back pay amount, Whitfield is entitled to a tax component award–an additional amount intended to relieve the increased tax burden incurred by receipt of a large lump sum payment. In 2015, after the trial occurred in this case, the Seventh Circuit recognized for the first time the appropriateness of a tax component award in a Title VII case. *See EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015). As the appellate court explained:

> Today, we join the Third and Tenth Circuits in affirming a tax-component award in the Title VII context. Upon Miller's receipt of the $43,300.50 in back pay, taxable as wages in the year received, Miller will be bumped into a higher tax bracket. The resulting tax increase, which would not have occurred had he received the pay on a regular, scheduled basis, will then decrease the sum total he should have received had he not been unlawfully terminated by Hospitality. Put simply, without the tax-component award, he will not be made whole, a result that offends Title VII's remedial scheme.

*Id.* (citation omitted).

Whitfield is hereby granted leave to file a computation showing the increased tax burden he will incur as a result of the back pay amount awarded herein. A briefing schedule is included in the conclusion of this Entry.

### IV. Lost Pension Benefits

The parties agree that Whitfield is entitled to recover lost pension benefits in the amount of $23,000.00.

### V. Prejudgment Interest

"Prejudgment interest 'is simply an ingredient of full compensation that corrects judgments for the time value of money.'" *Pickett v. Sheridan Health Care Ctr.*, 813 F.3d

640, 646 (7th Cir. 2016) (quoting *Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1123

(7th Cir. 1998)).  It ensures that a plaintiff is fully compensated for his loss by putting

him in the position he would have been in had he been paid immediately.  *Am. Nat'l Fire*

*Ins. Co. v. Yellow Freight Sys.*, 325 F.3d 924, 935 (7th Cir. 2003).  Furthermore, an

award of prejudgment interest ensures that Navistar does not benefit from what amounts

to an interest-free loan obtained as a result of illegal activity.  *See Gorenstein Enters. v.*

*Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("[P]rejudgment interest

should be presumptively available to victims of federal law violations.  Without it,

compensation of the plaintiff is incomplete and the defendant has an incentive to delay.").

Whitfield is therefore entitled to prejudgment interest on his back pay award.

Courts in the Seventh Circuit typically apply the average prime rate and compound

interest either annually or monthly.  *See e.g., Smith v. Farmstand*, No. 11-cv-9147, 2016

U.S. Dist. LEXIS 140460, at *74 (N.D. Ill. Oct. 11, 2016) (monthly); *Heyne v. Nick's*

*Am. Pancake & Cafe, Inc.*, No. 3:11-CV-305 JD, 2013 U.S. Dist. LEXIS 162891, at *19

(N.D. Ind. Nov. 15, 2013) (annually).  In this case, the parties both advocate for the same

approach–using a simple interest formula with no compounding.  The formula is:

prejudgment interest = (p) x (r) x (n)

p – principal (net back pay + pension)

r – average prime rate

n – number of years

The parties slightly disagree as to the value the court should use for the interest

rate and the number of years.  Navistar claims that the average prime rate for the period at

issue is "approximately 5%," and Whitfield submits a more exact figure of 5.22%. The court has conducted an independent calculation based upon data available from the Federal Reserve, and finds that the average prime rate is 5.22%. Of the two figures proposed for the years value (17.5 from Navistar, and 18.5 from Whitfield), the court agrees that 18.5 is the proper number.

With those disputes resolved, the calculation is straightforward:

$$\text{prejudgment interest} = (\$363,317.00 + \$23,000.00) \times 5.22\% \times 18.5$$

$$\text{prejudgment interest} = \$373,066.30$$

Whitfield is therefore entitled to $373,066.30 in prejudgment interest.

### A. Failure to Prosecute

Navistar argues that the court should deduct four years of prejudgment interest for Whitfield's failure to prosecute his claim from June 2007 to May 2010 and July 2014 to June 2015. Whitfield shows that there was no failure to prosecute this action through his attorney's sworn declaration, (Filing No. 535-2, Declaration of Samuel Fisher (discussing the June 2007-May 2010 period)), and his briefing on other motions, (Filing No. 487, Response in Opposition to Motion for Status Conference at 2; Filing No. 495, Reply in Support of Motion for Entry of Final Judgment at 11 (both discussing the July 2014-June 2015 period)). Therefore, no deduction is appropriate.

### VI. Compensatory Damages

A plaintiff can recover compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). At trial, Whitfield testified that he

23

was humiliated and embarrassed when he realized that he was not going to be hired at Navistar. (Tr. I 102:20-24). Based on what Navistar officials told him during the interviews, he told his peers and family that he would be working at Navistar. (*Id.* 103:2-9). He felt that he had let other black electricians, like Freeman Young, down by not getting hired. (*Id.* 103:21-104:2). This testimony went unchallenged by Navistar.

The court finds that Whitfield's testimony is sufficient to support a modest award of compensatory damages. However, the award in this case has a low ceiling because (a) Whitfield's testimony on this subject was brief and conclusory, (b) he did not testify that the embarrassment and humiliation was long-lasting, (c) he did not claim that he suffered in any physical way (e.g., vomiting, weight loss, or difficulty sleeping), and (d) he did not seek the care of any medical professional or pursue counseling. To be clear, none of these facts wholly preclude a compensatory damage award. *See e.g., Farfaras v. Citizens Bank & Tr.*, 433 F.3d 558, 566 (7th Cir. 2006) ("Medical support is not necessary to prove emotional injury in a Title VII case."); *Deloughery v. City of Chi.*, 422 F.3d 611, 620 (7th Cir. 2005) ("[The plaintiff's] testimony was succinct and to the point; however, brevity and self-control in a judicial proceeding need not be interpreted as a weak case . . . ."). Rather, they serve as limiting factors.

An award of $12,000.00 for compensatory damages is reasonable under the facts of this case. This sum comports with amounts awarded in other cases in this circuit. *See e.g., Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 391 (7th Cir. 2011) (reducing compensatory damage award of $200,000 to $30,000 due to "the absence of stronger evidence of long-lasting emotional harm to plaintiff" despite the plaintiff having

been subjected to racist rants and feeling "devastated" after being terminated); *Pickett v. Sheridan Health Care Center*, 610 F.3d 434, 446 (7th Cir. 2010) (upholding award of $15,000 where the plaintiff testified that she was very upset by how she was treated, felt embarrassed, and nearly became homeless as a result of the discriminatory discharge); *Marion Cty. Coroner's Office v. EEOC*, 612 F.3d 924, 931 (7th Cir. 2010) (reducing award of $200,000 to $20,000 because "[t]he testimony on Linehan's suffering was extremely brief and only indicated that Linehan had undergone weekly therapy sessions for several months for situational depression") (quotation marks and some brackets omitted); *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004) (finding that district court did not err in reducing jury's compensatory damage award from $100,000 to $27,000 where plaintiff testified to "nontrivial symptoms of anxiety and other forms of emotional distress" due to belated promotion). *See also Chandler v. Meetings & Events Int'l, Inc.*, No. 3:13-cv-200-WGH-WTL, 2016 U.S. Dist. LEXIS 6388, at *7-8 (S.D. Ind. Jan. 20, 2016) ("I have reviewed the compensatory damage awards previously given in employment law cases in the Southern District of Indiana. Looking at cases where a jury awarded damages that were entered as final judgment without adjustment, the awards range from $5,000 to $35,048.30.").

## VII. Punitive Damages

"A complaining party may recover punitive damages in a Title VII case by demonstrating that the employer 'engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir.

2016) (quoting 42 U.S.C. § 1981a(b)(1)) (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999)). "[A] positive element of conscious wrongdoing is always required," *Kolstad*, 527 U.S. at 538, but "evidence of 'egregious' or 'outrageous' conduct" is not. *May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2012).

Whether to award punitive damages in this case presents a difficult question. On one hand, Whitfield failed to identify the decision-maker at Navistar who was ultimately responsible for the refusal to hire him. He cannot, therefore, argue that that individual acted with malice or reckless indifference to his rights. Additionally, the facility at which Whitfield sought employment has been out of business for over seven years. This means that any attempt to deter future discriminatory conduct at that site specifically would be futile. Finally, the court decided in its Entry on Whitfield's Motion for Entry of Final Judgment to exclude the evidence from the class action trial. This means that the disturbing evidence of racial hostility at the plant (nooses, graffiti, slurs, etc.) cannot be considered.

On the other hand, Whitfield points to a consent decree from the 1970s that focused on confronting and correcting racial discrimination in hiring at Navistar. Freeman Young, one of the first African American electricians hired at the Indianapolis plant, testified that he was initially rejected from the apprenticeship program at Navistar. (Tr. I 235:9-11). He was not offered a position until after he filed a charge with the Equal Employment Opportunity Commission ("EEOC"), which resulted in a consent decree by Judge S. Hugh Dillon of this court. (*Id.* 235:4-8, 236:22-237:2, 237:16-18, 238:4-18). That consent decree required Navistar "to set up a minority list and majority list so as

they brought apprentice[s] in, they would alternate one to the other." (*Id.* 238:6-10).

Whitfield suggests that Navistar violated this consent decree by failing to hire any African American electricians from approximately 1974 to 1998. That may be true, but it would be improper for this court to punish Navistar for violating a consent decree from a different case. It would be more appropriate for Young to file a motion under the original cause number. Nonetheless, this consent decree is still relevant to the punitive damages inquiry in this case–it serves as evidence that the decision-makers at Navistar were familiar with the anti-discrimination laws but nonetheless ignored them when Whitfield applied. This constitutes reckless indifference to federally-protected rights.

After careful review of the evidence and the Supreme Court's guidance in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (establishing a framework for determining whether a punitive damages award violates due process), the court now holds that Whitfield is entitled to punitive damages in the amount of $106,250.00. This represents a $10,000.00 penalty for each year Whitfield was not hired during the relevant period.

**VIII. Conclusion**

Therefore, Whitfield is entitled to damages in the following amounts:

| Damages Element | Amount |
|---|---|
| Pension | $23,000.00 |
| Back Pay | $363,317.00 |
| Prejudgment Interest | $373,066.30 |
| Tax Component | TBD |
| Compensatory Damages | $12,000.00 |
| Punitive Damages | $106,250.00 |

Whitfield is **ORDERED** to file a computation of his requested tax component award within fourteen days of the date of this Entry. If Navistar objects to the amount, it may file a response brief within seven days. Any reply must be filed within three days of the response. The court shall enter final judgment after reviewing those submissions.

**SO ORDERED** this 18th day of April 2017.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.